# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

|  |  |
|---|---|
| e-ventures Worldwide, LLC,<br><br>          Plaintiff,<br><br>     v.<br><br>GOOGLE INC.,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 2:14-cv-00646-JES-CM

## GOOGLE'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

DAVID H. KRAMER (*pro hac vice* application pending)
COLLEEN BAL (*pro hac vice* application pending)
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300

NATHAN BERMAN, Fla. Bar No. 0329230
Zuckerman Spaeder LLP
101 East Kennedy Blvd.
Suite 1200
Tampa, FL 33602
(813) 221-1010

BRIAN M. WILLEN (*pro hac vice* application pending)
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
(212) 497-7700

*Counsel for Google Inc.*

4684580.1

Defendant Google Inc. ("Google") submits this opposition to the motion of Plaintiff e-ventures Worldwide LLC ("e-ventures" or "Plaintiff") for a preliminary injunction.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In seeking a preliminary injunction, Plaintiff asks this Court to do something unprecedented—dictate to an Internet search engine the contents of its search results. The relief that e-ventures demands is barred by the First Amendment and by federal law, and Plaintiff does not come close to carrying the heavy burden needed to justify such an extraordinary and drastic remedy.

The most basic question for any search engine is what websites to include in search results and how to rank the sites that appear. Google's search results represent its constitutionally protected opinion about what sites are most responsive to users' queries. Integral to those determinations are Google's efforts to protect the integrity of its results against those who seek to manipulate them for their own gain. Such manipulations (which Google often refers to as "spam" or "webspam") are common. The problem and the steps Google takes to combat it are clearly explained on Google's website:

> Ever since there have been search engines, there have been people dedicated to tricking their way to the top of the results page. This is bad for searchers because it means more relevant websites get buried under irrelevant results, and it's bad for legitimate website owners because their sites become harder to find. For these reasons, we've been working since the earliest days of Google to fight spammers, helping people find the answers they're looking for, and helping legitimate websites get traffic from search. Our algorithms are extremely good at detecting spam, and in most cases we automatically discover it and remove it from our search results. However, **to protect the quality of our index, we're also willing to take manual action to remove spam from our search results**.

Declaration of Brandon Falls ("Falls Decl.") ¶ 8; *id.* Ex. A at 11-12 (emphasis added).

This is what happened here. Using its expertise in detecting manipulations, Google determined that e-ventures was engaged in a wide-ranging scheme to artificially boost the appearance of its network of websites in Google's search engine. To ensure the quality of its service, Google decided to remove e-ventures' websites from search results. That determination was not made lightly. It was based on

4684580.1

established—and widely publicized—guidelines that explain the practices that may lead Google to take manual action against search-manipulation schemes. Plaintiff was well aware of these guidelines. Over the years, Google has warned e-ventures about its manipulations and repeatedly taken action against its sites. But those warnings went unheeded, and Google was ultimately compelled to do something more significant. Google explained to e-ventures why its sites were removed and has given it ample opportunity to correct those problems. And, where Plaintiff has cured the violations Google identified, its sites have been restored. Apparently dissatisfied with this remedial process, Plaintiff now tries to replace it with a preliminary injunction. But Plaintiff's effort to use the courts to second-guess Google's editorial judgments is entirely improper.

First and foremost, the mandatory injunction that Plaintiff seeks violates the First Amendment. By forcing Google to include e-ventures' websites in its search results, an injunction would compel Google to speak in ways that contradict its considered opinion about the value of those sites. The First Amendment does not allow such compulsion. Beyond that, Plaintiff has no likelihood of success on the merits. Plaintiff's claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is precluded by federal law. The Communications Decency Act ("CDA") rules out any effort to hold an online service liable under state law on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be … objectionable." 47 U.S.C. § 230(c)(2). That is precisely what Google did here. The FDUTPA claim also fails of its own accord, as Google engaged in no deceptive or unfair conduct. Google has been transparent about its guidelines for removing manipulative websites from search results, and it explained clearly to e-ventures why its sites were removed. And Google's actions were not remotely "unfair." Removing e-ventures' websites was an appropriate step to protect Google's search engine and its users against Plaintiff's deceptive schemes.

Plaintiff also cannot make any of the other showings required for a preliminary injunction. It offers no actual evidence of irreparable injury caused by Google's removal of its websites from search

results. Indeed, e-ventures concedes that it has no such evidence. Plaintiff also ignores the significant harm that Google would suffer by being compelled to include e-ventures' websites. Not only would that impair Google's First Amendment rights, it would make its search results less trustworthy, diluting the integrity of one of the company's most important services. Finally, an injunction is contrary to the public interest. Google takes manual action against sites like e-ventures to protect its users (who want relevant search results) and legitimate website operators (who do not want their sites buried under an avalanche of useless results). Plaintiff's injunction would disserve the interests of all those people.

## FACTUAL BACKGROUND

### A.     Google's Search Engine

Anyone with an Internet connection has free access to Google's search engine. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1155 (9th Cir. 2007). Users enter search queries of their choosing, and the search engine responds with a ranked list of websites and other responsive data. Falls Decl. ¶ 2. These results and the particular order in which they appear are generally determined by algorithms that are proprietary to Google. Those algorithms are designed in a way that, in Google's judgment, will provide users with information that is most relevant to their queries and best serves their needs. *Id.* ¶ 3; *see generally Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999). Ensuring the quality of its search results is of paramount importance to Google. Falls Decl. ¶ 4. By returning useful results, Google enables its users to readily find the information that they are seeking on the Internet and helps high quality websites find an audience for their content. *Id.* ¶ 4. By consistently generating search results that meet users' needs and expectations, Google's search engine has become popular. But there are plenty of alternatives, and users can readily switch between search engines. Thus, it is essential for Google to maintain its users' trust by continuing to return quality results. *Id.* ¶ 4.

### B.     Google's Guidelines for Combatting Search-Engine Manipulation

An important part of Google's quality-assurance process is protecting against search engine manipulation. Falls Decl. ¶ 5. Third-parties often try to trick Google's search algorithms into ranking

certain webpages higher in search results than they would otherwise be ranked based on their content and popularity. Google takes this problem seriously, has detailed guidelines to combat it, and devotes significant resources to mitigating it. Those guidelines set out the kinds of actions Google deems manipulative and describe the remedial actions Google takes against those it determines are engaged in manipulation. Website operators found to have violated Google's guidelines can have their sites demoted in search results and, in more serious cases, may be excluded from Google search results altogether. *Id.* ¶ 7. Google can apply these actions to individual websites or pages, but broader action is warranted in some instances. To that end, Google may identify a network of related websites so that it can respond where a manipulation scheme involves an entire network (often acting in a coordinated way), rather than just a few sites. *Id.* ¶ 22.

Google's anti-manipulation policies are designed to ensure the quality of its search results. They protect Google's users and the public by ensuring that searchers get the best results and that higher-quality websites don't lose out to those trying to game the system. *Id.* ¶ 7. Although application of these guidelines is critical to the integrity of search results, Google does not take action against websites on a whim. It carefully gathers evidence of possible violations, goes through an internal process that often includes approval from senior employees, and allows affected sites to seek reinstatement. *Id.* ¶¶ 21, 24.

While the ultimate application of Google's guidelines is necessarily done in private, the existence and nature of these guidelines are well documented. Contrary to what Plaintiff suggests (Motion For Preliminary Injunction ("PI Mot.") at 6-8), Google provides extensive public information about the fact that it will manually remove websites that seek to manipulate search results and about the criteria it uses to make those determinations. Falls Decl. ¶¶ 8-10. An entire section of Google's website (its "Webmaster Guidelines") is devoted to explaining these guidelines. Just by way of example:

- "While Google relies on algorithms to evaluate and constantly improve search quality, we're also willing to take manual action on sites that use spammy techniques, such as demoting them or even removing them from our search results altogether" (*id.*, Ex. A);

- "[W]e strongly encourage you to pay very close attention to the "Quality Guidelines," which outline some of the illicit practices that may lead to a site being removed entirely from

4684580.1

the Google index or otherwise impacted by an algorithmic or manual spam action." (*id.* ¶ 9, Ex. A).

The Webmaster Guidelines also give specific examples of the kinds of manipulations that may lead to manual action. *Id.* ¶¶ 9-11, 13, 15-16, 18-20; Ex. A. These schemes are used to deceive search engines, and they harm Google's users by directing them to lower-value, less relevant websites. *Id.* ¶ 8.[1] Google thus makes clear to website operators that their sites are subject to removal from search results if they engage in such tactics. *Id.* ¶¶ 8, 10, Ex. A. At the same time, Google explains that the specific violations described in the Guidelines are not exhaustive: "These quality guidelines cover the most common forms of deceptive or manipulative behavior, but Google may respond negatively to other misleading practices not listed here. *It's not safe to assume that just because a specific deceptive technique isn't included on this page, Google approves of it.*" *Id.* Ex. A at 3 (emphasis added).[2]

### C. Application of Google's Anti-Manipulation Guidelines to Plaintiffs' Websites

This case involves a routine application of Google's anti-manipulation guidelines to e-ventures' network of websites. Plaintiff has a long history of schemes aimed at gaming search engines. Google has tried to address those problems as they arose in the last decade, and it previously took other actions, such as demoting certain e-ventures' sites in search results. Falls Decl. ¶ 28. Google first took action with respect to e-ventures in 2005; since then, Google has had to investigate e-ventures multiple times for search manipulation, resulting in 16 separate remedial actions just in the past two years. *Id.*

---

[1] The use of these tactics may lead Google to determine that sites are "pure spam," a term clearly explained in the Guidelines: "If you see this message on the Manual Actions page, it means that Google has detected that some of your pages may be using techniques that are outside our Webmaster Guidelines. The site appears to use aggressive spam techniques such as automatically generated gibberish, cloaking, scraping content from other websites, and/or other repeated or egregious violations of Google's quality guidelines." Falls Decl. Ex. A at 14.

[2] Google's manipulation guidelines are distinct from its policies for removing information from search results that is illegal or violates third-parties' rights. Those content policies, which are designed primarily to allow third-parties to request the removal of particular search results, relate to such issues as copyright infringement and privacy violations. While these policies serve important goals, they are separate from Google's efforts to protect the integrity of its search results from search-engine manipulation. Falls Decl. ¶ 27.

4684580.1

The latest problems came to a head this fall, when Google's team fighting search manipulation identified multiple instances of webspam on sites associated with e-ventures. Google launched an investigation, which revealed widespread violations. *Id.* ¶¶ 30-35. Because the manipulations were so significant and involved so many sites (often acting in concert), Google decided to treat e-ventures' collection of websites as a single network. Such grouping allows Google to use its resources more efficiently to protect users from schemes involving large numbers of low-quality sites. *Id.* ¶ 22.

Three of Plaintiff's violations were especially significant: (1) the widespread use of "scraped" content (material pulled from higher-ranked sites to artificially increase the visibility of lower-ranked sites); (2) "link schemes" (unnatural links to or from a website aimed at tricking Google's search algorithms into ranking the site as more popular than in fact it is); and (3) "doorway" or "duplicate" domains (low-quality or duplicate pages designed to mislead searchers by funneling them to a single destination or to over-represent a given operator's pages in search results). *Id.* ¶ 30. For instance, as e-ventures admitted, a single one of its sites housed over 18,000 scraped articles, 46,000 scraped press releases, and 28,126 scraped job listings. *Id.* ¶ 34, Ex. G. Google also determined that e-ventures was engaging in link schemes across numerous websites in order to boost its search rankings. *Id.* ¶¶ 31-32. In one particularly egregious version of that scheme, e-ventures adopted expired domains from legitimate websites and replaced these sites' content with inorganic links to e-ventures' other sites. *Id.* ¶ 32. In addition, nearly 200 of the sites in Plaintiff's network were duplicates of one another, designed to artificially capture search traffic and direct it to e-ventures' network. Google's public-facing guidelines prohibit such manipulations and promise action against operators that use them. *Id.* ¶¶ 8-19; Ex. A.[3]

Based on these violations (and Plaintiff's long history of search engine manipulation), e-ventures' websites were removed from Google's search results on September 18. *Id.* ¶ 38-39. Google believed that taking action against Plaintiff's entire network was needed to halt its far-reaching scheme

---

[3] In early September, while this investigation was going on, and Google was preparing to take action against Plaintiff's network, Google received an independent tip that corroborated its own findings. Falls Decl. ¶ 37.

and to prevent e-ventures from migrating its content to other sites (a tactic used to evade manual removal actions known as "domain hopping"). *Id.* ¶ 39.[4] The same day, Google notified Plaintiff about the removals. Indeed, because e-ventures had registered many of its websites with Google, it received notice directly though Google's "Webmaster Dashboard" interface, which allows site operators to get information about their pages' performance in Google's search engine. *Id.*

Contrary to what Plaintiff now claims (PI Mot. at 5-6, 9), Google has explained in detail to e-ventures why its sites were removed and the steps Plaintiff would need to take to have them restored through Google's reconsideration process. Falls Decl. ¶¶ 39, 43-45, Exs. I, L. And, in fact, Plaintiff has fixed a number of the problems that Google identified. *Id.* ¶¶ 44, 47. Based on Plaintiffs' remedial actions to date, Google has restored more than a dozen of e-ventures' sites to search results. *Id.* ¶ 44, Exs. G, I, J, K. But not all of Plaintiff's reconsideration requests have been equally valid. Where the changes that e-ventures has made fall short of Google's standards (as was the case for some 200 sites that Plaintiff submitted last week), Google has denied Plaintiff's requests. *Id.* ¶ 45. Google has legitimate reasons for rejecting those requests, which were explained to e-ventures and in the accompanying declaration. *Id.* Even though Google's internal remediation process has worked, e-ventures now seeks to circumvent it with this motion for a preliminary injunction.

## ARGUMENT

## I.   THE FIRST AMENDMENT BARS AN INJUNCTION COMPELLING GOOGLE TO INCLUDE PLAINTIFF'S WEBSITES IN ITS SEARCH RESULTS

Plaintiff seeks an injunction requiring Google to include e-ventures' websites in search results. But search results are protected speech, and Plaintiff's demand runs headlong into the "basic First

---

[4] Google's concerns were justified. In early October, Google discovered that Plaintiff had created new sites that appeared to be placeholders to allow e-ventures to engage in domain hopping. Falls Decl. ¶ 42 . As part of its ongoing efforts to clean up e-venture's network, Google removed these sites from its search results. *Id.* This accounts for the removal of the low-quality "test domain" referenced in Plaintiff's motion (PI Mot. at 3).

Amendment principle" that "freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l. Dev. v. Alliance for Open Soc'y Intl., Inc.*, 133 S. Ct. 2321, 2327 (2013).

### A.      Compelled Speech Violates The First Amendment

The "First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796-97 (1988) (emphasis omitted). "Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views." *United States v. United Foods*, 533 U.S. 405, 410 (2001).

Applying this rule, the Supreme Court has repeatedly invalidated efforts to require private parties to speak in particular ways or transmit others' messages. *See, e.g.*, *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) (parade organizers cannot be compelled to include marchers whose message the organizers did not wish to convey); *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1 (1986) (utility company cannot be required to transmit speech from a third party with which it disagreed); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) (newspaper cannot be required to provide space for political candidates to respond to editorials).

Two key principles emerge from these cases. First, "the Government may not interfere with the editorial judgments of private speakers on issues of public concern—that is, it may not tell a private speaker what to include or not to include in speech about matters of public concern." *Zhang v. Baidu.com, Inc.*, No. 11-civ-3388, 2014 U.S. Dist. LEXIS 41439, at *10 (S.D.N.Y. March 27, 2014) (applying this rule to Internet search engine); *Tornillo*, 418 U.S. at 258 (First Amendment protects publishers from interference with their "exercise of editorial control and judgment"). Second, speakers cannot be forced to carry or associate themselves with other people's views, especially those that conflict with their own. As the Supreme Court explained, "when dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised." *Hurley*, 515 U.S. at 576.

**B.      Google's Search Results Are Protected By The First Amendment**

These principles stand in the way of any effort to force search engines to include particular information in their search results. The "creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011). Search results involve exactly that. In presenting those results, a search engine is disseminating information about the contents of various websites and expressing its opinions about which sites are most likely to be most relevant responses to users' queries. Falls Decl. ¶ 3. Those editorial judgments are protected by the First Amendment, no less than "the newspaper editor's judgment of which wire-service stories to run and where to place them in the newspaper, the guidebook writer's judgments about which attractions to mention and how to display them, and Matt Drudge's judgments about which stories to link and how prominently to feature them." *Zhang*, 2014 U.S. Dist. LEXIS 41439, at *12.

Every court that has addressed the issue has held that search engines have a First Amendment right to decide what information to include in—and exclude from—their search results. *See id.*, 2014 U.S. Dist. LEXIS 41439, at *13-14 ("When search engines select and arrange others' materials, and add the all-important ordering that causes some materials to be displayed first and others last, they are engaging in fully protected First Amendment expression.") (internal quotation marks omitted); *Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457-M, 2003 U.S. Dist. LEXIS 27193, at *11-12 (W.D. Okla. 2003) (search results are "opinions of the significance of particular web sites as they correspond to a search query" and are entitled to "full constitutional protection").

Two cases involving Google itself are directly on point here. In *Search King*, the plaintiff alleged that Google "maliciously" diminished its rank in search results "because Google learned that [plaintiff] was competing with Google." 2003 U.S. Dist. LEXIS 27193, at *4. The court dismissed the claim, holding that Google's search rankings were protected speech and that Google was immune from tort liability for ordering its search results at it did. *Id.* at *12. Similarly, *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622 (D. Del. 2007), rejected on First Amendment grounds an injunction requiring Google and other

search engines to "place Plaintiff's ads for his websites in prominent places on their search engine results." *Id.* at 629. Echoing the claim made in this case, the plaintiff in *Langdon* contended that Google's decision to remove his material from search results was "fraudulent, arbitrary, and punitive." *Id.* at 627. Nevertheless, the court held that "the injunctive relief sought by Plaintiff contravenes Defendants' First Amendment rights." *Id.* at 630. Such relief would have violated the First Amendment by compelling Google "to speak in a manner deemed appropriate by Plaintiff and would prevent Google from speaking in ways that Plaintiff dislikes." *Id.* at 629.[5]

### C.     Plaintiff's Proposed Injunction Violates The First Amendment

Under these principles, the injunction that e-ventures seeks here is impermissible. Just as a newspaper cannot be ordered to publish particular articles, Google cannot be ordered to include items in its search results. In *Passaic Daily News v. NLRB*, 736 F. 2d 1543 (D.C. Cir. 1984), for example, the D.C. Circuit invalidated an NLRB injunction that required a newspaper to publish a particular employee's column. The court explained that the order impermissibly "invites the Board to review the Company's publication standards and to become directly involved with the Company's exercise of editorial control and judgment." *Id.* at 1559. The order amounted to "an express and implied command that the press publish what it prefers to withhold." *Id.* (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)). That remedy had to "yield to the Company's First Amendment interest in retaining control over prospective editorial decisions." *Id.* The same is true here. Google's decision to exclude e-ventures' websites from search results reflects its editorial decision about what information to include in its search engine for the interest and benefit of its users. Falls Decl. ¶ 3. Plaintiff's proposed injunction would undo that decision and require Google to publish information that it has determined should be

---

[5] The court in *Zhang* built upon these rulings in holding that the First Amendment shielded Baidu (a "search engine akin to Google") from a suit seeking to hold it liable for blocking information about the democracy movement in China. *Zhang*, 2014 U.S. Dist. LEXIS 41439, at *1-2. The court explained that "there is a strong argument to be made that the First Amendment fully immunizes search-engine results from most, if not all, kinds of civil liability and government regulation." *Id.* at *11.

excluded. That is a direct intrusion into the "editorial control and judgment" at the heart of the First Amendment. 736 F.2d at 1559 (quoting *Tornillo*, 418 U.S. at 258).

That is not all. Like an order compelling a parade organizer to include marchers whose views contradicted its own, an injunction here would force Google to alter "the expressive content" of its message. *Hurley*, 515 U.S. at 572-73. In deciding to exclude e-ventures' websites from its search results, Google expressed its opinion that those sites were engaged in manipulative behavior and thus were not sufficiently relevant or useful to Google's users. Google decided that it did not want to associate itself with e-ventures' gamesmanship. Under the First Amendment, Google cannot be compelled to revise its opinion or to "associate with speech with which [it] may disagree." *Pacific Gas*, 475 U.S. at 15 (plurality op.). The proposed injunction would do exactly that. A court order returning Plaintiff's websites to Google's search results would force Google to communicate something about e-ventures that contradicts its own considered judgment. That would "violate the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 573. In short, because Plaintiff "seeks relief precluded by [Google's] First Amendment right" (*Langdon*, 474 F. Supp. 2d at 630), its motion fails right out of the gate.

## II.     PLAINTIFF IS NOT ENTITLED TO THE "EXTRAORDINARY AND DRASTIC" REMEDY OF A PRELIMINARY INJUNCTION

Even apart from the First Amendment, Plaintiff's bid for a preliminary injunction fails on its own terms. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). One can be granted only where the moving party shows:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'" for each of these requirements. *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014)

(quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). Here, an even more stringent showing is required, as e-ventures seeks a "mandatory injunction": an order forcing Google to act affirmatively. As this Court has said, "there is a particularly heavy burden of persuasion on the moving party when it requests a mandatory injunction." *Om Group, Inc. v. Mooney*, No. 2:05-CV-546-FtM-33SPC, 2006 U.S. Dist. LEXIS 1446, at *25-26 (M.D. Fla. Jan. 11, 2006); *see also Staver v. ABA*, 169 F. Supp. 2d 1372 (M.D. Fla. 2001). Plaintiff cannot carry this burden on *any* of the necessary elements.

### A.  Plaintiff Has No Chance of Success On Its FDUTPA Claim

Plaintiff has no likelihood of success on its FDUTPA claim. That claim is precluded by federal law (§ 230 of the CDA), and it also loses on the merits because Plaintiff cannot show that Google's actions were "deceptive" or "unfair." Fla. Stat. § 501.204(1). Courts have repeatedly rejected similar claims against Google alleging that it deceptively or unfairly removed websites from its search results. *See, e.g., Kinderstart.com, LLC v. Google, Inc.*, No. C-06-2057, 2007 U.S. Dist. LEXIS 22637, at *53-55 (N.D. Cal. Mar. 16, 2007); *Langdon*, 474 F. Supp. 2d at 633-34. This Court should do likewise.

### 1.  Plaintiff's Claim Is Barred By The CDA

In removing e-ventures' websites, Google acted in good faith to limit the availability of material that it deemed objectionable. Section 230 of the CDA protects Google from state law claims in these circumstances. "Congress clearly enacted § 230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions." *Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F. 3d 980, 986 (10th Cir. 2000). Section 230(c)(2) provides as follows:

> No provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable . . .

47 U.S.C. § 230(c)(2). This provision offers a "'robust' immunity." *Holomaxx Technologies Corp. v. Microsoft Corp.*, NO. 10-CV-049240JF, 2011 U.S. Dist. LEXIS 94316, at *6 (N.D. Cal. Aug. 23, 2011). It gives "fairly absolute protection to those who choose to block." *e360Insight LLC v. Comcast Corp.*, 546 F.

4684580.1

Supp. 2d 605, 607-08 (N.D. Ill. 2008). As the Eleventh Circuit has observed, the "language of section 230(c)(2) is clearly inconsistent with state law that makes interactive service providers liable based on their efforts to screen content." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1322 n.3 (11th Cir. 2006).[6]

Plaintiff's FDUTPA claim is barred by this provision. Google is the provider of an "interactive computer service." *Langdon*, 474 F. Supp. 2d at 630; *Murawski v. Pataki*, 514 F. Supp. 2d 577, 591 (S.D.N.Y. 2007). And Plaintiff seeks to hold Google liable on account of "voluntary" action taken "to restrict access to" material that it "considers" "objectionable." The CDA does not allow that. "[S]ection 230 imposes a subjective element into the determination of whether a provider or user is immune from liability." *e360Insight*, 546 F. Supp. 2d at 608. What matters is not whether the material is *actually* objectionable, but whether Google "considers" it to be so. *Id.* at 609 ("a mistaken choice to block, if made in good faith, cannot be the basis for liability under federal or state law"). In this case, Google applied experience and judgment to conclude that e-ventures was engaging in a pattern of manipulative activity that threatened the integrity of its search results. Falls Decl. ¶ 30. That was a paradigmatic instance of the kind of Internet self-regulation that the CDA protects. Indeed, just as "unsolicited and bulk e-mails … are the sort of communications an entity like Comcast could deem to be objectionable" (*e360Insight*, 546 F. Supp. 2d at 607-08), websites like e-ventures, which seek to game search engines for their own gain, are material that Google can and did consider merited being removed from its service.[7]

---

[6] The CDA "expressly pre-empt[s] state or local laws inconsistent with its grant of immunity." *e360Insight*, 546 F. Supp. 2d at 607. That includes "unfair business practices" claims (*Batzel v. Smith*, 333 F.3d 1018, 1030 n.14 (9th Cir. 2003)) and claims seeking injunctive relief (*Asia Econ. Inst. v. Xcentric Ventures LLC*, No. 10-01360-SVW, 2011 U.S. Dist. LEXIS 145380, at *21-22 (C.D. Cal. May 4, 2011).

[7] An unpublished opinion in *National Numismatic Certification, LLC v. eBay, Inc.*, No. 6-08-CV-42-Orl-19GJK, 2008 U.S. Dist. LEXIS 109793 (M.D. Fla. July 8, 2008), suggested that to be "objectionable" for purposes of § 230(c)(2), the material must "involve or be similar to pornography, graphic violence, obscenity, or harassment." *Id.* at *81-82. That outlier decision is contrary to more recent cases that have applied the "otherwise objectionable" language to material (such as email spam) that was not pornographic, violent, or harassing. *Langdon*, 464 F. Supp. 2d at 631; *e360Insight*, 546 F. Supp. 2d at 607-08; *Hollomax*, 2011 U.S. Dist. LEXIS 94316, at *4-7; *Zango, Inc. v. Kaspersky Lab, Inc.*, No. C07-0807-JCC, 2007 U.S. Dist. LEXIS 97332, at *11 (W.D. Wash. Aug. 28, 2007), *aff'd* 568 F.3d 1169 (9th Cir. 2009). Those decisions should be followed here. *National Numismatic* overlooked key language in the statute. "Section 230(c)(2)(B) does not require that the material actually be objectionable; rather, it affords protection for blocking material 'that the provider or user considers to be'

In making that determination, moreover, Google acted "in good faith." The good faith requirement "is focused upon the provider's subjective intent." *Hollomax*, 2011 U.S. Dist. LEXIS 94316, at *6-7; *see, e.g.*, *e360Insight*, 546 F. Supp. 2d at 608-09. Here, Google acted based on its sincere belief that e-ventures' websites were trying to game its search results. Removing websites that would undermine the quality of its service and deceive its users falls well within the traditional functions of a search engine. *See Donato v. Moldow*, 865 A.2d 711, 727 (N.J. Super. Ct. 2005) (no bad faith where service provider acts "within the scope of the traditional publisher's functions"). The CDA precludes any claim against Google for its good-faith decision. *Langdon*, 474 F. Supp. at 630-31 (§ 230(c)(2) provides search engines "immunity for their editorial decisions regarding screening and deletion from their network").

### 2. Google Did Not Engage In Deceptive Trade Practices

Plaintiff cannot succeed on its claim even apart from the CDA. A deception claim under FDUTPA exists only where there is "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (internal quotation marks omitted). This standard "requires a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." *Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (internal quotation marks and citation omitted). There is nothing like that in this case.[8]

---

objectionable." *Zango*, 2007 U.S. Dist. LEXIS 97332, at *11. This clearly consigns the question of what is "objectionable" to the judgment of online services; it is not to be resolved based on some objective court-imposed standard. Moreover, while *National Numismatic* invoked *ejusdem generis,* that canon does not apply where, as here, there is no common attribute linking the various items in the list. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225-226 (2008). Finally, the court's reading drains the words "otherwise objectionable" of independent force. The whole point of that phrase is to extend immunity to decisions about content deemed objectionable in some way *other* than those previously listed. *Smith v. Trusted Universal Stds. in Elec. Transactions, Inc.*, No. 09-4567, 2010 U.S. Dist. LEXIS 43360, at *19-20 (D.N.J. May 4, 2010) ("nothing about the context before or after that phrase limits it to just patently offensive items."). Websites engaged in search-engine manipulation are a perfect example.

[8] Although courts have divided on the issue, the majority (and better) view is that FDUTPA "has no application to entities complaining of tortious conduct which is not the result of a consumer transaction." *Pinecrest Consortium, Inc. v. Mercedes-Benz USA, LLC*, 2013 U.S. Dist. LEXIS 59558, at *3-4 (S.D. Fla. Apr. 25, 2013) (quoting *Burger King Corp. v. H&H Restaurants, LLC*, 2001 U.S. Dist. LEXIS 24038, 2001 WL 1850888, at *9 (S.D. Fla. Nov. 30, 2001)). Here, e-ventures is not a "consumer" of Google's services, and it therefore lacks standing

-14-

In support of its claim, e-ventures offers only misdirection. It asserts that Google's published guidelines "do not reveal that Google removes websites as 'spam.'" PI Mot. at 12; *id.* at 6-7 (claiming that Google provides no "indication that Google ever removes content as 'pure spam,' 'spam,' or for similar reasons").[9] That is simply false. Plaintiff ignores Google's numerous statements specifically explaining that Google may remove websites from search results that it believes are engaged in manipulation ("spam"). Google's Webmaster Guidelines could hardly be clearer about this:

- Google explicitly states that it is "willing to take manual action to remove spam from our search results" and that violations of its spam guidelines "may lead to a site being removed entirely from the Google index." Falls Decl. ¶¶ 8, 10, Ex.A.

- Google gives specific examples of the sort of conduct that can result in manual removal, including unnatural links, thin content, scraped content, and doorway pages designed to manipulate a site's ranking in search results can lead to removal. *Id.* ¶¶ 9-11, 13, 15-16, 18-20.

These (and other) statements put website operators like e-ventures on notice of the sorts of schemes that may lead their sites to be removed from Google search results. As an operator registered with Google, and having had numerous actions taken against its manipulation schemes over the years, e-ventures was unquestionably aware of Google's guidelines. *Id.* ¶ 28. And Google's recent decision to remove e-ventures' websites was entirely consistent with its public statements. Google's conduct here was not remotely deceptive. *See Zlotnick*, 480 F.3d at 1287 (dismissing FDUTPA claim where defendant's statements "eliminated any possibility that a reasonable [consumer] would be misled").

---

to bring a FDUTPA claim in the first place. *See, e.g.*, *Dobbins v. Scriptfleet, Inc.*, 2012 U.S. Dist. LEXIS 23131, at *11-12 (M.D. Fla. Feb. 23, 2012).

[9] As explained above, the statements that Plaintiff cites address when Google will remove material that a third-party contends is unlawful (such as copyright infringement) or redact material that improperly exposes a person's sensitive information (such as Social Security numbers). Falls Decl. ¶ 26. While these policies are important (and Google's statements about them are not misleading), they have nothing to do with Google's guidelines for removing websites from search results that are engaged in search-engine manipulation. *Id.* ¶ 27. Nothing in these statements (nor any others that Google has made) suggests that any website has a right to appear in search results or that Google will refrain from removing sites that it believes are trying to game its search engine.

Nor was there anything "surreptitious" about Google's action (PI Mot. at 8). In addition to its public statements, Google clearly explained to e-ventures both that its websites had been removed and why. Falls Decl. ¶¶ 39, 43, 45, Exs.G, I, L.[10] Google also outlined the remedial steps that e-ventures would have to take for Google to consider restoring its sites. *Id.* Since then, Google has continued to communicate with Plaintiff about this process, and e-ventures has successfully corrected the problems with a number of its sites. *Id.* ¶ 44, Exs. G, I, J, K . There is, in short, no mystery about what happened, why it happened, or what e-ventures needs to do to fix the problem. Plaintiff has no chance of succeeding on a deception claim under these circumstances. It cannot come close to showing that Google's statements about its guidelines and actions are "likely to cause injury to a reasonable relying consumer." *Zlotnick*, 480 F.3d at 1284 (internal quotation marks and citation omitted).

3.   Google Did Not Engage in Unfair Trade Practices

Under the FDUTPA, an unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *PNR*, 842 So. 2d at 777 (Fla. 2003) (quoting *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F.2d 287, 293 (7th Cir. 1976)). In applying this standard, Florida follows the FTC's directive that anyone alleging unfairness must also show the injury is "substantial," is "not . . . outweighed by any countervailing benefits to consumers or competition that the practice produces," and is "an injury that consumers themselves could not reasonably have avoided." *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. 3d Dist. Ct. App. 2014); *see* Fla. Stat. § 501.203. Plaintiff cannot make that showing here.

---

[10] Google's Transparency Report and its relationship with Chilling Effects (PI Mot. at 8, 13) have nothing to do with this case. The fact that Google publicizes some situations where it removes search results does not oblige Google to make public each time it applies its guidelines to remove websites it finds to be trying to manipulate search results. The two kinds of removals are entirely unrelated, and Google has good reason for not broadcasting to the world each time it removes a website engaged in manipulation. Falls Decl. ¶¶ 25, 27. No one could read Google's Transparency Report or its statements about Chilling Effects as promising a public notice about the actions Google takes in a case like this. In any event, those statements cannot be a basis for a deception claim by e-ventures, which indisputably had notice that its sites were removed (*id.* ¶¶ 39, 43, 45, Exs. G, I, L ).

4684580.1

In removing e-ventures' websites, Google sought to protect the quality of its search results and present the best possible product to its users (Falls Decl. ¶ 40), actions that neither offend public policy nor constitute unethical or immoral behavior. Rather than causing substantial injury to consumers, Google's actions here *prevented* injury to consumers. Sites engaged in search engine manipulation try to trick Google's ranking algorithms into placing their webpages higher in search results than is warranted by their actual content and popularity. *Id.* ¶ 8. When such pages are included in search results, Google's users have a harder time finding the material they are actually looking for and legitimate website operators may find themselves losing ground in search results to less scrupulous sites. *Id.* By removing websites sites associated with such manipulation, Google allows its users to search more effectively and protects higher-value websites from falling behind. *Id.* ¶ 7.

Google did not engage in an unfair trade practice by applying these guidelines to e-ventures. As explained above, since at least 2005, Google has seen evidence that e-ventures was engaged in link schemes and other manipulative tactics. *Id.* ¶ 28. Over the years, Google took various actions against e-ventures short of actual removal, but to little avail. *Id.* Plaintiff's continued bad behavior in the face of these warnings ultimately prompted Google to act more comprehensively. Google's decision was supported by ample evidence and by Google's considerable expertise in detecting and rooting out similar search engine manipulations. *Id.* ¶¶ 30-35; Exs. B-F. Indeed, Plaintiff acknowledged its manipulations in responding to the removal, admitting for example that one of its sites contained tens of thousands of articles and job listing copied from other sites. *Id.* ¶ 34, Ex. G. What Google did to protect its users and the public from e-ventures' schemes did not violate FDUTPA. Any "injury" that Plaintiff suffered is one that it could readily "have avoided" and Google's action produced considerable "countervailing benefits to consumers or competition." *Diamond*, 140 So. 3d at 1096.

In an effort to change the subject, Plaintiff points to the FTC's 2012 investigation of Google. PI Mot. at 13-14. This is a canard. After an "extensive" investigation into allegations that Google removed or downgraded the search ranking of sites that competed with its other products, the FTC

took no action against Google and found that it had violated no laws. It explained: "Challenging Google's product design decisions in this case would require the Commission – or a court – to second-guess a firm's product design decisions where plausible procompetitive justifications have been offered, and where those justifications are supported by ample evidence." Statement of the Federal Trade Commission Regarding Google's Search Practices, *In the Matter of Google Inc.*, FTC File Number 111-0163 (Jan. 3, 2013) (available at http://www.ftc.gov/sites/default/files/documents/public_statements/statement-commission-regarding-googles-search-practices/130103brillgooglesearchstmt.pdf).[11] The FTC's conclusion only confirms that e-ventures has no chance of prevailing on its unfairness claim.

### B.      Plaintiff Cannot Show Irreparable Harm

A party seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* This is reflected in the Eleventh Circuit's insistence that the party seeking relief establish that irreparable injury "will be suffered." *Hudgens*, 742 F.3d at 1329.

Plaintiff here has not come close to making that stringent showing. Indeed, e-ventures offers no actual evidence of irreparable harm. It adverts vaguely to "plummeting revenues" (P.I. Mot. 15), but it provides no data to back up that claim. *See* Trinka Verif. ¶ 25. Such undocumented speculation is not a demonstration of irreparable injury. *See, e.g., Snook v. Trust Co. of Georgia Bank, N.A.*, 909 F.2d 480, 487 (11th Cir. 1990). Plaintiff is remarkably candid about its failure of proof: "There is no way that e-ventures can accurately measure the volume of damages it has suffered to date, because, although it can

---

[11] Plaintiff asserts that as a result of the FTC investigation, Google committed to "meet its prior commitments to allow competitors access – on fair, reasonable, and non-discriminatory terms." PI Mot. at 13-14. But the agreement Plaintiff references concerns Google's licensing of standards-essential *patents* owned by its subsidiary Motorola Mobility. *See* Arena Verif., Ex. F. It has nothing to do with Google's handling of search results and did not result from the FTC's investigation into Google's search practices.

4684580.1

measure its lost revenues,[12] it is impossible to pinpoint how much of the loss was caused by Google's actions in relation to other potential economic factors." PI Mot. at 10. This is an argument *against* a preliminary injunction, not in favor of one. Plaintiff admits it cannot plausibly tie any purported economic harm to Google's actions—a concession that confirms the lack of irreparable injury. *See, e.g., GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1338 (M.D. Fla. 2010) (denying preliminary injunction where plaintiff failed to show that defendant's actions contributed to the alleged injury).

Plaintiff's inability to document its harm is not surprising. Though they were removed from Google's search results, e-ventures' websites remain online, and they are accessible "with just a click of the mouse" through the "almost limitless other means of finding content on the Internet." *Zhang*, 2014 U.S. Dist. LEXIS 41439, at *20. Anyone who wants to find e-ventures' sites can still to do so, including by simply entering their URLs into a browser or using a different search engine. While Plaintiff says that its "business is dependant [sic] on Google" (PI Mot. at 15), it offers no evidence to support that claim and no reason to think it is even plausible. *Zhang*, 2014 U.S. Dist. LEXIS 41439, at *20 ("search engine operators … lack the physical power to silence anyone's voices, no matter what their alleged market shares may be"). Finally, Plaintiff ignores that Google has restored dozens of the websites at issue through its internal reconsideration process. Falls Decl. ¶ 44.[13] This gives Plaintiff the ability to get its sites back online as it makes meaningful corrections, and they underscore that there is no irreparable harm and no basis for the extraordinary remedy of a mandatory injunction.

---

[12] Despite this statement, e-ventures identifies no data or any other evidence purporting to "measure" its supposedly lost revenues. Plaintiff points to decreases in the (already modest) traffic to *three* of the 231 websites it says were delisted. Trinka Verif. ¶ 16. But even if a drop in traffic standing alone were an irreparable harm (and it is not), this comes nowhere close to the showing needed to justify an injunction forcing Google to restore hundreds of websites for which there is absolutely no evidence of *any* diminished traffic, revenue, or goodwill.

[13] This also defeats Plaintiff's bid for an injunction requiring Google to "inform e-ventures of **_why_** its websites are being excluded from Google's search results." PI Mot. at 18 (emphasis in original). Google has already provided e-ventures with more than sufficient information in that regard. Where e-ventures has modified its websites to fix its violations, the sites have been reinstated. Falls Decl. ¶ 44 & Exs. J & K. But Google has good reason for not providing too much detail about the proprietary ways it detects search engine manipulation. Revealing that information would give bad actors a playbook for avoiding detection. *Id.* ¶ 25.

4684580.1

### C.      The Balance of Equities Strongly Favors Google

Plaintiff claims that the relief it seeks "will cost Google nothing." PI Mot. at 15. That is quite

mistaken. An injunction requiring Google to include e-ventures' websites in its search results would

impose significant harm on Google. As described above, compelling Google to publish information

that it has decided to withhold directly impairs Google's First Amendment rights. While this

constitutional injury should bar Plaintiff's proposed injunction outright, at a minimum it weighs heavily

in Google's favor on the balance of equities. *See Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d

1320, 1339 (M.D. Fla. 2011) ("even a temporary infringement of First Amendment rights constitutes a

serious and substantial injury") (quoting *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir.

2006)). But the loss of First Amendment rights is not the only inequity Google would suffer. The

forced return of websites that Google has determined are engaged in manipulation would undermine

the integrity of Google's search results. The success of Google's search engine is attributable in large

part to the trust Google has among its users, who count on Google to return responses to their search

queries that are relevant, responsive, and of high quality. That is what Google's manual actions,

including the removal of e-ventures' sites, aim to preserve. Undoing these efforts, and requiring Google

to return information about websites that it has determined are trying to deceive users, would make

Google's results less reliable and useful. It would also undermine Google's established guidelines for

combating gamesmanship on the part of websites seeking to artificially boost their search result

placement. Falls Decl. ¶ 5. For Google, the result would be a compromised search engine, diminished

protection against manipulation, and loss of users' goodwill—practical harms over and above the

serious indignity of being forced to speak in a manner that conflicts with its own considered judgment.

### D.      An Injunction Would Disserve The Public Interest

Finally, the public interest would be undermined by Plaintiff's injunction. There are significant

public benefits in ensuring that search engines like Google do their best to cull websites engaged in

efforts to manipulate their rank through artificial schemes. As explained, manual removal actions of the

4684580.1

sort taken here help ensure that members of the public who run searches on Google get the best and most useful results. They also protect the interests of legitimate websites that might otherwise lose traffic to lower-value sites trying to game the search process for their own benefit. Google's removal of e-ventures' websites was intended to advance those public-minded goals. Those interests would be undermined by forcing Google to include in its results an array of sites that it has determined are not to be trusted. Falls Decl. ¶ 5. If those sites are involuntarily restored outside of Google's internal process (which has worked in this case and remains ongoing), Google users may have their searches frustrated and websites that have not engaged in the kinds of tactics used by Plaintiff would lose out.

Against all this, Plaintiff does not even argue that the public would benefit from having e-ventures' websites included in Google search results or that its services advance some public good. Instead, it hurls mud. Plaintiff argues that Google did not act transparently in removing e-ventures' sites. PI Mot. at 16. That baseless claim is refuted above. Plaintiff also says that it "believes that Google's conduct cannot be considered objective." PI Mot. at 16-17. It is not clear what this means (or what its legal significance is supposed to be), but it is totally unsupported by any evidence. Google applied its established guidelines for combatting search manipulation to e-ventures' websites. Falls Decl. ¶¶ 30, 36, 38. Those actions were reviewed by multiple Google employees and based on years of experience with e-ventures' schemes. They had nothing to do with concerns about competition. *Id.* ¶ 40. In short, there was nothing untoward about what Google did, and the public would lose out if Google is ordered to undo the considered application of its anti-manipulation guidelines.

## CONCLUSION

For these reasons, Plaintiff's motion for a preliminary injunction should be denied.

4684580.1

Dated:  November 26, 2014

Respectfully submitted,

s/ *Nathan M. Berman*

DAVID H. KRAMER (*pro hac vice* application pending)
COLLEEN BAL (*pro hac vice* application pending)
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300
dkramer@wsgr.com
cbal@wsgr.com

NATHAN M. BERMAN
Fla. Bar No. 0329230
Zuckerman Spaeder LLP
101 East Kennedy Blvd.
Suite 1200
Tampa, FL 33602
Tel: (813) 221-1010
Fax: (813) 223-7961
nberman@zuckerman.com

BRIAN M. WILLEN (*pro hac vice* application pending)
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the Americas, 40th Floor
New York, NY  10019
(212) 497-7700
bwillen@wsgr.com

*Counsel for Google Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2014, I electronically filed the foregoing with the Clerk

of the Court using the Court's CM/ECF system.

/s/ Nathan M. Berman
Nathan M. Berman

-22-

4684580.1