# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

|  |  |
|---|---|
| e-ventures Worldwide, LLC, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 2:14-cv-00646-JES-CM |
| Google Inc., | ) |
| Defendants. | ) |

**GOOGLE'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND SUPPORTING MEMORANDUM OF LEGAL AUTHORITY**

DAVID H. KRAMER (admitted *pro hac vice*)
COLLEEN BAL (admitted *pro hac vice*)
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300

BRIAN M. WILLEN (admitted *pro hac vice*)
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
(212) 497-7700

NATHAN BERMAN, Fla. Bar No. 0329230
Zuckerman Spaeder LLP
101 East Kennedy Blvd.
Suite 1200
Tampa, FL 33602
(813) 221-1010

*Counsel for Google Inc.*

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Google Inc. ("Google") moves to dismiss the complaint filed by Plaintiff e-ventures Worldwide LLC ("e-ventures"). Because e-ventures fails to state a claim, the Court should dismiss the complaint with prejudice. Google submits the following memorandum of legal authority in support of its motion.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Every minute of every day, Google returns search results that represent its considered opinions about what information is most relevant and responsive to its users' queries. An important part of that process involves Google's efforts to prevent website operators from harming the quality of search results by trying to artificially boost how their sites are ranked. Plaintiff now wants to use the federal courts to second-guess these editorial determinations. It seeks to hold Google liable for removing e-ventures' websites from search results after Google determined that Plaintiff was trying to manipulate Google's search engine to get better placements. This strategy has been tried before. Other website owners dissatisfied with whether or where their sites have appeared in search results have turned to litigation. Each time, the courts have dismissed these efforts. The complaint here should meet the same fate.

First, Plaintiff's claims are barred by the First Amendment. Google's search results reflect editorial judgments about what information to present to users based on their queries. In displaying results that exclude e-ventures' websites, Google is engaging in fully protected expression. Plaintiff impermissibly seeks to hold Google liable for that speech and to prohibit Google from engaging in similar speech in the future. The First Amendment does not allow that.

Similarly, the Communications Decency Act, 47 U.S.C. § 230 ("CDA") precludes any effort to hold Google liable under state law on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be … objectionable." 47 U.S.C. § 230(c)(2). It is clear from the complaint that in removing e-ventures' websites from its search results, Google acted to restrict access to content it deemed

4696866.1

objectionable within the meaning of this provision. Courts in other cases have applied the CDA to dismiss claims like those here, and this Court should follow suit.

Even apart from federal law, the complaint fails. Plaintiff's claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") must be dismissed, first, because e-ventures is not a "consumer" of Google's services and thus lacks standing to sue. Beyond that, Plaintiff does not plausibly allege that Google engaged in deceptive or unfair conduct. Plaintiff cannot conceal from the Court a host of Google's public statements making clear that Google will remove websites from search results that it determines are engaged in manipulation schemes. And none of the other Google statements mentioned in the complaint is remotely deceptive (or even relevant to what happened here). Plaintiff also makes no credible allegation that its purported harm was caused by any public statements made (or not made) by Google. As for unfairness, Plaintiff has not pleaded that Google's conduct violated established public policy or that any injury to e-ventures was not outweighed by the benefits to consumers from Google acting against websites that, in its judgment, are undermining the integrity of its search engine.

Plaintiff's defamation claim is equally infirm. That claim arises from Google's decision to remove e-ventures' sites from search results. In doing so, however, Google did not "publish" any "statement" of fact about the quality of e-ventures' websites. To the contrary, the complaint makes clear that Google communicated its decision only to e-ventures, not to the public. And what Google did was simply a manifestation of its constitutionally protected opinion. Defamation liability cannot attach to that opinion. Nor can Plaintiff evade these problems by trying to plead a tortious interference claim. That runs afoul of Florida's "single action" rule, which bars multiple claims arising out of the same act as a failed defamation claim. Moreover, Plaintiff offers nothing to plausibly suggest that Google knew about e-venture's contractual relationships, that it acted with the specific intent of harming those relationships, or that any of the relationships were actually breached as a result of Google's conduct.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.        Google and Its Search Engine

Google is one of the world's leading Internet companies. Its mission is "to organize the world's information and make it universally accessible and useful." https://www.google.com/about/company. While Google offers many different products in service of this goal, this case arises out of its search engine. Compl. ¶ 16. "Search engines are indexing tools used to locate web sites that correspond to a user's search query. Search queries typically consist of one or more words or phrases that identify or are related to the subject of the search." *Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457-M, 2003 U.S. Dist. LEXIS 27193, at *2 n.1 (W.D. Okla. May 27, 2003).

> When a keyword is entered, the search engine processes it through a self-created index of web sites to generate a (sometimes long) list relating to the entered keyword. Each search engine uses its own algorithm to arrange indexed materials in sequence, so the list of web sites that any particular set of keywords will bring up may differ depending on the search engine used.

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999).

The search results that Google provides in response to users' queries are selected and ordered through a combination of algorithms and manual action. Compl. ¶ 21. Google's algorithms select among billions of webpages to determine which should be displayed in response to each search. *Search King*, 2003 U.S. Dist. LEXIS 27193, at *3-4 (describing Google's ranking algorithms). "[E]very algorithm employed by every search engine is different, and will produce a different representation of the relative significance of a particular web site depending on the various factors, and the weight of the factors, used to determine whether a web site corresponds to a search query." *Id.* at *10. Google's search results thus reflect its "fundamentally subjective" opinion about what webpages its algorithms determine are the most relevant. *Id.*

While Google's algorithms are designed to return the best possible results to users, manual action is sometimes needed to protect the integrity of Google's search engine from

4696866.1

content that is unlawful or offensive, as well as from efforts by website operators to manipulate the order of search results. Compl. ¶¶ 25, 36. If a website does not conform to Google's quality standards, Google may choose not to include that site in its index. *Id.* ¶ 33; *see Search King*, 2003 U.S. Dist. LEXIS 27193, at \*3. Google's policies regarding search engine manipulation (also called "webspam") are clearly explained on the support pages of its website. http://support. google.com ("Webmaster Guidelines" and "Removal Policies") (attached as Exhibit A).[1] These policy guidelines are necessary because third parties often try to trick Google's algorithms into ranking certain webpages higher in search results than they would otherwise be ranked based on their content and popularity. *Id.* at 12.

In publishing its guidelines, Google makes clear to the public that Google will not hesitate to remove or demote websites it finds to be engaged in such schemes. *Id.* at 1-14. Google "strongly encourage[s] website operators to pay very close attention to the 'Quality Guidelines,' which *outline some of the illicit practices that may lead to a site being removed entirely* from the Google index or otherwise impacted by an algorithmic or manual spam action." *Id.* at 1. (emphasis added). The guidelines give specific examples of the kinds of manipulations that may lead Google to take manual action against particular websites. *Id.* at 2-14. But Google cautions that the specific violations described in the guidelines are not exhaustive: "These quality guidelines cover the most common forms of deceptive or manipulative behavior, but Google may respond negatively to other misleading practices not listed here." *Id.* at 3. Plaintiff's claims in this case arise out of Google's application of these policies. Compl. ¶ 33.

### B.    Plaintiff and Its Claims

Plaintiff is a self-described "online publishing and research firm that reviews products and services in various industries." Compl. ¶ 12. Its business is to help companies engage in

---

[1] As discussed below, these published statements can be considered here because they are incorporated by reference in Plaintiff's complaint and are subject to judicial notice.

"search engine optimization" ("SEO")—strategies aimed at "affecting the visibility" of websites in search engine results. *Id.* ¶¶ 14-15, 17. Plaintiff operates a vast network of websites in connection with its business. *Id.* ¶ 30.

This case arises from e-ventures' efforts to boost the appearance of those websites in Google's search engine. On September 18, Google applied the policies described in its guidelines to remove e-ventures' websites from search results. *Id.* ¶¶ 33-34. Google notified Plaintiff about the removals the same day. *Id.* Google explained that e-ventures' sites had run afoul of Google's quality standards and had been determined to be "pure spam." *Id.* That term is clearly explained in the Webmaster Guidelines (Ex. A at 14):

> If you see this message ["pure spam"] on the Manual Actions page, it means that Google has detected that some of your pages may be using techniques that are outside our Webmaster Guidelines. The site appears to use aggressive spam techniques such as automatically generated gibberish, cloaking, scraping content from other websites, and/or other repeated or egregious violations of Google's quality guidelines.

Plaintiff filed suit against Google on November 4, 2014 (Dkt. 1), asserting three causes of action under Florida law, all stemming from the removal of Plaintiff's websites from Google's search listings: (1) deceptive and unfair trade practices, in violation of FDUTPA (Compl. ¶¶ 50-61); (2) defamation (*id.* ¶¶ 62-68); and (3) tortious interference (*id.* ¶¶ 69-74). Plaintiff seeks injunctive relief and damages. *Id.* ¶¶ 4-5. Plaintiff also filed a motion for a preliminary injunction, asking the Court to compel Google to return e-ventures' websites to search results. Dkt. 11. Google opposed Plaintiff's motion on November 26. Dkt. 30. Accompanying its opposition, Google submitted a detailed declaration explaining its policies for combatting search engine manipulations and documenting its communications with e-ventures about the removal of its websites. Dkt. 31. Plaintiff asked for the Court's permission to file a reply brief. Dkt. 34. Instead of doing so, however, e-ventures has now withdrawn its preliminary injunction motion after making significant changes to its websites that allowed Google to return some of those sites to search results. Dkt. 35. But Plaintiff says it is still seeking damages from Google. *Id.*

## ARGUMENT

A complaint will be dismissed under Rule 12(b)(6) when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" (*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), and "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions" (*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Instead, "only a complaint that states a *plausible* claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (emphasis added). "[W]hen plaintiffs have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *ADA v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (internal quotation marks omitted). While the court accepts as true all material allegations in the complaint, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

## I.       PLAINTIFF'S CLAIMS ARE BARRED BY THE FIRST AMENDMENT

The common thread linking Plaintiff's causes of action is the aim of imposing liability on Google for removing e-ventures' websites from its search results and compelling Google to reinstate those sites. But Google's search results are constitutionally protected opinions, and Plaintiff's case runs headlong into the "basic First Amendment principle" that "freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l. Dev. v. Alliance for Open Soc'y Intl., Inc.*, 133 S. Ct. 2321, 2327 (2013).

### A.       Google's Search Results Are Opinions Protected By The First Amendment

Every court that has considered the issue has held that Internet search results are speech protected by the First Amendment. *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 439 (S.D.N.Y. 2014); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007); *Search King*, 2003 U.S. Dist. LEXIS 27193, at *11-12. That is not surprising. The "dissemination of information [is]

speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011). Search results involve exactly that. In presenting results, a search engine is disseminating information about the contents of various websites and other material across the Internet:

> The central purpose of a search engine is to retrieve relevant information from the vast universe of data on the Internet and to organize it in a way that would be most helpful to the searcher. In doing so, search engines inevitably make editorial judgments about what information (or kinds of information) to include in the results and how and where to display that information (for example, on the first page of the search results or later).

*Zhang*, 10 F. Supp. 3d at 438. Moreover, with each set of results, search engines are offering their opinions—"opinions of the significance of particular web sites as they correspond to a search query. Other search engines express different opinions, as each search engine's method of determining relative significance is unique." *Search King*, 2003 U.S. Dist. LEXIS 27193, at *10-12 (observing that search results are "fundamentally subjective in nature").

These opinions are "fully protected First Amendment expression." *Zhang*, 10 F. Supp. 3d at 439; *see also Search King*, 2003 U.S. Dist. LEXIS 27193, at *11-12 (search results warrant "full constitutional protection"). They deserve no less protection than "the newspaper editor's judgment of which wire-service stories to run and where to place them in the newspaper, the guidebook writer's judgments about which attractions to mention and how to display them, and Matt Drudge's judgments about which stories to link and how prominently to feature them." *Zhang*, 10 F. Supp. 3d at 438. And because the First Amendment extends to "the decision of both what to say and what not to say" (*Riley v. National Federation of Blind of N. Carolina, Inc.*, 487 U.S. 781, 796-97 (1988)), search engines have a right to decide not only what to include in their results but also what should be excluded. *See Zhang*, 10 F. Supp. 3d at 438 ("there is a strong argument to be made that the First Amendment fully immunizes search-engine results from most, if not all, kinds of civil liability and government regulation").

**B.     The First Amendment Protects Google From Liability Based On Its Removal of Plaintiff's Website From Search Results**

Applying these principles, courts have uniformly rejected—and dismissed at the pleading stage—claims like the ones e-ventures makes here, which seek to impose liability on search engines for excluding particular websites or information from their search results. Two of these cases involved Google, and they are directly on point here, and the third sets out in detail the First Amendment rules that decide this case.

First, in *Search King*, the court dismissed the plaintiff's claims that Google "maliciously" diminished the position of its website in search results (and ultimately caused its site not to appear at all). 2003 U.S. Dist. LEXIS 27193, at *3-4. Echoing e-ventures' strategy in this case, the plaintiff sued for tortious interference, alleging Google's actions were motivated by concerns about competition and that they "adversely impacted the business opportunities available" to the plaintiff. *Id.* at *4. The court dismissed the claim under Rule 12(b)(6), agreeing that Google was "immune from tort liability arising out of the devaluation because PageRanks constitute protected speech." *Id.* at *4, 12. The court explained that Google's search results "do not contain provably false connotations." *Id.* at *11. They are simply opinions, and "[o]ther search engines express different opinions, as each search engine's method of determining relative significance is unique. The Court simply finds there is no conceivable way to prove that the relative significance assigned to a given web site is false." *Id.* at *11-12. Accordingly, the plaintiff's claim ran headlong into the First Amendment rule that that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* at *7 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).

*Langdon* similarly relied on the First Amendment to dismiss various claims against Google (including for deceptive business practices and fraud) arising out of its decision to remove the plaintiff's website from search results. 474 F. Supp. 2d at 629-30. The plaintiff alleged that Google's removal decision was "fraudulent, arbitrary, and punitive," and he sought

4696866.1

damages and an injunction. *Id.* at 627. The court held this claim impermissibly sought to "compel [Google] to speak in a manner deemed appropriate by Plaintiff and would prevent Google from speaking in ways that Plaintiff dislikes." *Id.* at 629-30. The court thus granted the motion to dismiss "on the basis that Plaintiff seeks relief precluded by [Google's] First Amendment rights." *Id.* at 630.

Most recently, the court in *Zhang* built upon these rulings to hold that the First Amendment shielded Baidu (a search engine specializing in Chinese-language material) from claims seeking to hold it liable for refusing to include information in its search results about democracy in China. 10 F. Supp. 3d at 434. Plaintiffs asserted various causes of action, but the court dismissed these claims without even addressing the viability of the plaintiffs' allegations. Instead, the court categorically held that "Plaintiffs' efforts to hold Baidu accountable in a court of law for its editorial judgments about what political ideas to promote cannot be squared with the First Amendment." *Id.* at 434. As the court explained:

> Plaintiffs call upon the Court to impose a penalty on Baidu precisely because of what it does and does not choose to say. . . . As the *Turner* Court made clear, however, "the First Amendment, subject only to narrow and well-understood exceptions"— inapplicable here—"does not countenance governmental control over the content of messages expressed by private individuals." Accordingly, to allow Plaintiffs' suit to proceed, let alone to hold Baidu liable for its editorial judgments, would contravene the principle upon which "[o]ur political system and cultural life rest": "that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."

*Id.* at 441 (internal quotation marks and citations omitted) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). Finding the complaint barred by the First Amendment, the court granted the defendant's motion for judgment on the pleadings and denied the plaintiffs' request to amend. *Id.* at 443.

The claims that e-ventures advances in this case fail for the same reasons. Just as the First Amendment protects newspaper publishers from interference with their "exercise of editorial control and judgment" (*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)), it

4696866.1

protects Google from claims that seek to hold it liable for editorial decisions about what information to include in its search results. *Zhang*, 10 F. Supp. 3d at 437 ("the Government may not interfere with the editorial judgments of private speakers on issues of public concern"). In returning results that excluded e-ventures' websites, Google was expressing its constitutionally protected opinion about what information would be most relevant to its users' queries. Plaintiff's effort "to impose 'a penalty on the basis of content'" of Google's speech is impermissible. *Id.* at 442 (quoting *Tornillo*, 418 U.S. at 256); *Search King*, 2003 U.S. Dist. LEXIS 27193, at *12-13. To allow these claims to proceed would violate "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 (1995).[2]

## II. PLAINTIFF'S CLAIMS ARE BARRED BY THE CDA

Even apart from the First Amendment, federal law protects Google from claims seeking to hold it liable for actions taken to remove material from its search engine that it finds objectionable. Section 230(c)(2) of the CDA provides as follows:

> No provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable.

---

[2] That is especially true insofar as Plaintiff seeks an injunction compelling Google to include e-ventures' websites in its search results. Compl., Prayer for Relief ¶ a. As we have explained (Google's Mem. of Law In Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. 30)), any claim for injunctive relief here would violate bedrock First Amendment prohibitions on compelled speech. *See Langdon*, 474 F. Supp. 2d at 630. Such an injunction would impermissibly force Google to alter "the expressive content" of its message (*Hurley*, 515 U.S. at 572-73 (1995)), and to "associate with speech with which [it] may disagree" (*Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 15 (1986) (plurality op.)). *See, e.g., Passaic Daily News v. NLRB*, 736 F. 2d 1543, 1559 (D.C. Cir. 1984) ("First Amendment interest in retaining control over prospective editorial decisions" barred injunctive order commanding a newspaper to "publish what it prefers to withhold").

4696866.1

47 U.S.C. § 230(c)(2). "Congress clearly enacted § 230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions." *Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F. 3d 980, 986 (10th Cir. 2000). This provision offers a "robust immunity." *Holomaxx Techs. Corp. v. Microsoft Corp.*, No. 10-cv-04924, 2011 U.S. Dist. LEXIS 94316, at *6 (N.D. Cal. Aug. 23, 2011). It gives "fairly absolute protection to those who choose to block." *e360Insight LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 607-08 (N.D. Ill. 2008). As the Eleventh Circuit has observed, the "language of section 230(c)(2) is clearly inconsistent with state law that makes interactive service providers liable based on their efforts to screen content." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1322 n.3 (11th Cir. 2006).[3]

Plaintiff's claims here are barred by the CDA. As the operator of an Internet search engine (Compl. ¶ 16), Google is the provider of an "interactive computer service." *Langdon*, 474 F. Supp. 2d at 630; *Murawski v. Pataki*, 514 F. Supp. 2d 577, 591 (S.D.N.Y. 2007). And Plaintiff seeks to hold Google liable on account of "voluntary" action taken "to restrict access to" material that it "considers" "objectionable." 47 U.S.C. § 230(c)(2). The language of the statute "imposes a subjective element into the determination of whether a provider or user is immune from liability." *e360Insight*, 546 F. Supp. 2d at 608. What matters here is not whether e-ventures' websites were actually objectionable, but whether Google "considers" them to be so. *See Zango, Inc. v. Kaspersky Lab, Inc.*, No. C07-0807-JCC, 2007 U.S. Dist. LEXIS 97332, at *11 (W.D. Wash. Aug. 28, 2007), *aff'd* 568 F.3d 1169 (9th Cir. 2009).

---

[3] Courts strive "to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254-55 (4th Cir. 2009) (quoting *Fair Housing Council v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc)); *see also Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 417 (6th Cir. 2014). Thus, application of CDA immunity often occurs at the pleadings stage. *See, e.g., Langdon*, 474 F. Supp. 2d at 630-31 (motion to dismiss); *e360Insight*, 546 F. Supp. 2d at 609-10 (judgment on the pleadings).

The complaint shows that Google did just that. Plaintiff acknowledges that Google removed e-ventures' websites from search results because it considered them to be "pure spam." Compl. ¶¶ 33, 36; *cf.* Ex. A at 14 (explaining what Google means by "pure spam"). Such removals are paradigmatic instances of the Internet self-regulation that the CDA protects. Just as email spam—"unsolicited and bulk e-mails"—"are the sort of communications an entity like Comcast could deem to be objectionable" (*e360Insight*, 546 F. Supp. 2d at 607-08), websites that seek to game search results are material that Google can consider sufficiently objectionable to remove from its service. While Plaintiff (half-heartedly) alleges that its websites were not in fact objectionable (Compl. ¶ 34), its assessment is beside the point in applying the CDA. A "mistaken choice to block, if made in good faith, cannot be the basis for liability under federal or state law." *e360Insight,* 546 F. Supp. 2d at 609. Indeed, forcing Google "to litigate the question of whether what it blocked was or was not spam would render § 230(c)(2) nearly meaningless." *Id.*[4]

Finally, there is nothing to suggest that Google did not act "in good faith." The CDA's good faith requirement "is focused upon the provider's subjective intent." *Holomaxx*, 2011 U.S. Dist. LEXIS 94316, at *6-7. The "issue is whether [plaintiff] has pled an absence of good faith."

---

[4] An unpublished opinion in *National Numismatic Certification, LLC v. eBay, Inc.*, No. 6-08-CV-42-Orl-19GJK, 2008 U.S. Dist. LEXIS 109793 (M.D. Fla. July 8, 2008), suggested that to be "objectionable" for purposes of § 230(c)(2), the material must "involve or be similar to pornography, graphic violence, obscenity, or harassment." *Id.* at *81-82. That outlier decision is contrary to more recent cases that have applied the "otherwise objectionable" language to material (such as email spam) that was not pornographic, violent, or harassing. *Langdon*, 464 F. Supp. 2d at 631; *e360Insight*, 546 F. Supp. 2d at 607-08; *Holomaxx*, 2011 U.S. Dist. LEXIS 94316, at *4-7; *Zango*, 2007 U.S. Dist. LEXIS 97332, at *11. Those decisions should be followed here. *National Numismatic* overlooked key language in the statute protecting actions taken against materials the providers "*considers to be* . . . otherwise objectionable." § 230(c)(2)(B) (emphasis added). The whole point of that phrase is to extend immunity to decisions about content deemed objectionable in some way other than those previously listed. *Smith v. Trusted Universal Stds. in Elec. Transactions, Inc.*, No. 09-4567, 2010 U.S. Dist. LEXIS 43360, at *19-20 (D.N.J. May 4, 2010) ("nothing about the context before or after that phrase limits it to just patently offensive items."). Websites engaged in search-engine manipulation are a perfect example. Moreover, while the court invoked *ejusdem generis*, that canon does not apply where, as here, there is no common attribute linking the various items in the list (which range from "lewd" to "harassing" to "excessively violent" (§ 230(c)(2)). *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225-226 (2008).

4696866.1

*e360Insight*, 546 F. Supp. 2d at 609. "To raise an issue of an absence of good faith, an allegation of conduct outside the scope of the traditional publisher's function would be required." *Donato v. Moldow*, 865 A.2d 711, 727 (N.J. Super. Ct. 2005) (conclusory allegation of bad faith "is not sufficient to withstand a motion to dismiss on the pleadings"). There is nothing like that here.

The complaint offers no plausible factual allegations to suggest that Google acted outside of the normal role of a search engine publisher or that Google did not subjectively believe that e-ventures' websites were "pure spam." Compl. ¶¶ 33-35. Ignoring Google's published statements (Ex. A at 14), Plaintiff suggests that "pure spam" is a label given to sites that Google "dislikes," (Compl. ¶ 36), but "[w]hether [defendant] knew and disliked appellants is not relevant to the immunity terms of § 230." *Donato*, 865 A.2d at 727. Plaintiff also refers cryptically to a "third party with a personal vendetta against e-ventures" that may have provided "false information" to Google. Compl. ¶ 32. But this in no way suggests bad faith on *Google's* part (as opposed to that of the unidentified tipster). Here, as in *e360Insight*, the "absence of good faith is not adequately pled." 546 F. Supp. 2d at 609.

In short, it is evident "from the allegations in the [] Complaint that Plaintiff attempts to hold [Google] liable for decisions relating to the monitoring, screening, and deletion of content from [its] network. … [T]hese actions are quintessentially related to a publisher's role, and § 230 specifically proscribes liability in such circumstances." *Langdon*, 474 F. Supp. at 630-631 (internal citation and quotation marks omitted).

## III.   PLAINTIFF FAILS TO STATE A FDUTPA CLAIM

Plaintiff's claims fail independently of these protections. Plaintiff lacks standing to sue under FDUTPA because it is not a "consumer" of Google's services. Nor has it plausibly alleged that Google's actions were "deceptive" or "unfair."

### A.      Plaintiff Is Not A "Consumer" Entitled To Sue Under FDUTPA

In enacting FDUTPA, the "Florida legislature intended to create a statutory cause of action to allow citizens to recover damages related solely to a product or service purchased in a consumer transaction infected with unfair or deceptive trade practices or acts." *Dobbins v. Scriptfleet, Inc.*, No. 8:11-CV-1923-T-24-AEP, 2012 U.S. Dist. LEXIS 23131, at *10 (M.D. Fla. Feb. 23, 2012). Prior to 2001, the statute expressly restricted actions for damages to "consumers" of a product or service. *Carroll v. Lowes Home Ctrs., Inc.*, No. 12-23996, 2014 U.S. Dist. LEXIS 68525 at *9 (S.D. Fla. May 5, 2014). "[I]n 2001, the Legislature amended § 501.211(2) by replacing the word 'consumer' with the word 'person.'" *Id.* Since then, while there is some division of authority (*see Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1349-50 (S.D. Fla. 2009)), most courts have held that the amendment did not expand the statute to reach non-consumers.[5] Under these decisions, a FDUTPA claim can be brought only by someone who was acting as a consumer—"one who has engaged in the purchase of goods or services"— in connection with the relevant transaction. *Leon*, 2014 U.S. Dist. LEXIS 143270, at *14.

That is the correct result. "The legislative history of the 2001 amendment indicates the Florida Legislature did not intend to expand the FDUTPA to non-consumers. Rather, the purpose of the amendment was to clarify that remedies available to individuals under the FDUTPA are also available to businesses." *Carroll*, 2014 U.S. Dist. LEXIS 68525, at *10; *see also Leon*, 2014 U.S. Dist. LEXIS 143270, at *13. The amendment was not meant to allow claims with no connection to actual consumer transactions. *Dobbins*, 2012 U.S. Dist. LEXIS 23131, at

---

[5] *See, e.g., Leon v. Tapas & Tintos, Inc.*, No. 14-21133-CIV, 2014 U.S. Dist. LEXIS 143270, at *12-13 (S.D. Fla. Oct. 7, 2014) ("The Court looks to the legislative history and recent district court decisions to find that the term 'person,' while broadening the scope of FDUTPA, still applies only to consumers."); *Carroll*, 2014 U.S. Dist. LEXIS 68525, at *11-12 ("I conclude 'person' in § 501.211(2) applies only to 'consumers,' including businesses who are consumers."); *Pinecrest Consortium, Inc. v. Mercedes-Benz USA, LLC*, No. 13-2083-CIV, 2013 U.S. Dist. LEXIS 59558, at *1-2 (S.D. Fla. April 25, 2013) (FDUTPA "has no application to entities complaining of tortious conduct which is not the result of a consumer transaction.'").

*11. This reflects FDUTPA's central goal—protecting the consuming public. "Providing actual damages to non-consumers does not further this purpose." *Carroll*, 2014 U.S. Dist. LEXIS 68525, at *11.

Here, Plaintiff was not a consumer of Google's services. The complaint's conclusory allegation that e-ventures is a consumer (¶ 51) is contradicted by the facts Plaintiff actually alleges and is entitled to no weight. *Iqbal*, 556 U.S. at 663. Plaintiff purports to be "an online publishing and research firm that reviews products and services in various industries." Compl. ¶¶ 12-15. Plaintiff does not assert that it has any relevant connection to Google (commercial or otherwise) beyond the simple fact that, like millions of other website operators, its sites at various times have appeared in Google's search results. The complaint does not allege that e-ventures paid Google for the right to appear in search results or otherwise purchased goods or services (such as advertising) from Google. *Cf.* ¶ 19. Plaintiff's theory instead appears to be that its customers use Google's search engine to find e-ventures' websites. *Id.* ¶ 20. But that does not suggest any consumer relationship between e-ventures and Google. And without plausible allegations of such a relationship, Plaintiff's claim cannot proceed. *See, e.g.*, *Leon*, 2014 U.S. Dist. LEXIS 143270, at *14 (dismissing FDUTPA claim where Plaintiff failed to alleged that it was a "consumer" who "engaged in any consumer transaction").

**B.     Plaintiff Makes No Plausible Claim of Deception Or Unfairness**

Even if Plaintiff had standing, its FDUTPA claim still would fail because the complaint does not plausibly allege that Google engaged in any deceptive or unfair practices.

***Deception***. Under FDUTPA, a deceptive practice involves "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (quotation marks omitted). The plaintiff must make "a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." *Zlotnick v. Premier Sales*

*Group, Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (quotation marks omitted). Plaintiff here offers nothing like that. The complaint alleges that various statements made on Google's website are contrary to the company's actions in removing e-ventures' sites from search results. Compl.¶¶ 29, 48. More specifically, Plaintiff says that Google "purports to remove website content only in very limited circumstances such as for obscenity, for intellectual property violations, to ensure personal privacy, … to protect users from harmful software or malware, or to comply with a court order." *Id.* ¶ 2. According to the complaint, Google deceives the public into believing that it "only removes content that violates its Removal Policies." *Id.* ¶ 58.

The only way that e-ventures can make these allegations is by engaging in misleading conduct of its own. While it liberally cites statements made on Google's website, Plaintiff ignores a plethora of other public statements on the same website that clearly explain Google's policies for removing websites from search results that it concludes are violating its anti-spam guidelines. Indeed, as explained above (*supra* pp. 3-4), an entire section of Google's website (the "Webmaster Guidelines") is devoted to explaining that Google *will* remove websites, like e-ventures' sites, that it determines are trying to manipulate its search results. For example:

- The Guidelines expressly state that Google is "willing to take manual action to remove spam from our search results" and that violations of Google's spam policies "may lead to a site being removed entirely from the Google index." (Ex. A at 10)

- Google's statements "strongly encourage website operators to pay very close attention to the 'Quality Guidelines,' which *outline some of the illicit practices that may lead to a site being removed entirely* from the Google index or otherwise impacted by an algorithmic or manual spam action." (Ex. A at 1)

- Google also makes clear that its "quality guidelines cover the most common forms of deceptive or manipulative behavior, but Google may respond negatively to other misleading practices not listed here. *It's not safe to assume that just because a specific deceptive technique isn't included on this page, Google approves of it.*" (Ex. A at 3)

These clear public statements give lie to the allegation that "'spam' is not even a reason for removal identified in Google's Removal Policies." Compl. ¶ 42. They undermine any suggestion that Google tells the public that it "does not remove content from its search results except in the

very limited circumstances" set out in the complaint. *Id.* ¶ 21. And they put website operators like e-ventures on notice that Google will remove websites that it considers to be engaging in deceptive techniques, whether or not those techniques are expressly listed in the guidelines. These statements doom Plaintiff's deception claim. *See, e.g., Zlotnick*, 480 F.3d at 1287 (dismissing FDUTPA claim where defendant's statements "eliminated any possibility that a reasonable [consumer] would be misled").[6]

Even putting aside Plaintiff's lack of candor about the Google's guidelines, the deception claim fails because e-ventures' allegations simply are not supported by the various Google statements specifically cited in the complaint (¶¶ 23-28). None of those statements say or promise anything inconsistent with Google's decision to remove e-ventures' websites from search results. Consider each in turn:

- *"Google's index merely reflects that the page exists on the wider web, and not that Google endorses it."* Compl. ¶ 22. This true statement does not remotely suggest that all websites will appear in Google's search results, only that the inclusion of a given site is not an endorsement by Google.

- *"Google search results are a reflection of the content publicly available on the web."* *Id.* ¶ 23. Likewise, this truism says merely that Google does not control the content of the

---

[6] The full text of Google's Removal Policies and Webmaster Guidelines can and should be considered in connection with this motion. By selectively pointing to various public statements on Google's website about its removal policies, Plaintiff has incorporated those policies (which include the Webmaster Guidelines) into the complaint. *See, e.g., SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) (applying the incorporation-by-reference rule); *Horsley v. Feldt*, 304 F.3d 1125, 1135-37 (11th Cir. 2002); *Smith v. Cox*, No. 5:13-CV-347-Oc-10PRL, 2014 U.S. Dist. LEXIS 126490, at *2-3, n. 3 (M.D. Fla. Sept. 10, 2014); *Cucinotta v. CVS Pharm., Inc.*, No. 8:12-CV-1194-T-33AEP, 2012 U.S. Dist. LEXIS 160993, at *9 (M.D. Fla. Nov. 9, 2012); *Reynolds v. Gables Residential Servs., Inc.*, 428 F. Supp.2d 1260, 1263 (M.D. Fla. 2006). The Court can also take judicial notice of these materials, which are publicly available and whose authenticity is undisputed. *See, e.g., Regions Bank v. Kaplan*, No. 8:12-CV-1873-T-17MAP, 2013 U.S. Dist. LEXIS 40805, at *49 (M.D. Fla. Mar. 22, 2013) (taking judicial notice of material on defendant's website). That is only fair. Plaintiff has cited isolated excerpts from Google's website in an effort to create the false impression that they comprise the full universe of Google's statements about the material it will remove from search results. Having done so, Plaintiff should not be permitted to ignore (and to keep the Court in the dark about) other statements on that same website that directly contradict its allegations. *See Simpson v. Kay Jewelers*, 142 F.3d 639, 646-47 (3d Cir. 1998) (plaintiffs cannot "pick and choose" favorable outliers among similar evidence).

websites that appear in its search results. It does not suggest that every public website will necessarily be included in search results.

- *"If you want to remove a photo, link to a profile, or webpage from Google Search results, you usually need to contact the website owner (webmaster) and ask them to remove the information." Id.* ¶ 24. This is a true statement that has nothing to do with—and certainly does not call into question—Google's policies for removing sites from search results that do not meet its quality standards. This passage is clearly directed to the removal of content in response to requests from third parties who object to material they find in search results.

- Google's *"Removals Polices"* page *"explains our policies for different types of content that Google will remove from web, image or video results." Id.* ¶ 25. This page accurately explains Google's policies for removing content from search results that is "sensitive or not appropriate for everyone to see." Ex. A at 15. It does not purport to exhaustively describe the circumstances where Google will remove material from search results. No reasonable person could conclude from this page that Google never removes websites for reasons other than those described here—particularly in light of the Webmaster Guidelines, which say precisely the opposite.

- Google's *"Transparency Report"* lists circumstances where search results are removed for reasons such as intellectual property violations. Compl. ¶ 26. The Transparency Report lists particular kinds of removals (those done in response to certain kinds of third-party requests). The Report does not promise to list *everything* removed from search results for any reason.

- Google is *"committed to leading the industry in transparency"* and publishes data that *"sheds light on how laws and policies affect Internet users and the flow of information online." Id.* ¶ 27. These statements are true and irrelevant to this case. Again, the Transparency Report does not suggest that Google will not remove material that violates its spam guidelines or promise that Google will publicize all removals made for that reason.

- *"Chilling Effects posts and analyses copyright removal requests (among other types of content removal requests) from a number of participating companies on its website. We link in our search results to the requests published by Chilling Effects in place of removed content when we are able to do so legally." Id.* ¶ 28. Again, this is entirely true and totally irrelevant to Plaintiff's claims. It simply explains that Google sends information to Chilling Effects about material removed from its search results based on claims of copyright infringement and other legal complaints from third parties. It does not say that Google will similarly publicize removals done for different reasons or that it has any obligation to do so.

Whether considered individually or collectively, therefore, these statements offer no support for Plaintiff's suggestion that Google misleads the public about its removal policies (*id.* ¶¶ 29, 47-48). No reasonable person could conclude from these statements that Google will not remove websites from its search results that it determines are engaged in manipulation—and, of course,

the Webmaster Guidelines make plain to the public that Google will do exactly that. There can be no deception claim based on Google's public statements.

Beyond all this, Plaintiff's claim fails because the complaint does not establish any causal connection between Google's alleged deception and e-ventures' purported harm. *See Shibata v. Lim*, 133 F. Supp. 2d 1311, 1317, 1321 (M.D. Fla. 2000) (dismissing FDUTPA claim where plaintiff failed to "allege sufficient facts to show that the consumer has been actually aggrieved by the unfair or deceptive act"). Plaintiff offers only a bare recital of this causation element. Compl. ¶ 58. That assertion is supported by no factual allegations and is entirely implausible. Even crediting the idea that Google's public-facing statements somehow failed to disclose that Google removes websites for violating its spam guidelines, Plaintiff cannot claim to have been deceived by those statements. As the complaint acknowledges, e-ventures (through its "Webmaster Tools" account) received direct notice from Google that its websites had been removed as "pure spam." Compl. ¶ 33. The fact that e-ventures registered certain of its sites using Google's Webmaster Tools, and was specifically told why those sites were removed, confirms Plaintiff's knowledge of Google's guidelines and destroys any causal link between Google's allegedly deceptive statements and Plaintiff's alleged harm.

In short, it is evident from the materials before the Court that Google made accurate statements about its removal policies, acted consistent with those policies, and provided notice to Plaintiff when it did so. The complaint fails to state a deception claim.

**Unfairness.** Nor can Plaintiff make out an unfairness claim. The court in *Kinderstart.com, LLC v. Google, Inc.*, No. C-06-2057, 2007 U.S. Dist. LEXIS 22637 (N.D. Cal. Mar. 16, 2007), dismissed a virtually identical claim that Google's decision to remove certain websites from search results was "unfair" competition. *Id.* at *53-55. The outcome should be the same here.

Under FDUTPA, an unfair practice is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to

consumers." *PNR*, 842 So. 2d at 777 (quotation marks omitted). Plaintiff does not make those allegations here. The complaint says merely that "Google committed unfair methods of competition." Compl. ¶ 54. But this "'naked assertion[]' devoid of 'further factual enhancement'" cannot support a legally viable claim. *Iqbal*, 556 U.S. at 678 (quoting *Twombly* at 557). Beyond that, Plaintiff offers no facts whatsoever suggesting that Google's removal from search results of websites that it deems to violate its spam guidelines violates any public policy or ethical norm. While e-ventures vaguely insinuates, without any supporting allegations, that Google acted to protect its "bottom line" (Compl. ¶¶ 36-37), not only is that contrary to Google's stated rationale for the removals (*id.* ¶ 33), the complaint cannot even bring itself to assert that such a motivation would amount to unethical or immoral behavior.

In addition to showing a public policy or ethical violation, a plaintiff pursuing an unfairness claim under FDUTPA must show that it suffered a "substantial" injury that is "not outweighed by any countervailing benefits to consumers or competition that the practice produces" and is one "that consumers themselves could not reasonably have avoided." *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. 3d DCA 2014). Plaintiff here does not even try to make such allegations. The complaint does not claim that e-ventures' injury was "substantial," much less that it was not outweighed by countervailing public benefits. Compl. ¶¶ 51-61. That is not surprising. It is clear that Google's removal actions were aimed at *preventing* injury to the consuming public. As Plaintiff admits, websites attempting to manipulate search engines may trick Google's algorithms into placing their sites higher in search results than may be warranted by their actual content and popularity. *Id.* ¶¶ 14-15, 17. Google's Webmaster Guidelines clearly explain this:

> Ever since there have been search engines, there have been people dedicated to tricking their way to the top of the results page. This is bad for searchers because it means more relevant websites get buried under irrelevant results, and it's bad for legitimate website owners because their sites become harder to find.

Ex. A at 11-12. Google's anti-spam policies are designed to combat this problem for the benefit of the public. By removing or demoting websites it believes are engaged in manipulation, Google allows its users to search more effectively and helps ensure that its results feature higher-value websites that provide quality content for users. *Id.* Plaintiff does not allege anything to suggest that Google's actions in this regard cause any substantial consumer injury, let alone that such injury outranks the benefits resulting from protecting search engine users against potentially deceptive manipulations. For this reason as well, Plaintiff's FDUTPA claim should be dismissed.

## IV.   PLAINTIFF FAILS TO STATE A DEFAMATION CLAIM

Under Florida law, defamation has the following five elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). The plaintiff must show that "the statement was a false statement of fact as distinguished from opinion, which is protected by the first amendment." *Keller v. Miami Herald Pub. Co.*, 778 F.2d 711, 715 (11th Cir. 1985) (citing *Hay v. Independent Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. Dist. Ct. App. 1984)). "This element, a false statement of fact, has been called the 'sine qua non for recovery in a defamation action.'" *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1247 (M.D. Fla. 2007) (quoting *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983)). "Whether a statement is one of fact or one of opinion is a question of law." *Id.*

In this case, Plaintiff falls well short of these requirements. First, the complaint does not identify a single published statement by Google about e-ventures or the removal of its websites from search results. "Publication of defamatory matter is its communication intentionally or by a negligent act to one *other than the person defamed*." Restatement (Second) of Torts § 577, cited in *Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1016 (Fla. 2001) (quoting *Zeran v. Am. Online, Inc.*, 958 F. Supp. 2d. 1133 (E.D. Va. 1997)). Here, however, Plaintiff admits that "no notice to the public

4696866.1

was posted" about the removal of e-ventures' sites. Compl. ¶ 3. The only "communication" that Google made about the delisting (and the reasons for it) was privately to e-ventures. *Id.* ¶ 33. Without a published statement of fact, there can be no defamation.

Instead of alleging the publication of a supposedly defamatory statement, Plaintiff contends that Google's search results themselves are somehow defamatory by virtue of their failure to list e-ventures' websites. Compl. ¶¶ 63-65. This will not do. Search results are not statements of fact. As discussed above, a search engine's decisions about what websites to include in its results constitute its "opinions of the significance of particular web sites as they correspond to a search query." *Search King*, 2003 U.S. Dist. LEXIS 27193, at *11. Different search engines will "express different opinions" on that issue, and "there is no conceivable way to prove that the relative significance assigned to a given web site is false." *Id.* at *11-12. Search results thus are "fundamentally subjective in nature." *Id.* at *10. Plaintiff itself acknowledges this when it alleges that the removal actions sent a message that Google thinks e-ventures websites "are not worthy of being listed on Google's search engine." Compl. ¶ 63. Whether something is "worthy of being included" in search results is clearly an expression of opinion. And "[o]pinions are protected from defamation actions by the first amendment." *Keller*, 778 F.2d 717; *see also Gertz v. Robert Welch, Inc.*, 418 US 323, 339-40 (1974) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."); *Search King*, 2003 U.S. Dist. LEXIS 27193, at *12 (holding that search results "are constitutionally protected opinions").

Finally, Plaintiff does not even try to plead fault, *i.e.,* that Google acted with knowledge (as at least negligence) of the falsity of its statements. *See Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2014 U.S. Dist. LEXIS 156499, at *32 (S.D. Fla. July 10, 2014) ("Florida defamation law requires a plaintiff to prove fault."); *Log Creek, L.L.C. v. Kessler*, 717 F. Supp. 2d 1239,1241 (N.D. Fla. 2010) ("the First Amendment bars a defamation claim of this kind absent an allegation of

fault"). While a heightened showing of fault is likely required here, as Google's opinion involves a matter of public concern and e-ventures is at least a limited-purpose public figure (*cf. Silvester v. American Broadcasting Cos.*, 839 F.2d 1491, 1493-98 (11th Cir. 1988)), the Court need not address that issue, as the complaint does not even allege that Google was negligent about the truth of its supposed statements regarding e-ventures. Without that, there can be no viable defamation claim. *See, e.g.*, *Kessler*, 717 F. Supp. 2d at 1251 (dismissing claim for failure to allege fault).

## V.    PLAINTIFF FAILS TO STATE A TORTIOUS INTERFERENCE CLAIM

Plaintiff cannot evade these problems with its defamation claim by asserting a claim for tortious interference. Florida's "single publication/single action rule does *not* permit multiple actions to be maintained when they arise from the same publication upon which a failed defamation claim is based." *Ovadia v. Bloom*, 756 So.2d 137, 141 (Fla. 3d DCA 2000) (emphasis in original)); *see also Kamau v. Slate*, No. 4:11cv522-RH/CAS, 2012 U.S. Dist. LEXIS 158213, at *23 (N.D. Fla. Oct. 1, 2012) ("Plaintiffs may not proceed on multiple claims for the same challenged defamatory actions."). The rule is "designed to discourage the erosion of free speech safeguards by the simple expedient of looking to a substitute cause of action." *Trujillo v. Banco Central Del Ecuador*, 17 F. Supp. 2d 1334, 1340 (S.D. Fla. 1998) (quoting *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607, 609 (Fla. 4th DCA 1975)).

The rule applies here. Plaintiff's tortious interference claim is based on the same act as its defamation claim. Compl. ¶ 72. Plaintiff is not permitted to evade Google's First Amendment and other defenses by restating that claim in a different guise. *See Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992) (successful invocation of a defamation privilege precludes a separate claim based on same publication); *see, e.g.*, *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002) (dismissing tortious interference claim); *Kamau*, 2012 U.S. Dist. LEXIS 158213, at *24 (same).

Even apart from the single-act rule, e-ventures cannot state a claim against Google. A tortious interference claim requires a showing of the following:

> (1) the existence of a business relationship[;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.

*Ethan Allen v. Georgetown Manor*, 647 So. 2d 812, 814 (Fla. 1994). The complaint here falls well short of this standard. First, other than to incant that the removal of e-ventures' sites was not "privileged, justified, or excusable" (Compl. ¶ 73), Plaintiff makes no effort to plead that Google's conduct was unjustified. Plaintiff's conclusory allegation is insufficient (*Iqbal*, 556 U.S. at 681), and it ignores that Google's decisions regarding the selection of material in its search results are constitutionally protected opinions that "cannot constitute improper interference in the context of a claim for tortious interference with contractual relations." *Search King*, 2003 U.S. Dist. LEXIS 27193, at \*12-13 (holding that "protected speech—in this case, PageRanks— cannot give rise to a claim for tortious interference with contractual relations because it cannot be considered wrongful, even if the speech is motivated by hatred or ill will").

Plaintiff also fails to plead knowledge and intent. Its effort to do so consists merely of the assertion that Google is "aware" that "e-ventures has contractual relationships with various third parties" (Compl. ¶ 71) and that it "wrongfully and intentionally harmed e-ventures' actual and prospective business relationships" (*id.* ¶ 72). Such "bald allegations" are "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. Indeed, the complaint does even *identify* any of e-ventures' supposed relationships, much less describe how Google might have been aware of them. Nor does it offer any facts to suggest that Google "manifested a specific intent to interfere with the business relationship." *Hodge v. Orlando Utils. Comm'n*, No. 6:09-cv-1059-Orl-19DAB, 2011 U.S. Dist. LEXIS 7621, at \*57 (M.D. Fla. Jan. 26, 2011) (quotation marks omitted). "Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687.

The same is true for Plaintiff's effort to plead damage resulting from a breach. Plaintiff does not even plead that any of its business and contractual relationships were actually *breached*, only that they were "damaged" in some unspecified way. Compl. ¶¶ 44, 71, 74. Plaintiff conspicuously does not allege that any third parties have cancelled contracts, terminated relationships, or otherwise refused to do business with e-ventures since its websites were removed from Google's search results. *Id.* ¶ 45. And the complaint offers nothing to suggest that e-ventures' relationships were damaged *as a result* of Google's actions. *See, e.g.*, *Roca Labs, Inc. v. Consumer Opinion Corp.*, 2014 U.S. Dist. LEXIS 161132, at *18-19 (M.D. Fla. Oct. 28, 2014) (rejecting tortious interference claim where plaintiff failed to show causation).[7] These pleading failures rule out any claim for tortious interference.

## CONCLUSION

For these reasons, Plaintiff's Complaint should be dismissed with prejudice.

Dated:  December 12, 2014

DAVID H. KRAMER (admitted *pro hac vice*)
COLLEEN BAL (admitted *pro hac vice* )
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
dkramer@wsgr.com
cbal@wsgr.com

BRIAN M. WILLEN (admitted *pro hac vice*)
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the Americas, 40th Floor
New York, NY  10019
bwillen@wsgr.com

Respectfully submitted,

s/ *Nathan M. Berman*
NATHAN M. BERMAN
Fla. Bar No. 0329230
Zuckerman Spaeder LLP
101 East Kennedy Blvd.
Suite 1200
Tampa, FL 33602
Tel: (813) 221-1010
Fax: (813) 223-7961
nberman@zuckerman.com

COUNSEL FOR GOOGLE INC.

---

[7] Any claim of causation would be implausible here given the limited nature of the action Google took here. Google does not have the power to block Plaintiff's websites from the Internet. Those sites remain online, and anyone interested in them can find them easily by entering their online address, clicking a link, or using another search engine. *Cf. Zhang*, 10 F. Supp. 3d at 441.

4696866.1

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2014, I electronically filed the foregoing with the

Clerk of the Court using the Court's CM/ECF system.

/s/ Nathan M. Berman
Nathan M. Berman