IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| E-VENTURES WORLDWIDE, LLC, <br> 9045 Strada Stell Court, Suite 103, <br> Naples, FL  34109, <br><br>     Plaintiff, <br><br>         v. <br><br> GOOGLE, INC., <br> 1600 Amphitheatre Parkway <br> Mountain View, CA  94043, <br><br>     Defendant. | Civil Action No. 2:14-CV-00646-JES-CM <br><br> **JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

1.  Plaintiff e-ventures Worldwide, LLC ("e-ventures"), files this First Amended Complaint against defendant Google, Inc. ("Google"), in accordance with the Court's April 17, 2015 Order.

## THE PARTIES

2.  e-ventures is a limited liability company organized and existing under the laws of Indiana with its principal place of business at 9045 Strada Stell Court, Suite 103, Naples, Florida 34109.

3.  Defendant Google is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California, 94043.

4.  Google advertises, solicits clients, and conducts substantial amounts of business in the state of Florida and within this district, subjecting it to personal jurisdiction in this district.

## JURISDICTION AND VENUE

5. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2), because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

6. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, because the matter involves a Federal question.

7. Venue is proper in this district under 28 U.S.C. § 1391 (b)(2) because a substantial part of the events or omissions giving rise to e-ventures' claims occurred in this district.

8. Venue is also proper in this district under 28 U.S.C. §§ 1391(b)(1) and (c) because Google is a corporation whose contacts would be sufficient to subject it to personal jurisdiction in this district.

## FACTS

**A. Google Has an Anti-Competitive Incentive to Damage e-ventures Because of the Nature of the Parties' Businesses.**

9. Both parties in this case provide online publishing and advertising services.

10. e-ventures is a small, online publishing and research firm based in Naples that reviews products and services in specific industries.

11. Google has been called "the world's largest media company," with approximately 70% of the United States' online search market and 90% of Europe's online search market.

12. On information and belief, over 90% of Google's revenues are derived from Google's online advertising services. The majority of the revenues arise from Google's "AdWords" advertising program, through which consumers pay Google to have their websites ranked and displayed prominently in Google's search results.

13. Links to the advertisers' websites are displayed at the top of Google's search

results, and every time a consumer clicks on the link to reach the advertiser's website, Google charges the advertiser and collects a profit.  Each ad proposes a commercial transaction.

14.	e-ventures specializes in publications concerning the "search engine optimization" or "SEO" industry.  "SEO" is the process of causing websites to be ranked and displayed more prominently in search results, without payment being made to the search engine.  The majority of e-ventures' revenues arise from SEO industry members.

15.	Because of Google's large market share, SEO companies generally focus on how their clients' websites can be ranked higher in Google's unpaid search listings.

16.	The "SEO" services advertised on e-ventures' websites reduce Google's revenues, because if companies are successful in achieving website prominence in Google's unpaid search listings, then there is less of a need for those companies to purchase Google's "AdWords" advertising services.

17.	In addition, in general, marketing dollars that might otherwise be spent on Google advertising are, instead, being spent by companies to pay SEO providers to increase their visibility on Google.

18.	Both Google and e-ventures publish information online designed to assist third parties in achieving increased website visibility on Google.  Google hopes that third parties read Google's publications and pay Google to be ranked higher in Google's search results.  e-ventures hopes that third parties read e-ventures' publications and pay a SEO provider instead of Google to achieve the same result.

19.	In sum, Google has an anti-competitive, economic motivation to eliminate the visibility of e-ventures' websites on its search engine.

**B.     Google Banned e-ventures' Websites From Being Displayed on Google.com and All Google-Affiliated Websites, Resulting in Damages to e-ventures.**

20.     Prior to September 2014, e-ventures had not instituted any significant or sudden changes in its website content that would have prompted Google to suddenly treat e-ventures' websites any differently.

21.     However, e-ventures received information indicating that, on or about September 15, 2014, a third party with a personal vendetta against e-ventures had caused Google to receive false information about e-ventures' websites.

22.     On September 19, 2014, e-ventures was notified by Google that 231 websites owned by e-ventures were being manually removed by Google from all of Google's search results, because they had been identified as "pure spam."

23.     "Pure spam" is a term coined and defined by Google.

24.     The websites included almost every website owned by e-ventures, including "corporate" websites, brand new websites, and websites that could not have engaged in any activities which could possibly be classified as "spam."

25.     As a result of Google's decision to "ban" e-ventures, e-ventures' websites could not be located on the world's most widely used search engine, Google.com, in either Google's paid or unpaid search listings.

26.     e-ventures websites were removed by Google from both its paid and its unpaid search listings.  Upon information and belief, the removal of e-ventures' paid search listings was an automatic byproduct of Google's decision to ban e-ventures' websites from Google's search results entirely.

27.     As a result, at the time the Complaint was filed, when an individual searched for "eventures" on Google's search engine, a confusing display of third party websites for companies

4

using the trademark "eventures" appeared, but e-ventures' actual corporate websites were absent from Google's paid and unpaid search listings.

28. Google's manual actions prevented e-ventures' business partners, customers, and prospective customers from locating e-ventures' websites through Google, the world's most widely-used search engine.

29. In addition, the scope of the ban was not confined to Google.com. e-ventures' websites were also precluded from being displayed on all Google-affiliated websites and on third party websites participating in Google's advertising programs (upon information and belief, this includes over 2 million websites).

30. Google's decision to delist almost all websites associated with e-ventures from its search results caused irreparable harm and significant damage to e-ventures' business while the "ban" was in effect.

C.   e-ventures Attempted to Mitigate Its Damages.

31. After Google notified e-ventures that the websites had been delisted, e-ventures immediately began researching the possible basis for Google's notifications, without success. e-ventures began making every possible change to its websites that e-ventures could conceive of in order to get its websites "relisted," but to no avail.

32. Google's removal of e-ventures' websites appeared to result from the fact that Google determined that the websites were all affiliated with e-ventures, because many of the websites had nothing else in common with each other.

33. e-ventures did not understand what (if any) specific objections Google had to its websites in the first place, and trying to satisfy the unknown desires of Google was a mysterious, unfruitful and unfair process.

34. Prior to filing the Complaint, e-ventures repeatedly attempted to address with Google the reasons for Google's designation of its websites as "pure spam," to no avail; e-ventures made significant changes to its websites and filed multiple resubmission requests, to no avail; e-ventures attempted to mitigate its damages by creating new websites, to no avail (Google also delisted those sites); and e-ventures sent letters to Google from counsel, to no avail.

35. e-ventures created "test websites" that were also delisted. For example, e-ventures created a new blog that merely stated "bye bye world" to see if it would be included in Google's search results, but it was also delisted.

36. It was not until after e-ventures filed this lawsuit that its websites were relisted.

**D.  Google's Published Statements Are Inconsistent With Google's Conduct.**

37. Google informs consumers that Google's search results are largely the result of mechanical algorithms and that Google does not remove content from its search results except in very limited circumstances. These limited circumstances are seemingly identified in Google's published "Removal Policies."

38. Nowhere in the Removal Policies, or in any other publication, does Google ever indicate that it will "ban" a website owner, or take punitive action against a website owner by completely removing from its paid and unpaid search results every website affiliated or associated with that website owner.

39. Nowhere in the Removal Policies, or in any other publication, does Google ever indicate that it will remove content for anti-competitive reasons.

40. To the contrary, Google's Removal Policies inform the public that Google takes a neutral approach and only removes very specific categories of content, which do not include any of the content published by e-ventures.

6

41.     For example, when defamatory content posted by a third party appears prominently in search results for a person's name, Google attempts to avoid any responsibility for the content.  Google claims that: "Google's index merely reflects that the page exists on the wider web, and not that Google endorses it."

42.     Google further states: "Google search results are a reflection of the content publicly available on the web" and "search engines can't remove content directly from websites."

*See*  https://www.google.com/intl/en/policies/faq/:

> **How can I remove information about myself from Google's search results?**
>
> Google search results are a reflection of the content publicly available on the web. Search engines can't remove content directly from websites, so removing search results from Google wouldn't remove the content from the web. If you want to remove something from the web, you should contact the webmaster of the site the content is posted on and ask him or her to make a change. Once the content has been removed and Google has noted the update, the information will no longer appear in Google's search results. If you have an urgent removal request, you can also visit our **help page** for more information.

43.     The referenced "help page" states: "If you want to remove a photo, link to a profile, or webpage from Google Search results, you usually need to contact the website owner (webmaster) and ask them to remove the information…See our Removals Policies to learn more about what information Google will remove."

44.     The referenced "Removal Policies" page states: "This page explains our policies for different types of content that Google will remove from web, image or video results."  The page identifies certain limited content that may be removed by Google, such as pages identifying a person's social security number, or obscene or graphic content.

45.     Google also includes a "Transparency Report" at http://www.google.com/transparencyreport/, which identifies limited circumstances in which

search results are removed, such as for intellectual property violations, the inclusion of malware (websites dangerous to users), and for compliance with court orders.

46. Google also states: "Chilling Effects posts and analyses copyright removal requests (among other types of content removal requests) from a number of participating companies on its website. We link in our search results to the requests published by Chilling Effects in place of removed content when we are able to do so legally."

47. In sum, Google's statements to the public (and e-ventures) were false, deceptive and misleading, because they are inconsistent with the conduct Google demonstrated in this case. By way of specific example, Google made the following statements to the public and to e-ventures:

    a. "*Google's index merely reflects that the page exists on the wider web.*" e-ventures' pages existed on the web, but they were not reflected in Google's index.

    b. "*Google search results are a reflection of the content publicly available on the web.*" e-ventures' websites were publicly available, but did not appear in Google search results.

    c. "*See our Removal Policies to learn more about what information Google will remove.*" The Removal Policies say nothing about the removal of "pure spam" or blacklisting companies. They are inconsistent with Google's conduct towards e-ventures and therefore deceptive and misleading to the public.

    d. "*This page explains our policies for different types of content that Google will remove from web, image or video results.*" The page is inconsistent with Google's conduct towards e-ventures, because Google removed content that is not described on the page.

    e. Google's "mission is 'to organize the world's information.'" Google excluded e-ventures' information from the world's information.

    f. "*Google is committed to leading the industry in transparency*" and publishes data that "sheds light on how laws and policies affect Internet users and the flow of information online." Google does not publish any data shedding light on these removals, and prior to this litigation, did nothing to inform the public about the e-ventures removals.

8

g. *"Chilling Effects posts and analyzes copyright removal requests (among other types of content removal requests) from a number of participating companies on its website. We link in our search results to the requests published by Chilling Effects in place of removed content when we are able to do so legally."* Google could have linked to Chilling Effects legally, but did not do so, to let the public know that e-ventures' websites had been removed.

h. *"It is Google's policy not to censor search results. However, in response to local laws, regulations, or policies, we may do so. When we remove search results for these reasons, we display a notice on our search results pages. Please note: For some older removals (before March 2005), we may not show a notice at this time."* Google censored e-ventures' websites without any notice to the public and did not do so in response to local laws, regulations or policies.

48.     All of Google's published statements state that Google will only remove website content based upon that content falling within certain limited exceptions, but here, Google delisted websites solely based upon the websites' affiliation with e-ventures, which also did not fall within the exceptions set forth in the Removal Policies.

**E.     Google's Conduct and Acknowledgements After the Filing of e-ventures' Complaint Confirm That Google's Conduct Was Inconsistent With Google's Statements to the Public.**

49.     After e-ventures' Complaint and Preliminary Injunction Motion were filed, Google did gradually lift the ban and begin to relist e-ventures' websites in its search results.

50.     Some websites (and ads) of e-ventures were summarily delisted and then relisted by Google, without changes being made to the websites by e-ventures.

51.     For a time period following the ban, Google also accepted money from e-ventures to run a new ad for a website that Google was continuing to block from Google's unpaid search results, allegedly because the website was "pure spam." This ended while the Preliminary Injunction Motion was pending.

52.     Google never accused e-ventures of publishing content in violation of Google's Removal Polices, such as publishing obscene information, a person's social security number,

9

information that was the subject of an intellectual property take-down notice, or information that had to be removed pursuant to Court order.

53.     Google also never accused e-ventures of "spam," which Google defines as "irrelevant or inappropriate messages sent on the Internet to a large number of recipients." e-ventures did not engage in this conduct.

54.     Instead, Google accused e-ventures of trying to have its website be ranked higher in Google's search results. Google characterized this conduct is egregious "pure spam," although Google itself engages in the same types of conduct that Google criticized e-ventures for, and of course, many businesses in the United States attempt to cause their websites to be ranked higher on Google.

55.     Since the filing of e-ventures' initial Complaint in this matter, it has also been revealed to the public that Federal Trade Commission officials concluded in a 2012 investigation that Google used anticompetitive tactics in connection with its Internet search results, and abused its monopoly power in ways that harmed Internet users and rivals.

56.     Google itself heavily promotes to its customers the same services advertised by e-ventures, but only when those services are offered by Google.

57.     Google's post-Complaint explanation of the ban – that e-ventures engaged in manipulation schemes and that this is why every website associated with e-ventures was removed from Google's search listings – is inconsistent with Google's published policies and the parties' conduct in this matter.

58.     In its response to e-ventures' Complaint and injunction motion, Google has acknowledged that it removed 366 websites from its search results entirely, based upon the websites' apparent affiliation with e-ventures.

59. Google acknowledged that it "acted upon the entire network" of e-ventures websites "to efficiently use Google's resources." Upon information and belief, the content of each website was not individually reviewed and evaluated by Google prior to Google's decision to ban e-ventures' websites. Rather, websites were banned regardless of their contents simply because they were identified as belonging to e-ventures.

60. Google also stated that it delists websites "when we believe it appropriate to deter bad behavior," which is not a reason for removal stated in Google's published policies.

61. Upon information and belief, Google has a history of surreptitiously characterizing website owners, who advertise or promote SEO services, which negatively impact Google's bottom line, as engaging in "pure spam," and banning them from Google's search results.

62. Upon information and belief, Google removes websites that are affiliated with companies or persons advertising or promoting SEO services as "pure spam," and does so for anti-competitive reasons, although it does not make this action or the reasons for it public.

63. Upon information and belief, Google acted against e-ventures for anti-competitive reasons and to punish e-ventures for engaging in what it has unilaterally labeled as "pure spam," and not based on the content of e-ventures' individual websites.

**FIRST CAUSE OF ACTION**
**UNFAIR COMPETITION UNDER THE LANHAM ACT**

64. e-ventures incorporates by reference Paragraphs 9-19 above (explaining the anti-competitive nature of the injury and the commercial relationship of the parties); Paragraphs 20-36 (explaining Google's ban of e-ventures and the resulting damage to e-ventures); Paragraphs 37-48 (identifying Google's false, misleading and deceptive statements); and Paragraphs 49-63 (identifying post-Complaint evidence of Google's unfair competition).

11

65.     Under Section 43(a) of 15 U.S.C. 1125(a),

[a]ny person who, on or in connection with any goods or services ... uses in commerce any …false or misleading description of fact, or false or misleading representation of fact which ... is likely to deceive as to…commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

66.     Google's description of its search engine services in the Removal Policies, and other statements identified in Paragraph 47, in light of Google's actual conduct towards e-ventures, were false or misleading to consumers and likely to deceive consumers.

67.     The statements had a tendency to deceive or actually deceived a substantial segment of consumers into believing that e-ventures' websites had violated Google's Removal Policies (or other published policies) and that is why the websites were banned from Google's search results, when this was not the case.

68.     e-ventures was damaged as a result of Google's statements and conduct, as e-ventures' revenues plummeted during and following the Google ban.  Moreover, Google's statements damaged the good will and positive reputation that e-ventures had previously enjoyed with its customers and the general public.

69.     Google's treatment of e-ventures was unfair, as it singled e-ventures out for disparate treatment on the sole or primary basis of an anti-competitive motive and, as Google acknowledges, to "deter" what Google felt was e-ventures' "bad behavior."

70.     Due to Google's market share, Google has the power to effectively destroy any online publishing business such as e-ventures.

71.     e-ventures suffered actual damages proximately caused by Google's violation of the Act.

72.    Google's unfair competition has damaged e-ventures in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

73.    e-ventures incorporates by reference Paragraphs 9-19 above (explaining Google's anti-competitive motivation for its conduct); Paragraphs 20-36 (explaining Google's ban of e-ventures and the resulting damage to e-ventures); Paragraphs 37-48 (explaining Google's deceptive and misleading conduct and statements); and Paragraphs 49-63 (identifying post-Complaint evidence of Google's anti-competitive conduct).

74.    The parties have a ongoing commercial relationship. e-ventures has purchased and continues to purchase Google's services.

75.    e-ventures has its headquarters in Florida, designed the websites at issue in Florida, and suffered damages, including irreparable harm, as a result of Google's wrongful actions, in Florida.

76.    Google does business in Florida and was engaged in "trade or commerce" under the Act.

77.    Google's deceptive and misleading statements caused harm to e-ventures, because e-ventures expected Google to comply with its published policies concerning whether and when it would remove content, and Google did not, banning e-ventures' websites from its search results for anti-competitive reasons. Google's failure to comply with its promises resulted in the ban and in damages to e-ventures.

78.    Google's practices are likely to deceive consumers acting reasonably, and have in fact already deceived consumers into believing that Google only removes content that violates Google's Removal Policies and/or in certain other limited circumstances, when that is untrue.

79. Google also harmed e-ventures by falsely and misleadingly informing consumers that e-ventures' websites had violated Google's Removal Policies and/or any other published policies of Google, when that was untrue.

80. Google never informed the public or e-ventures that it ever "banned" companies in this manner "when we believe it appropriate to deter bad behavior," although it is acknowledging now that it does so.

81. The public has an interest in whether Google's statements to the public are misleading and deceptive, particularly as Google has a 70-90% market share.

82. Google's treatment of e-ventures was clearly unfair, as it singled e-ventures out for disparate treatment and Google had an anti-competitive motive to do so.

83. Google committed unfair methods of competition or unfair or deceptive acts or practices under the Act by engaging in the conduct described above.

84. Google's actions contradicted its published statements concerning censorship, transparency, content removal, and notice to the public, as set forth above.

85. e-ventures suffered actual damages proximately caused by violation of the Act.

86. Google's unfair trade practices have damaged e-ventures in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**DEFAMATION**

87. e-ventures incorporates by reference 9-19 above (explaining the parties' respective businesses); Paragraphs 20-36 (explaining Google's ban of e-ventures and the resulting damage to e-ventures), Paragraphs 37-48 (explaining Google's statements to the public concerning when it removes content), and Paragraphs 49-63 (describing Google's post-complaint conduct).

88. Google's statements to the public concerning its search results (including but not limited to the Removal Policies), and its search results, are publications.

89. Google's removal of e-ventures' websites from its search results falsely indicated to the public that e-ventures' websites were not worthy of being listed on Google's search engine, because the websites somehow met Google's narrow criteria for website removal. However, in reality, e-ventures' websites did not fall within Google's criteria for removal.

90. Google's publications falsely conveyed to the public that e-ventures did not measure up to Google's published standards, thereby damaging e-ventures' business and reputation.

91. Google's failure to list e-ventures' websites in its search results has resulted in actual damages to e-ventures.

92. Google's actions tended to lower the public's opinion of e-venture and its websites.

93. Third parties seeing that e-ventures' websites had been delisted immediately assumed that e-ventures had engaged in wrongful conduct in which e-ventures did not engage.

94. Google's defamation of e-ventures has damaged e-ventures in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE**

95. e-ventures incorporates by reference Paragraphs 9-19 above (explaining the parties' respective businesses); Paragraphs 20-36 (explaining Google's ban of e-ventures and the resulting damage to e-ventures); Paragraphs 37-48 (explaining Google's statements to the public concerning when it removes content); and Paragraphs 49-63 (describing Google's post-complaint conduct).

15

96. Like other online publishing businesses, e-ventures' business is heavily dependant upon its visibility on Google's search engine.

97. As Google is aware, e-ventures has contractual relationships with various third parties which have been damaged by Google's refusal to list e-ventures' websites on Google's search engine.

98. Upon information and belief, Google viewed at least one of e-ventures' websites before making the decision to ban e-ventures and it was readily-apparent from the website that e-ventures has contractual relationships with third parties, which would be damaged if e-ventures was banned from Google's search results.

99. In removing e-ventures' websites from its search listings, Google wrongfully and intentionally harmed e-ventures' actual and prospective business relationships.

100. Google acted to delist e-ventures' websites not just on September 18, but also later when e-ventures created new websites.

101. Google acted to maintain the ban between September 18 and December 11.

102. Google was also aware of e-ventures' contractual relationships with third parties during the ban, because e-ventures and its counsel sent Google letters detailing the damage prior to filing suit, but the letters were ignored and the ban was maintained.

103. Google's conduct was not privileged, justified or excusable.

104. Google's tortious inference with contractual relations has damaged e-ventures in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff e-ventures Worldwide, LLC, asks for an order and judgment against Google:

      a.      Awarding e-ventures actual, compensatory and punitive damages, and its costs and attorneys' fees, to the full extent allowed by law and specifically, by the Florida Deceptive and Unfair Trade Practices Act and the Lanham Act; and

      b.      Granting such other relief as this Court deems just and equitable.

## DEMAND FOR A JURY TRIAL

Plaintiff e-ventures Worldwide, LLC, hereby demands a jury trial on all issues triable by a jury in the above-captioned matter.

Dated: May 1, 2015

Respectfully submitted,

Alexis Arena, Esquire
  alexis.arena@flastergreenberg.com
**FLASTER/GREENBERG P.C.**
1628 JFK Blvd., 15th Floor
Philadelphia, PA  19103
(215) 279-9908 (phone)
*Admitted Pro hac vice*

John Clough, Esq.
**Zung Clough Attorneys at Law**
8985 Fontana del Sol Way
Naples, Florida 34109
(239) 325-1895 (phone)

*Attorneys for Plaintiff*