# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

|  |  |
|---|---|
| e-ventures Worldwide, LLC, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 2:14-cv-00646-JES-CM |
| Google Inc., | ) |
| Defendants. | ) |

**GOOGLE'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW**

BRIAN M. WILLEN (admitted *pro hac vice*)
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the Americas, 40th Floor
New York, NY  10019
(212) 497-7700

NATHAN BERMAN, Fla. Bar No. 0329230
Zuckerman Spaeder LLP
101 East Kennedy Blvd.
Suite 1200
Tampa, FL 33602
(813) 221-1010

*Counsel for Google Inc.*

4936082.1

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Google Inc. ("Google") moves to dismiss the First Amended Complaint ("FAC") filed by Plaintiff e-ventures Worldwide LLC ("e-ventures"). Google submits the following memorandum of law in support of its motion.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This is Plaintiff's second attempt to hold Google liable for removing material from its search results that Google determined violated its guidelines aimed at preventing the manipulation of search rankings. Plaintiff's original complaint asserted claims based on Google's removal of e-ventures' websites from ordinary ("natural") search results. The FAC asserts new claims based on the removal of e-ventures' *paid* search results (advertisements) in connection with Google's "AdWords" program. Either way, however, Plaintiff's claims must be dismissed, this time with prejudice.

As an initial matter, Plaintiff's claims are barred by the Communications Decency Act ("CDA"), which protects Google from liability on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be … objectionable." 47 U.S.C. § 230(c)(2). In removing links related to e-ventures from its search results, Google acted to restrict access to material on its service that it deemed objectionable. As courts in similar cases have held, that is exactly what the CDA protects.

The First Amendment separately bars Plaintiff's effort to hold Google liable for its editorial judgments about what information to present to users in response to search queries. That is true regardless of whether e-ventures challenges the removal of natural search results or search-related advertisements. In both instances, by choosing what material to display (and not display) in its search results, Google is engaging in speech protected by the First Amendment and cannot be held liable for that expression of opinion.

Even if they could get past these problems, Plaintiff's claims fail on their own merits. e-ventures asserts a new federal claim, under Section 43(a) of the Lanham Act, but that statute is

totally inapplicable here. Plaintiff does not (and could not) suggest that Google's actions were likely to deceive consumers as to Google's "affiliation, connection, or association" with e-ventures or as to Plaintiff's "sponsorship, or approval" of Google's services. 15 U.S.C. § 1125(a)(1)(A). Likewise, insofar as e-ventures is trying to advance a false advertising claim, the FAC fails to identify any statement (much less a false one) that Google made "in commercial advertisement or promotion." *Id.* § 1125(a)(1)(B). Nor does Plaintiff make a plausible allegation that Google's allegedly misleading statements caused e-ventures any harm.

Plaintiff's state law claims fare no better. The claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") must be dismissed because e-ventures still fails to plausibly allege that Google engaged in deceptive or unfair conduct. Like its predecessor, the FAC presents various innocuous and non-deceptive statements from Google's website that do not relate to the conduct at issue here. Even considered on their own, those statements are not misleading, but Plaintiff cannot hide from the Court a host of other public statements from the same Google website that clearly describe Google's readiness to take action—including removal—against website operators that it determines are trying to manipulate search results. Nor does the FAC offer any credible allegation that Plaintiff's purported harm was caused by Google's statements or omissions, rather than by Google's removal of e-ventures' webpages from search results. As for unfairness, e-ventures remains unable to plead that Google's conduct violated established public policy or that any alleged injury to e-ventures was not outweighed by the benefits to consumers from Google acting against websites that, in its judgment, are undermining the integrity of its search results.

As for e-ventures' defamation claim, it is based on Google's decision to remove e-ventures' links from search results. But Plaintiff does not identify any "statement of fact" that Google "published" about the quality of e-ventures' websites. To the contrary, the FAC makes clear that Google communicated an *opinion*—and only to e-ventures, not to the public. There can be no

defamation liability in that circumstance. But even if Google had made and published an actual statement about e-ventures, that statement would be protected by the First Amendment unless there were credible allegations of actual malice, which are totally missing from the FAC.

Finally, Plaintiff's effort to repackage its failed defamation claim as one for tortious interference runs afoul of Florida's "single action" rule. Beyond that, Plaintiff still offers no allegations that Google knew about and acted with the specific intent of harming any of e-ventures' (unidentified) contractual relationships or that any of those relationships actually were breached as a result of Google's conduct.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Google and Its Search Engine

While Google offers many different products in service of its mission "to organize the world's information and make it universally accessible and useful" (https://www.google.com/about/company), this case arises out of its search engine and associated advertising program, "AdWords." FAC ¶ 11. "Search engines are indexing tools used to locate web sites that correspond to a user's search query." *Search King, Inc. v. Google Tech., Inc.*, 2003 U.S. Dist. LEXIS 27193, at *2 n.1 (W.D. Okla. May 27, 2003).

> When a keyword is entered, the search engine processes it through a self-created index of web sites to generate a (sometimes long) list relating to the entered keyword. Each search engine uses its own algorithm to arrange indexed materials in sequence, so the list of web sites that any particular set of keywords will bring up may differ depending on the search engine used.

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999).

Google's search results are selected and ordered primarily by a combination of proprietary algorithms. FAC ¶ 37. Google's algorithms select among billions of webpages to determine which should be displayed in response to a given search. *Search King*, 2003 U.S. Dist. LEXIS 27193, at *3-4. "[E]very algorithm employed by every search engine is different, and will produce a different representation of the relative significance of a particular web site depending

on the various factors, and the weight of the factors, used to determine whether a web site corresponds to a search query." *Id.* at *10. Google's search results thus reflect its "fundamentally subjective" opinion about what information is most relevant to each user's search queries. *Id.*

In addition to Google's unpaid ("natural") search results, Google runs a paid advertising program known as "AdWords." FAC ¶¶ 12-13. Advertisers participating in AdWords can bid on particular words and phrases, and when users enter search queries using those terms, Google "presents [the winning bidder's] advertisements as 'sponsored links' or 'sponsored results' in addition to the standard search results." *CollegeSource, Inc. v. Academyone, Inc.*, 2012 U.S. Dist. LEXIS 153197, at *16 (E.D. Pa. Oct. 25, 2012). Advertisers "must register for a Google AdWords account before bidding on a keyword," and in doing so they must agree to the AdWords terms and conditions. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 151 (4th Cir. 2012). Insofar as e-ventures paid for its websites to appear as part of advertisements appearing on Google's search engine, it did so through the AdWords program, and its use of the program was governed by the AdWords terms and conditions. Among other things, this agreement expressly gives Google the right to restrict the contents of advertisements. *See generally* Google's Motion to Transfer (filed concurrently with this motion).

While Google's algorithms are designed to return the best results to users, manual action is sometimes needed to protect the integrity of Google's search engine from content that is unlawful or offensive, as well as from efforts by website operators to manipulate the order of search results. FAC ¶¶ 22, 44. If a website does not conform to Google's quality standards, or if an operator is engaged in tactics to distort Google's results, Google may take action against the objectionable sites, including removing them from its search index. *Id.* ¶ 22; *see, e.g.*, *Search King*, 2003 U.S. Dist. LEXIS 27193, at *3. Google's guidelines regarding search engine manipulation (also called "webspam") are explained in detail on the support pages of its website. *See* http://support.google.com ("Webmaster Guidelines" and "Removal Policies") (attached hereto as

Exhibit A).[1] These policy guidelines are necessary because third parties often try to trick Google's algorithms into ranking certain webpages higher in search results than they would be ranked based on their content and popularity. Ex. A at 12.

Through these statements, Google makes clear that it will not hesitate to remove or demote websites it finds to be engaged in such schemes. *Id.* at 1-14. Google "strongly encourage[s] [website operators] to pay very close attention to the 'Quality Guidelines,' which *outline some of the illicit practices that may lead to a site being removed entirely* from the Google index or otherwise impacted by an algorithmic or manual spam action." *Id.* at 1. (emphasis added). These guidelines provide specific examples of the kinds of manipulations that may lead Google to take manual action against particular websites. *Id.* at 2-14. But Google cautions that the specific violations described in the guidelines are not exhaustive: "These quality guidelines cover the most common forms of deceptive or manipulative behavior, but Google may respond negatively to other misleading practices not listed here." *Id.* at 3. Plaintiff's claims in this case arise out of Google's application of these policies and terms. FAC ¶ 22.

### B.    Plaintiff and Its Claims

Plaintiff e-ventures specializes in publications about "search engine optimization" ("SEO")—strategies aimed at "affecting the visibility" of websites in search engine results. FAC ¶¶ 14-16. Plaintiff operates a network of websites in connection with its business. *Id.* ¶¶ 18, 22. This case arises from Plaintiff's efforts to artificially boost the appearance of those websites in Google's search results. On September 18, Google applied the policies described on its website to remove e-ventures' websites from search results. *Id.* ¶¶ 22-23. Google notified e-ventures about the removals that same day. *Id.* Google explained that e-ventures' sites had run afoul of

---

[1] As discussed below, these statements are appropriate for consideration with this motion because they are incorporated by reference in Plaintiff's FAC, and because they are subject to judicial notice.

Google's quality standards and had been determined to be "pure spam." *Id.* That term is clearly explained in the "Webmaster Guidelines" section of Google's website (Ex. A at 14):

> If you see this message ["pure spam"] on the Manual Actions page, it means that Google has detected that some of your pages may be using techniques that are outside our Webmaster Guidelines. The site appears to use aggressive spam techniques such as automatically generated gibberish, cloaking, scraping content from other websites, and/or other repeated or egregious violations of Google's quality guidelines.

Plaintiff filed suit against Google on November 4, 2014 (Dkt. 1). In the original incarnation of its complaint, Plaintiff asserted various claims under Florida law based on Google's removal of e-ventures' websites from natural search listings. Google filed a motion to dismiss. Dkt. 36.[2] Without reaching any of Google's arguments, the Court dismissed the complaint for employing improper "shotgun" pleadings tactics. Dkt. 52. On May 1, 2015 Plaintiff filed the FAC (Dkt. 53). While largely repeating the allegations of the original complaint, the FAC now makes allegations about the removal of e-ventures' paid advertisements and asserts a new cause of action under federal law for violation of the Lanham Act (FAC ¶¶ 64-72). Plaintiff also continues to press its claims under Florida law for deceptive and unfair trade practices, violation of the FDUTPA (*id.* ¶¶ 73-86), defamation (*id.* ¶¶ 87-94), and tortious interference (*id.* ¶¶ 95-104).

## ARGUMENT

Only "a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also ADA v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (internal quotation marks omitted) ("[W]hen plaintiffs have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."). Moreover,

---

[2] Plaintiff also sought a preliminary injunction. Dkt. 11. Google opposed Plaintiff's motion (Dkt. 30), submitting along with its opposition a detailed declaration explaining its policies for combatting search engine manipulations and documenting its communications with e-ventures about the removal of its websites (Dkt. 31). Shortly thereafter, on December 12, 2015, Plaintiff withdrew its preliminary injunction motion. Dkt. 35.

"the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

## I.    PLAINTIFF'S CLAIMS ARE BARRED BY THE CDA

Section 230(c)(2) of the CDA shields Google from liability for actions taken to remove material it finds objectionable. It provides as follows:

> No provider or user of an interactive computer service shall be held liable on account of … any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable.

47 U.S.C. § 230(c)(2). "Congress clearly enacted § 230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions." *Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000). This provision offers a "'robust' immunity." *Holomaxx Techs. Corp. v. Microsoft Corp.*, 2011 U.S. Dist. LEXIS 94316, at *6 (N.D. Cal. Aug. 23, 2011). It gives "fairly absolute protection to those who choose to block [materials they find objectionable]." *e360Insight LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 607-08 (N.D. Ill. 2008). The "language of section 230(c)(2) is clearly inconsistent with state law that makes interactive service providers liable based on their efforts to screen content." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1322 n.3 (11th Cir. 2006).[3]

---

[3] Courts strive "to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254-55 (4th Cir. 2009) (quoting *Fair Housing Council v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc)). Thus, application of CDA immunity often occurs at the pleadings stage. *See, e.g.*, *Langdon*, 474 F. Supp. 2d at 630-31; *e360Insight*, 546 F. Supp. 2d at 609-10.

Section 230(c)(2) bars Plaintiff's efforts to hold Google liable for removing e-ventures' websites and advertisements from search results. As the operator of an Internet search engine (FAC ¶ 16), Google is the provider of an "interactive computer service." *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 630 (D. Del. 2007); *Murawski v. Pataki*, 514 F. Supp. 2d 577, 591 (S.D.N.Y. 2007). And Plaintiff seeks to hold Google liable for "voluntary" action taken "to restrict access to" material that it "considers" "objectionable." 47 U.S.C. § 230(c)(2). The language of the statute "imposes a subjective element into the determination of whether a provider or user is immune from liability." *e360Insight*, 546 F. Supp. 2d at 608. What matters is not whether the material associated with e-ventures was actually objectionable (*cf.* FAC ¶ 24), but whether Google "considers" it to be so. *See Zango, Inc. v. Kaspersky Lab, Inc.*, 2007 U.S. Dist. LEXIS 97332, at *11 (W.D. Wash. Aug. 28, 2007), *aff'd* 568 F.3d 1169 (9th Cir. 2009).

The FAC shows that Google did just that. Plaintiff acknowledges that Google removed e-ventures' material from search results because it considered its websites to be "pure spam." FAC ¶¶ 22-23; *cf.* Ex. A at 14 (explaining what Google means by "pure spam"). Such removals are clear instances of the self-regulation that the CDA protects. Just as email spam—"unsolicited and bulk e-mails"—"are the sort of communications an entity like Comcast could deem to be objectionable" (*e360Insight*, 546 F. Supp. 2d at 607-08), websites that seek to game search results are material that Google can consider sufficiently objectionable to remove from its service. While Plaintiff contends that its websites were not in fact objectionable (FAC ¶ 34), its assessment is beside the point. Under § 230(c)(2), a "mistaken choice to block, if made in good faith, cannot be the basis for liability under federal or state law." *e360Insight,* 546 F. Supp. 2d at 609. Indeed, forcing Google "to litigate the question of whether what it blocked was or was not spam would render § 230(c)(2) nearly meaningless." *Id.*

Finally, there is nothing to suggest that Google did not act "in good faith." The CDA's good faith requirement "is focused upon the provider's subjective intent." *Holomaxx*, 2011 U.S. Dist.

LEXIS 94316, at *6-7. The "issue is whether [plaintiff] has pled an absence of good faith." *e360Insight*, 546 F. Supp. 2d at 609. "To raise an issue of an absence of good faith, an allegation of conduct outside the scope of the traditional publisher's function would be required." *Donato v. Moldow*, 865 A.2d 711, 727 (N.J. Super. Ct. 2005) (conclusory allegation of bad faith "is not sufficient to withstand a motion to dismiss on the pleadings"). There is nothing like that here.

The FAC offers no plausible allegations to suggest that Google did not believe that e-ventures' websites were "pure spam." FAC ¶¶ 22-24. Plaintiff says, without any supporting allegations—and ignoring Google's published statements (Ex. A at 14)—that Google applies the "pure spam" label to websites engaged in search-engine optimization because it is threatened by such services. FAC ¶¶ 61-63. But "bald allegations" like this are "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. In any event, the allegation has no bearing on whether Google's actions are outside the traditional publisher functions of a search engine. *Donato*, 865 A.2d at 727 ("[w]hether [defendant] knew and disliked appellants is not relevant to the immunity terms of § 230."). The FAC also refers cryptically to a "third party with a personal vendetta against e-ventures" who may have provided "false information" to Google. FAC ¶ 21. But this in no way suggests bad faith on *Google's* part; if anything, it supports a finding of good faith, by giving Google an additional reason to take action. As in Plaintiff's original complaint, therefore, the "absence of good faith is not adequately pled." *e360Insight*, 546 F. Supp. 2d at 609.[4]

In short, it is evident "from the allegations in the [] Complaint that Plaintiff attempts to hold [Google] liable for decisions relating to the monitoring, screening, and deletion of content from [its] network.… [T]hese actions are quintessentially related to a publisher's role, and § 230

---

[4] In support of an allegation that Google acted in bad faith because it did not review e-ventures' websites individually (FAC ¶ 59), Plaintiff quotes from the declaration Google submitted in response to e-ventures' preliminary injunction motion. Dkt. 31. This declaration describes Google's extensive investigation and review of e-ventures' sites (*id.* ¶¶ 29-33), which belies Plaintiff's assertion that "websites were banned regardless of their contents." FAC ¶ 59. If

(continued...)

specifically proscribes liability in such circumstances." *Langdon*, 474 F. Supp. at 630-631 (internal citation and quotation marks omitted).

## II.   PLAINTIFF'S CLAIMS ARE BARRED BY THE FIRST AMENDMENT

Apart from the protection provided by the CDA, e-ventures' claims are barred by the First Amendment. Google's search results are constitutionally protected opinions, and Plaintiff's effort to impose liability on Google for the content of those results runs headlong into the "basic First Amendment principle" that "freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l. Dev. v. Alliance for Open Soc'y Int'l., Inc.*, 133 S. Ct. 2321, 2327 (2013).

### A.     Google's Search Results Are Opinions Protected By The First Amendment

Every court that has considered the issue has held that Internet search results are speech protected by the First Amendment. *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 439 (S.D.N.Y.); *Langdon*, 474 F. Supp. 2d at 629-30; *Search King*, 2003 U.S. Dist. LEXIS 27193, at *11-12. That is not surprising. The "dissemination of information [is] speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011). Search results involve exactly that. In presenting results, a search engine is disseminating information about the contents of various websites and other material across the Internet:

> The central purpose of a search engine is to retrieve relevant information from the vast universe of data on the Internet and to organize it in a way that would be most helpful to the searcher. In doing so, search engines inevitably make editorial judgments about what information (or kinds of information) to include in the results and how and where to display that information (for example, on the first page of the search results or later).

*Zhang*, 10 F. Supp. 3d at 438. With each set of results, moreover, search engines are offering their opinions—"opinions of the significance of particular web sites as they correspond to a

_____

(...continued from previous page)
Plaintiff wants Google's declaration to be considered here, *all* the facts from that declaration
(continued...)

4936082.1

search query. Other search engines express different opinions, as each search engine's method of determining relative significance is unique." *Search King*, 2003 U.S. Dist. LEXIS 27193, at *10-12 (observing that search results are "fundamentally subjective in nature").

These opinions are "fully protected First Amendment expression." *Zhang*, 10 F. Supp. 3d at 439; *see also Search King, Inc.*, 2003 U.S. Dist. LEXIS 27193, at *11-12 (W.D. Okla. 2003) (same). They deserve no less protection than "the newspaper editor's judgment of which wire-service stories to run and where to place them in the newspaper, the guidebook writer's judgments about which attractions to mention and how to display them, and Matt Drudge's judgments about which stories to link and how prominently to feature them." *Zhang*, 10 F. Supp. 3d at 438. And because the First Amendment extends to "the decision of both what to say and what not to say" (*Riley v. National Federation of Blind of N. Carolina, Inc.*, 487 U.S. 781, 796-97 (1988)), search engines have a right to decide not only what to include in their results but also what should be excluded. This protection is robust, and applies to almost all efforts to attach liability to the particular results a search engine displays. *See Zhang*, 10 F. Supp. 3d at 438 ("there is a strong argument to be made that the First Amendment fully immunizes search-engine results from most, if not all, kinds of civil liability and government regulation").

### B. The First Amendment Protects Google From Liability Based On Its Removal of Plaintiff's Websites From Search Results

Applying these principles, courts have uniformly rejected—and dismissed at the pleading stage—claims like those Plaintiff makes here, which seek to impose liability on search engines for excluding particular websites or material from their search results.

First, in *Search King*, the court rejected claims that Google "maliciously" diminished the position of, and ultimately removed, the plaintiff's website in Google's search results. 2003 U.S. Dist. LEXIS 27193, at *3-4. Presaging e-ventures' strategy in this case, the plaintiff in *Search King*

---

(...continued from previous page)

must be incorporated, which would further undermine Plaintiff's claims.

sued for tortious interference, alleging that Google's actions were motivated by concerns about competition and "adversely impacted the business opportunities available" to the plaintiff. *Id.* at *4. The court dismissed the claim, holding that Google was "immune from tort liability arising out of the devaluation because PageRanks constitute protected speech." *Id.* at *4, 12. The court explained that, as expressions of opinion, Google's search results "do not contain provably false connotations." *Id.* at *11. As such, the plaintiff's claim was barred by the rule that that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* at *7 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).

The court in *Langdon v. Google, Inc.* similarly held that the First Amendment protected Google against claims (including for deceptive business practices and fraud) arising out of its decisions both to remove the plaintiff's websites from search results and not to display plaintiff's advertisements. 474 F. Supp. 2d at 626-27, 629-30. The court held that these claims impermissibly sought to "compel [Google] to speak in a manner deemed appropriate by Plaintiff and would prevent Google from speaking in ways that Plaintiff dislikes." *Id.* at 629-30. The court granted the motion to dismiss "on the basis that Plaintiff seeks relief precluded by [Google's] First Amendment rights." *Id.* at 630.

Most recently, the court in *Zhang v. Baidu.com, Inc.* built upon these rulings to hold that the First Amendment shielded Baidu (a search engine specializing in Chinese-language material) from claims seeking to hold it liable for refusing to include information in its search results about democracy in China. 10 F. Supp. 3d at 434. As the court explained:

> Plaintiffs call upon the Court to impose a penalty on Baidu precisely because of what it does and does not choose to say. . . . As the *Turner* Court made clear, however, "the First Amendment, subject only to narrow and well-understood exceptions"—inapplicable here—"does not countenance governmental control over the content of messages expressed by private individuals."

*Id.* at 441 (internal citations omitted) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 641

(1994)). Because Baidu's search results reflected "editorial judgments" protected by the First Amendment, the court rejected the plaintiff's complaint and denied leave to amend. *Id.* at 443.

e-ventures' claims here fail for the same reasons. Just as the First Amendment protects newspaper publishers from interference with their "exercise of editorial control and judgment" (*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)), it protects Google from claims seeking to hold it liable for editorial decisions regarding the information presented through its search results. *Zhang*, 10 F. Supp. 3d at 437 ("the Government may not interfere with the editorial judgments of private speakers on issues of public concern"). In returning results that excluded e-ventures' websites, Google was expressing its constitutionally protected opinion about what information would be most relevant to its users' queries. Plaintiff's effort "to impose 'a penalty on the basis of the content'" of Google's speech is impermissible. *Id.* at 442 (quoting *Tornillo*, 418 U.S. at 256); *Search King*, 2003 U.S. Dist. LEXIS 27193, at *12-13. To allow these claims to proceed would violate "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 (1995).

**C.    The First Amendment Applies Regardless of Whether a Company Paid to Have its Website Listed in Search Results**

Plaintiff's new allegations regarding the removal of its *paid* search results do not change this result. Regardless of whether it relates to natural search listings or advertisements taking the form of paid links, Google's determination of what material to return in response to users' queries remains an exercise of its protected editorial judgment. The court in *Langdon* held exactly that. *See* 474 F. Supp. 2d at 629 (First Amendment bars claims seeking to force Google to "place Plaintiff's ads for his websites in prominent places on their search engine results."). Plaintiff has suggested that it may try to rely on the commercial speech doctrine to argue for a different outcome. But "speech is not rendered commercial by the mere fact that it relates to an advertisement." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 384

(1973). Instead, "commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1332 (M.D. Fla. 2009) (quoting *United States v. United Foods*, 533 U.S. 405, 409 (2001)). That is not the case here. While Plaintiffs' advertisements may be commercial speech *by e-ventures*, Google's decision about whether to allow those ads to appear on its service is speech of a different nature. A publisher's determination about what ads to run implicates similar editorial considerations as decisions about what other information to present, and those determinations are fully protected by the First Amendment. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Associates & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 135-36 (9th Cir. 1971) (courts cannot "compel a private newspaper to publish advertisements without editorial control of their content"). So it is here. As with its removal of natural search results linking to Plaintiff's websites, Google's removal of e-ventures' paid listings reflects its constitutionally protected opinion about the relevance of that material to its users' search queries.[5]

## III.   THE FAC FAILS TO STATE A CLAIM UNDER FEDERAL OR STATE LAW

Plaintiff's claims fail independently of these overarching federal protections. The FAC's effort to invoke the Lanham Act is completely misguided, and its claims under Florida law continue to fall short for the reasons set out in Google's original motion to dismiss (Dkt. 36).

### A.   Plaintiff Cannot State a Claim Under the Lanham Act

Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a), creates "two distinct bases of liability: false association, §1125(a)(1)(A), and false advertising, §1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static*

---

[5] Even if Google's opinions about Plaintiff's advertisements were commercial speech, they would "not fall outside the purview of the First Amendment." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 553-54 (2001). Commercial speech is protected by the First Amendment, and the Supreme Court has invalidated compelled advertising speech for similar reasons as it has rejected other kinds of compelled speech. *United States v. United Foods, Inc.*, 533 U.S. 405 (2001). Plaintiff's efforts to hold Google liable for its decision not to display advertisements for e-ventures' websites—and to force it to display such ads against its better judgment—violates that principle.

*Control Components, Inc.*, 134 S. Ct. 1377, 1384 (2014). It is unclear from the misleading ellipses used in the FAC (¶ 65) which kind of claim Plaintiff wants to assert, but neither is viable. *Presby Envtl., Inc. v. Advanced Drainage Sys., Inc.*, 2014 U.S. Dist. LEXIS 138438, at *16 (D.N.H. Sept. 30, 2014) (where it was "not immediately apparent whether [plaintiff sought] to proceed on a false association theory, a false advertising theory, or both," court found that the plaintiff failed to show the required elements of either claim).

 **False Association**. A claim under §1125(a)(1)(A) requires a false or misleading description or representation of fact that "is likely to cause confusion, or to cause mistake, or to deceive *as to the affiliation, connection, or association of such person with another person*, or as to the *origin, sponsorship, or approval* of his or her goods, services, or commercial activities *by another person*." 5 U.S.C. § 1125(a)(1)(A) (emphases added). This is not a catchall misrepresentation or unfair trade practices provision. "Because of its inherently limited wording, § 43(a) can never be a federal codification of the overall law of unfair competition, but can apply only to certain unfair trade practices prohibited by its text." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003) (internal quotation marks and citation omitted); *see also Halicki v. United Artists Communications, Inc.*, 812 F.2d 1213, 1214 (9th Cir. 1987). The essence of §1125(a)(1)(A), as its text makes clear, is that the description or representation at issue is likely to cause confusion about the affiliation between the plaintiff and the defendant or about whether the plaintiff has approved or is connected with the defendant's goods or services. An example of such a claim would be where the defendant tried to "pass off" its goods as someone else's or someone else's goods as its own. *Dastar*, 539 U.S. at 32 (Lanham Act "forbids, for example, the Coca-Cola Company's passing off its product as Pepsi-Cola or reverse passing off Pepsi-Cola as its product").

 Plaintiff here does not even try to make such allegations. The FAC does not allege that Google's statements deceived consumers about the "association" or "connection" between Google and e-ventures. Nor is there any suggestion that Google misleadingly suggested that e-

ventures sponsored, approved, or is the originator of Google's services or commercial activities. FAC ¶¶ 64-72. Plaintiff in fact goes so far as to omit this operative statutory language from its quotation of the statute. *Id.* ¶ 65. That is revealing. It illustrates that e-ventures has no interest in a false association claim. Its theory is *not* that Google tricked the public into believing that it is affiliated with e-ventures or that Google is somehow trying to pass off e-ventures' services as its own. Instead, Plaintiff's claim is that Google deceived consumers "into believing that e-ventures' websites has [sic] violated Google's removal policies." *Id.* ¶ 67. But that has nothing to do with false association, and as a matter of law, it is not actionable under §1125(a)(1)(A).[6]

**False Advertising**. A false advertising claim requires that the defendant "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods." 15 U.S.C. § 1125(a)(1)(B). The FAC does not quote or reference this provision (¶ 65), so it does not seem that Plaintiff is even trying to advance a false advertising claim. But any such claim would fail because there is no allegation, and could not be an allegation, that Google's statements were made "in commercial advertising or promotion."

To fall within §1125(a)(1)(B), the statement must be "for the purpose of influencing consumers to buy defendant's goods or services … [that are] disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012) (internal quotations and citation omitted). Plaintiff does not allege that the statements it relies on meet this criterion (FAC ¶ 66), and for good reason. Those statements simply provide general information about

---

[6] Plaintiff also fails to make any plausible allegation that Google's statements are likely to confuse consumers about the affiliation or origin of Google's services, a requirement for any false association claim. *See Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 935 & n.16 (11th Cir. 2010). Plaintiff instead simply incants the statements were deceptive (FAC ¶ 67), but such "[t]hreadbare recitals of the elements of a cause of action" do not suffice. *Iqbal*, 556 U.S. at 678. Plaintiff's allegation is particularly implausible given that the statements say nothing whatsoever about e-ventures and suggest no affiliation between e-ventures and Google. FAC ¶ 47.

Google's policies for operating its search engine and removing certain kinds of objectionable material from search results. *Id.* ¶ 47. Beyond having nothing to do with the search-manipulation guidelines that are actually pertinent to understanding what Google did here, Google's general policy statements are not advertisements or commercial speech, and they cannot give rise to a claim under § 1125(a)(1)(B). *E.g.*, *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 802 F. Supp. 2d 1273, 1287 (M.D. Fla. 2011) (defendant's brochure was not an "advertisement or promotion" in part because it was intended to provide training to those who had already purchased the product).

Nor would Plaintiff have a viable claim even if it could somehow overcome these deficiencies. The Lanham Act requires a showing that the alleged misrepresentation was material to consumer's purchasing decisions (*Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010)) and that the plaintiff suffered "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising" (*Lexmark*, 134 S. Ct. at 1391). The FAC does not make any plausible factual allegation that Google's statements regarding its removal policies caused consumers to stop using e-ventures' services or injured Plaintiff's business. FAC ¶¶ 67-68. That is not surprising, as any purported harm in this case results from the removal of e-ventures' websites from Google's search results, not from the general statements Google makes about the operation of its search engine. *Id.* ¶ 68 (alleging that e-ventures' revenues plummeted "during and following the Google ban"). It simply is not plausible to conclude that the supposed deception wrought by Google's statements caused e-venture's purported injuries.

### B.     Plaintiff Fails To State A FDUTPA Claim

Plaintiff's FDUTPA claim fails because the FAC, like its predecessor, does not plausibly allege that Google's actions were deceptive or unfair.[7]

---

[7] As explained in Google's original motion to dismiss (Dkt. 36 at 14-15), insofar as Plaintiff's claims are based on Google's removal of its websites from natural search results, e-ventures cannot sue under FDUTPA because Plaintiff in that capacity is not a consumer of Google's services. *Leon v. Tapas & Tintos, Inc.*, 51 F. Supp. 3d 1290, 1297 (S.D. Fla. 2014). Plaintiff's claim

(continued...)

***Deception***. A deceptive practice involves "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (quotation marks omitted). The plaintiff must make "a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." *Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (quotation marks omitted). The FAC fails to make such allegations.

As an initial matter, e-ventures' claim is still built around the same sleight-of-hand described in Google's original motion to dismiss. Dkt. 36 at 16-17. Plaintiff relies on various irrelevant statements about Google's removal policies, but it ignores a host of other statements on the same Google website that clearly explain the policies that actually apply to this case—those that explain Google's willingness to take action against websites that it believes are trying to artificially inflate their position in Google's search engine. Indeed, as explained above (*supra* pp. 4-5), an entire section of Google's website (the "Webmaster Guidelines") is devoted to explaining these policies. For example:

- The Guidelines expressly state that Google is "willing to take manual action on sites that use spammy techniques" and that violations of Google's spam policies "may lead to a site being removed entirely from the Google index" (Ex. A at 1, 12);

- Google's statements "strongly encourage [website operators] to pay very close attention to the 'Quality Guidelines,' which *outline some of the illicit practices that may lead to a site being removed entirely* from the Google index or otherwise impacted by an algorithmic or manual spam action" (Ex. A at 1) (emphasis added);

- Google makes clear that its "quality guidelines cover the most common forms of deceptive or manipulative behavior, but Google may respond negatively to other misleading practices not listed here. *It's not safe to assume that just because a specific deceptive technique isn't included on this page, Google approves of it.*" (Ex. A at 3) (emphasis added).

---

(...continued from previous page)

about its advertisements, by contrast, are governed by the agreement that e-ventures accepted when it joined the AdWords program, which requires all claims arising out of the program to be brought under California law. *See* Google's Motion to Transfer. Plaintiff thus is contractually barred from bringing a FDUTPA claim regarding the removal of AdWords listings. *Cf. Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 244 (E.D. Pa. 2007) (enforcing Google's AdWords agreement).

These statements give lie to Plaintiff's suggestion (FAC ¶¶ 37-40, 47) that Google only removes content from its search results in the circumstances outlined in the Removal Policies. They likewise undermine any claim that Google tells the public that it "only removes very specific categories of content, which do not include any of the content published by e-ventures." *Id.* ¶ 40. The guidelines put website operators on notice that Google will take action against those who use deceptive techniques, whether or not those techniques are expressly listed. All of this shows that it is Plaintiff (not Google) that is omitting material information. What Google has said publicly about its anti-manipulation guidelines rules out any deception claim. *See, e.g., Zlotnick*, 480 F.3d at 1287 (dismissing FDUTPA claim where defendant's statements "eliminated any possibility that a reasonable [consumer] would be misled").[8]

Even putting aside Plaintiff's lack of candor, its deception allegations simply are not supported by the statements it cherry-picked from Google's website (¶¶ 41-48):

- *"Google's index merely reflects that the page exists on the wider web, and not that Google endorses it."* FAC ¶ 47(a). This true statement does not suggest that all websites will appear in search results, only that the inclusion of a given site is not an endorsement by Google.

- *"Google search results are a reflection of the content publicly available on the web."* *Id.* ¶ 47(b). This similarly conveys that Google does not control the content of the websites that appear in its search results. It does not suggest that every public website will be included.

---

[8] The full text of Google's Removal Policies and Webmaster Guidelines can and should be considered in connection with this motion. By selectively pointing to various public statements on Google's website about its removal policies, Plaintiff has incorporated those policies (which include the Webmaster Guidelines) into the FAC. *See, e.g., SFM Holdings, Ltd. v. Banc of Am. Sec., LLC,* 600 F.3d 1334, 1337 (11th Cir. 2010) (applying the incorporation-by-reference rule); *Horsley v. Feldt,* 304 F.3d 1125, 1135-37 (11th Cir. 2002); *Smith v. Cox,* 2014 U.S. Dist. LEXIS 126490, at *2-3, n. 3 (M.D. Fla. Sept. 10, 2014). The Court can also take judicial notice of these materials, which are publicly available and whose authenticity is undisputed. *See, e.g., Regions Bank v. Kaplan,* 2013 U.S. Dist. LEXIS 40805, at *49 (M.D. Fla. Mar. 22, 2013) (taking judicial notice of material on defendant's website). Doing so serves the public interest. Plaintiff has cited isolated excerpts from Google's website, falsely implying that they comprise the full universe of Google's statements about the material it will remove from search results. Having done so, e-ventures should not be permitted to keep the Court in the dark about other statements on that same website that contradict its allegations. *See Simpson v. Kay Jewelers,* 142 F.3d 639, 646-47 (3d Cir. 1998) (plaintiffs cannot "pick and choose" favorable outliers among similar evidence).

- Google's *"Removals Polices" page "explains our policies for different types of content that Google will remove from web, image or video results." Id.* ¶ 47(c),(d). This page accurately explains Google's policies for removing content from search results that is "sensitive or not appropriate for everyone to see." Ex. A at 15. It does not purport to exhaustively describe the circumstances where Google will remove material from search results.

- Google's *"mission is 'to organize the world's information.'" Id.* ¶ 47(e). Google's mission statement is irrelevant. It certainly does not support a deception claim, as organizing information necessarily includes decisions as to what information to exclude.

- *"Google is committed to leading the industry in transparency" and publishes data that "sheds light on how laws and policies affect Internet users and the flow of information online." Id.* ¶ 47(f). These true statements are similarly irrelevant. Google's Transparency Report simply lists particular kinds of removals, those done in response to certain kinds of third-party requests. Nowhere does it suggest that Google will not remove material that violates its spam guidelines or promise that Google will publicize removals made for that reason.

- *"Chilling Effects posts and analyses copyright removal requests (among other types of content removal requests) from a number of participating companies on its website. We link in our search results to the requests published by Chilling Effects in place of removed content when we are able to do so legally." Id.* ¶ 47(g). Again, this statement is both true and irrelevant. It discusses Google's policy of sending information to Chilling Effects about removals based on claims of copyright infringement. It does not say that Google will similarly publicize other kinds of removals or that it has any obligation to do so.

- *"It is Google's policy not to censor search results. However, in response to local laws, regulations, or policies, we may do so. When we remove search results for these reasons, we display a notice on our search results pages." Id.* ¶ 47(h). This true statement refers to Google's response to government and other legal censorship, and it explains that when Google is forced to remove search results due to legal pressure, it will put a notice on the results page. It does not say that Google will place a similar notice for all removals or that it is obliged to do so.

In short, none of the statements that Plaintiff puts at issue is inconsistent with Google's decision to remove e-ventures' websites from search results. No reasonable person could conclude from these statements that Google promised not to take action against websites that it determines are engaged in search manipulation—and, of course, Google tells the public in detail that it will do exactly that. There can be no deception claim based on these statements.[9]

---

[9] Moreover, Plaintiff still fails to establish any causal link between Google's alleged deception and e-ventures' purported harm. Dkt. 36, at 19. The FAC's threadbare recital of this causation element (¶¶ 77, 79) is supported by no factual allegations and is entirely implausible. Plaintiff

(continued...)

4936082.1

**Unfairness.** Plaintiff's unfairness claim is similarly deficient. The court in *Kinderstart.com, LLC v. Google, Inc.*, 2007 U.S. Dist. LEXIS 22637 (N.D. Cal. Mar. 16, 2007), dismissed a virtually identical claim that Google's decision to remove certain websites from search results was "unfair" competition. *Id.* at *53-55. The outcome should be the same here.

Under FDUTPA, an unfair practice is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR*, 842 So. 2d at 777 (quotation marks and citation omitted). Plaintiff makes no such allegations here. The FAC says merely that "Google committed unfair methods of competition." FAC ¶ 83. But this "'naked assertion[]' devoid of 'further factual enhancement'" cannot support a legally viable claim. *Iqbal,* 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Beyond that, Plaintiff offers no facts whatsoever suggesting that Google's removal of websites that it deems to violate its spam and search rank manipulation guidelines violates any public policy or ethical norm. While e-ventures suggests (implausibly) that Google had an "anti-competitive, economic motivation" for its actions (FAC ¶¶ 19), Plaintiff does not explain why simply having such a motivation would transform an otherwise legitimate removal into unethical or immoral behavior.

In addition to showing a public policy or ethical violation, a plaintiff pursuing an unfairness claim under FDUTPA must show that it suffered a "substantial" injury that is "not []outweighed by any countervailing benefits to consumers or competition that the practice produces" and is one "that consumers themselves could not reasonably have avoided." *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. 3d Dist. Ct. App. 2014). e-ventures makes only bare

---

(...continued from previous page)

does not explain what harm e-ventures suffered because of Google's alleged misrepresentations regarding its removal policies. *See, e.g.*, *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1317, 1321 (M.D. Fla. 2000) (dismissing FDUTPA claim where plaintiff failed to "allege sufficient facts to show that the consumer has been actually aggrieved by the unfair or deceptive act").

4936082.1

assertions of "significant damage" to its business. FAC ¶ 30. The FAC does not identify any actual injuries that would qualify as "substantial," much less any that are not outweighed by countervailing public benefits. That is not surprising. It is clear that Google's removal actions were aimed at preventing injury to the consuming public. As Plaintiff admits, websites attempting to manipulate search engines may trick Google's algorithms into placing their sites higher in search results than would be warranted by their actual content and popularity. *Id.* ¶ 14. Google's anti-spam policies are designed to combat this problem for the benefit of the public. By removing or demoting websites it believes are engaged in manipulation, Google allows its users to search more effectively and helps ensure that its results feature higher-value websites that provide quality content for users. Ex. A at 11-12. Plaintiff does not plausibly allege facts to support its unadorned allegation of significant injury, let alone that such injury outranks the benefits resulting from protecting search engine users against potentially deceptive manipulations. For this reason as well, Plaintiff's FDUTPA claim should be dismissed.

### C.     Plaintiff Fails To State A Defamation Claim

To state a claim for defamation under Florida law, a plaintiff must plead: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). e-ventures falls well short of these requirements.

First, the FAC does not identify any published statement by Google about e-ventures. "Publication of defamatory matter is its communication intentionally or by a negligent act to one *other than the person defamed*." Restatement (Second) of Torts § 577, cited in *Doe v. America Online, Inc.*, 783 So. 2d 1010, 1016 (Fla. 2001) (emphasis in original). The statements Plaintiff puts at issue (FAC ¶¶ 37-48) say nothing about e-ventures or the removal of its material from search results. Plaintiff asserts, without elaboration, that Google's "search results are publications" (*id.* ¶

88), but it does not, and cannot, explain how the *exclusion* of links to e-ventures' sites from these results was a publication about e-ventures. Without that, there can be no defamation claim.

Second, any statement that Google made was not defamatory as a matter of law. Defamation requires a showing that "the statement was a false statement of fact as distinguished from opinion, which is protected by the first amendment." *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 715 (11th Cir. 1985). "Whether a statement is one of fact or one of opinion is a question of law." *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1247 (M.D. Fla. 2007). Here, even assuming that Google somehow published a statement by removing e-ventures' material from Google's search results, that would not be a statement of fact. As discussed above, a search engine's decisions about what to include in its results constitute its "opinions of the significance of particular web sites as they correspond to a search query." *Search King*, 2003 U.S. Dist. LEXIS 27193, at *11. Search results thus are "fundamentally subjective in nature" (*id.* at *10), and "there is no conceivable way to prove that the relative significance assigned to a given web site is false" (*id.* at *11-12). Whether something is "worthy of being included" in Google's search results (FAC ¶ 89) is clearly an expression of opinion. And "[o]pinions are protected from defamation actions by the first amendment." *Keller*, 778 F.2d at 717; *accord Gertz v. Robert Welch, Inc.*, 418 US 323, 339-40 (1974) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.").

Third, Plaintiff does not even try to plead fault, *i.e.*, that Google acted with knowledge (as at least negligence) of the falsity of its statements. *See Carroll v. TheStreet.com, Inc.*, 2014 U.S. Dist. LEXIS 156499, at *32 (S.D. Fla. July 10, 2014) ("Florida defamation law requires a plaintiff to prove fault."). While a heightened showing of fault is likely required here (*cf. Silvester v. American Broadcasting Cos.*, 839 F.2d 1491, 1493-98 (11th Cir. 1988)), the Court need not address that issue, as the FAC does not even allege that Google was negligent about the truth of its supposed

statements. Without that, there can be no viable defamation claim. *See, e.g., Log Creek, LLC v. Kessler*, 717 F. Supp. 2d 1239, 1251 (N.D. Fla. 2010) (dismissing claim for failure to allege fault).

### D. Plaintiff Fails to State a Tortious Interference Claim

Plaintiff cannot evade those problems with its defamation claim by asserting a claim for tortious interference. Florida's "single publication/single action rule does *not* permit multiple actions to be maintained when they arise from the same publication upon which a failed defamation claim is based." *Ovadia v. Bloom*, 756 So. 2d 137, 141 (Fla. Dist. Ct. App. 3d Dist. 2000) (emphasis in original). The rule is "designed to discourage the erosion of free speech safeguards by the simple expedient of looking to a substitute cause of action." *Trujillo v. Banco Central Del Ecuador*, 17 F. Supp. 2d 1334, 1340 (S.D. Fla. 1998), *aff'd* 48 Fed. App'x 739 (11th Cir. 2002) (quoting *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607, 609 (Fla. Dist. Ct. App. 4th Dist. 1975)).

The rule applies here. Plaintiff's tortious interference claim is based on the same conduct as its defamation claim. FAC ¶ 95. Plaintiff cannot evade Google's First Amendment and other defenses by restating that claim in a different guise. *See Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992) (successful invocation of a defamation privilege precludes a separate claim based on same publication); *see, e.g., Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. Dist. Ct. App. 4th Dist. 2002) (dismissing tortious interference claim); *Kamau v. Slate*, 2012 U.S. Dist. LEXIS 158213, at *24 (N.D. Fla. Oct. 1, 2012) (same).

Even apart from the single-act rule, e-ventures cannot state a claim against Google. A tortious interference claim requires a showing of the following:

> (1) the existence of a business relationship[;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (citation omitted). The FAC here falls well short of this standard. Plaintiff's conclusory allegation that the removal of e-

ventures' sites was not "privileged, justified, or excusable" (FAC ¶ 103) ignores that Google's decisions regarding what material appears in its search results are constitutionally protected opinions that "cannot constitute improper interference in the context of a claim for tortious interference with contractual relations." *Search King*, 2003 U.S. Dist. LEXIS 27193, at *12-13 (search results "cannot give rise to a claim for tortious interference with contractual relations because it cannot be considered wrongful, even if the speech is motivated by hatred or ill will").

Likewise, Plaintiff's bald assertion that Google "wrongfully and intentionally harmed e-ventures' actual and prospective business relationships" (FAC ¶ 99), is unsupported by any factual allegations and entitled to no weight. Plaintiff still has not identified any of e-ventures' business relationships (FAC ¶ 97), much less offered any facts to suggest that Google knew about, much less "manifested a specific intent to interfere with," any of those relationships. *Hodge v. Orlando Utils. Comm'n*, 2011 U.S. Dist. LEXIS 7621, at *57 (M.D. Fla. Jan. 26, 2011) (quotation marks omitted). The same problem dooms Plaintiff's effort to plead damage resulting from a breach. Indeed, the FAC does not allege that any of e-ventures' business and contractual relationships were actually breached, only that they were "damaged" in some unspecified way. FAC ¶¶ 30, 97, 99. Plaintiff conspicuously does not allege that any third parties have cancelled contracts, terminated relationships, or otherwise refused to do business with it since its websites were removed from Google's search results. *Id.* ¶¶ 28, 99. That is not enough. As the Supreme Court has explained, "Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687.

## CONCLUSION

For these reasons, Plaintiff's FAC should be dismissed, and because any amendment would be futile, the dismissal this time should be with prejudice.

4936082.1

Dated:  June 5, 2015

Respectfully submitted,

s/ *Nathan M. Berman*

DAVID H. KRAMER (admitted *pro hac vice*)
COLLEEN BAL (admitted *pro hac vice* )
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
dkramer@wsgr.com
cbal@wsgr.com

NATHAN M. BERMAN
Fla. Bar No. 0329230
Zuckerman Spaeder LLP
101 East Kennedy Blvd.
Suite 1200
Tampa, FL 33602
Tel: (813) 221-1010
Fax: (813) 223-7961
nberman@zuckerman.com

BRIAN M. WILLEN (admitted *pro hac vice*)
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the Americas, 40th Floor
New York, NY  10019
bwillen@wsgr.com

COUNSEL FOR GOOGLE INC.

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2015, I electronically filed the foregoing with the Clerk of

the Court using the Court's CM/ECF system.

/s/ Nathan M. Berman
Nathan M. Berman

4936082.1