**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

| | |
|---|---|
| e-ventures Worldwide, LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :   Civil Action No.  2:14-cv-00646-JES-CM |
| | : |
| GOOGLE, INC., | : |
| | : |
| Defendant. | : |
| | : |

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

Alexis Arena (admitted *pro hac vice*)
FLASTER/GREENBERG, PC
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103
Tel.: (215) 279-9908
email: alexis.arena@flastergreenberg.com
*Attorneys for Plaintiff*

John Clough, Esq. (Bar. No. 0184391)
Zung Clough Attorneys at Law
8985 Fontana del Sol Way
Naples, Florida 34109
Tel:  (239) 325-1895
email: JClough@zungclough.com

Dated: July 6, 2015

## I.      PRELIMINARY STATEMENT

Google does not dispute the key facts that form the basis of e-ventures' claims in this case:

(1) a Google employee targeted e-ventures and decided that all websites that appeared to be associated with e-ventures (according to Google, 366 websites total) would be completely removed from all of Google's search results and hidden from all Google users' views indefinitely (First Amended Complaint ("FAC"), ¶ 22-24, 58);

(2) Google's purported rationale for this decision was that e-ventures (like many companies) had attempted to cause its websites to be ranked higher in Google's search results and in Google's judgment, this "bad behavior" needed to be "deterred" (FAC, ¶ 60);

(3) Google did not actually review the content of each website before removing all 366 websites, for reasons of "efficiency" (FAC, ¶ 59);

(4) As a result of this action, when the public looked for e-ventures' websites on Google.com, and on over 2 million Google-affiliated websites, e-ventures' websites could not be found, resulting in significant damage to e-ventures (FAC, ¶ 28-30); and

(5) Despite all of e-ventures' pre-litigation efforts to resolve this matter and frustrated attempts to communicate with and/or appease Google, e-ventures' websites were relisted only after e-ventures filed suit in desperation and moved for a preliminary injunction (FAC, ¶ 30-36).

The natural reaction to hearing these facts may be surprise, because with a 70%-90% market share, Google is well-known to most consumers (ubiquitous in our lives) and the public's perception of Google's search results is that they are generally comprehensive, transparent and fair. This public perception is not an accident; it is a direct result of Google's published policies and statements, which Google did not abide by in this case (FAC, ¶ 37-48).

In asking for *absolute immunity* against e-ventures' claims, Google's legal team is asking the Court for unchecked power.  Google is arguing that Google's individual employees wield the power to make any company or individual's websites disappear completely and covertly, for any reason (even, for example, because of a personal vendetta), and that there is no redress in courts of law.  Google argues that it was acting for the benefit of consumers, not for anti-competitive reasons, but in a separate, recently-disclosed investigation, the Federal Trade Commission found evidence that Google did manipulate search results for anti-competitive reasons (FAC, ¶ 55).  As described below, Plaintiff is compiling evidence that Google acted for anti-competitive reasons in this case and will present that evidence in due course; at this preliminary stage, Plaintiff's allegations of anti-competitive conduct are presumed to be true.  (FAC, ¶ 9-19, 56, 62-63).

To grant Google's Motion would contravene existing law.  First, to hold that Google has absolute immunity under the CDA would require the Court to conclude at this preliminary stage that: (1) the removed website content (some of which Google did not even review before removing) was all considered to be "objectionable" content under the statute by Google; (2) Google acted in "good faith"; and (3) an attempt to make your website rank higher on Google is "objectionable" within the meaning of the CDA.  This involves fact questions that cannot be resolved at this stage.  Plaintiff's Complaint alleges that Google removed unobjectionable content in bad faith, not because the content was considered to be objectionable by Google, but for punitive and anti-competitive reasons.

Second, to hold that Google has First Amendment immunity for its anti-competitive behavior would go against the holding in *Lorain Journal Co. v. United States,* 342 U.S. 143, 152, 155 (1951), where in an analogous situation, a newspaper with a virtual monopoly in its small town boycotted or punished one local advertiser because it was advertising on a competing radio station.  As described below, the newspaper was not protected by the First Amendment because instead of

excluding ads because of their content, the newspaper was excluding ads based on their affiliation with the boycotted advertiser.  There is no First Amendment protection against anti-competitive conduct.  Moreover, in the *Zhang v. Baidu.com* case cited by Google, a district court already stated in dicta that there would be no First Amendment protection for sponsored link ads, and in *Kinderstart v. Google*, the court opined that a defamation claim based on a company's treatment in Google's search rankings would be viable despite the First Amendment.  Such a defamation claim is asserted here.

## II.   FACTS

### A.  Google's Anti-Competitive Conduct and Removal of e-ventures' Websites

As stated above and in the FAC, Google decided to manually exclude all websites that it believed were associated with e-ventures (up to 366 websites) from Google's search results and all Google-affiliated websites.  (FAC, ¶ 22-24, 29, 58).  Google reported that it did this punitively, because it wanted to "deter" e-ventures' supposed "bad behavior," without even reviewing all of the websites' content.  (FAC, ¶ 60).[1]

During the "ban," e-ventures could not identify the reason(s) that it was being punished by Google or correct its supposed errors. (FAC, ¶ 31-34).  e-ventures tried to get "test websites" relisted, which merely said things like "bye bye world," and those were also summarily removed. (FAC, ¶ 35).  Stonewalling e-ventures, Google would not respond to e-ventures or its counsel to clarify the reason(s) for the removals (FAC, ¶ 34) and would not relist the websites until a lawsuit

---

[1] *See also* Doc. 31, Google's Declaration of Brandon Falls ("Falls Decl."), ¶ 6 ("[W]e also may manually adjust or edit our search results (i.e. take 'manual action') when we believe it appropriate to deter bad behavior…") and ¶ 39 ("I manually removed 366 of e-ventures' sites from Google's search results. Given the breadth and scope of violations (and Plaintiff's long history of search engine manipulation), we acted upon the entire network of websites to efficiently use Google's resources…"); Doc. 30, Google's Brief, at 6 ("Google decided to treat e-ventures' collection of websites as a single network. Such grouping allows Google to use its resources more efficiently…") (emphasis in quotes added).

and preliminary injunction motion was filed (FAC, ¶ 36).  After the lawsuit, some of the content that was removed was relisted again without any changes being made, belying Google's suggestion that the content was even at issue.  (FAC, ¶ 50).

Although this case is not remotely about sponsored link ads (as Google acknowledges, the case is about Google's decision to ban e-ventures in alleged contravention of its policies, and that is what caused e-ventures' damages), any "sponsored link" ads associated with the websites were also removed as a result of Google's overall ban (FAC, ¶ 26).  e-ventures' websites could not be found anywhere in Google's search results (FAC, ¶ 25).  At least one e-ventures' website - TopSEOs.com – had an associated sponsored link that was also automatically removed subsequent to, and as a result of, the overall Google ban.  The TopSEOs.com ad that was removed had the same content before it was "banned" by Google and after it was "relisted" by Google – it was a standard sponsored link merely identifying e-ventures' website.  The sponsored link functioned the same way as Google's other sponsored links – when a Google user clicked on it, it triggered a commercial transaction between e-ventures and Google.  (FAC, ¶ 13).  Google charges e-ventures based upon the number of times that a Google user clicks on the ad to reach the website (*Id.*)

e-ventures believes that Google acted for anti-competitive reasons.  Google does not appear to dispute that delisting e-ventures' websites also benefited Google economically and had an anti-competitive impact. Google's sponsored link ads are responsible for over 90% of its revenues (FAC, ¶ 2).  The parties in this case both provide online publishing and advertising services, and to some extent, are in competition with one another (FAC, ¶ 9,16-17).  Google hopes that third parties read Google's publications and pay Google to be ranked higher in Google's search results (Google's "sponsored links").  e-ventures hopes that third parties read e-ventures' publications and pay a SEO provider instead of Google to achieve the same result, which is a result that reduces Google's revenues (FAC, ¶ 16-19).

4

Days before the ban, Google was contacted by a third party with a personal vendetta against e-ventures (FAC, ¶ 21).  With e-ventures websites having been brought to its attention, Google did not contact e-ventures to share the third party message or to get its side of the story – Google simply implemented the ban without warning to e-ventures (FAC, ¶ 22).  This third party continued to contact e-ventures anonymously after the ban, gloating and asking e-ventures if it was "having fun yet."  Doc. 11, Ex. 1 to Trika Verif.

e-ventures then learned that Google has a history of banning websites that fall into the same anti-competitive industry as e-ventures, in the same cryptic manner (FAC, ¶ 61).[2]  Regarding e-ventures' supposed "bad behavior," Google has never accused e-ventures of publishing content in violation of Google's Removal Policies, such as publishing obscene information, a person's social security number, information that was the subject of an intellectual property take-down notice, or information that should be removed pursuant to court order (FAC, ¶ 52).  Nor has Google accused e-ventures of "spam" or "irrelevant or inappropriate messages sent on the Internet to a large number of recipients" (FAC, ¶ 53).  What Google accused e-ventures of doing was what Google can accuse any website owner of doing – trying to make its website rank higher  (FAC, ¶ 54), Google can call any website "pure spam" (FAC, ¶ 23).  Google invented the term "pure spam" and it means – whatever Google wants it to mean.  *See, e.g.* Doc. 58, Motion, at 5 ("Google cautions that the specific violations described in the guidelines are not exhaustive…Google may respond negatively to other misleading practices not listed here.")

### B.   Google's Published Policies and Statements Contradict Its Conduct

Google publishes official "Removal Policies" that do not even remotely suggest that it engages in this conduct.  To the contrary, the Removal Policies inform the public that Google takes a

---

[2] The evidence of Google's anti-competitive behavior is outside the scope of the Motion to Dismiss, but will be presented in due course.

neutral approach and only removes very specific categories of content, which do not include any of the content published by e-ventures (FAC, ¶ 40).  Nowhere in the Removal Policies, or in any other publication, does Google ever indicate that it will "ban" a website owner, or take punitive action against a website owner by removing all websites affiliated with that owner (FAC, ¶ 38).

Google attempts to introduce documents outside the scope of the FAC – Google's "Webmaster Guidelines" – and e-ventures submits that this is improper.[3]  Nevertheless, Google's conduct in this case does not even comport with the "Webmaster Guidelines" that Google references, because these "Webmaster Guidelines" state that they "outline some of the illicit practices that may lead to a site being removed entirely from the Google index" (Motion, at 5). However, Google's removal of e-ventures' websites was not based on illicit practices by the websites, or even the content of e-ventures' individual websites, the removals were based on whether or not the websites were affiliated with e-ventures and Google's decision to punish e-ventures (FAC, ¶ 32).  Even the Webmaster Guidelines incorrectly inform the public that when a website is removed, it's because of the website's content, not its company affiliation (FAC, ¶ 40-48).  With its resources, Google certainly has the capacity to publish Removal Policies that make Google's conduct clear to the public, but neither the existing Removal Policies or Webmaster Guidelines accomplish that.

### C.  Google's conduct caused significant economic damage to e-ventures.

With 70-90% of the search market, Google has a practical monopoly and the power to destroy any small online publishing company (or even large publishing company) it chooses.  (FAC, ¶ 11).

---

[3] In the first Motion to Dismiss, Google attached the Removal Policies and Webmaster Guidelines as one exhibit, but Google now appears to acknowledge that these are separate documents that are not related and do not link to one another.  The FAC does not reference the Webmaster Guidelines and e-ventures has not confirmed that the Webmaster Guidelines attached to Google's Motion were published prior to the conduct at issue.  There has also been no showing that the general public (as opposed to "webmasters") reads the "Webmaster Guidelines" or would consider them to override Google's formal, published policies (the name "Webmaster Guidelines" suggests the opposite).

Google's conduct caused significant damage to e-ventures.  Third parties that contracted with e-ventures terminated those contracts when e-ventures' websites were delisted and as a result, e-ventures' revenues plummeted during the Google ban.  (FAC, ¶ 68).  Third parties immediately noticed and had a clear interpretation of Google's delisting of e-ventures' websites, incorrectly believing that e-ventures' websites met Google's narrow criteria for website removal, when they did not.  (FAC, ¶ 89-90).

## III.    ARGUMENT

In considering this motion, the court must accept the allegations in the complaint as true, *Hishon v. King & Spalding,* 467 U.S. 69, 73, (1984), and construe them in  plaintiff's favor. *Duke v. Cleland,* 5 F.3d 1399, 1402 (11th Cir. 1993). To survive this motion, the complaint need not contain "detailed factual allegations," but must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations omitted).   Dismissal of a complaint is appropriate only "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993). As the Eleventh Circuit has noted, "the threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low."  *In re Southeast Banking Corp.,* 69 F.3d 1539, 1551 (11th Cir.1995) (quotations omitted). If dismissal could be avoided through amendment of the complaint, leave to amend the complaint should be freely given. *Thomason v. West Bank FSB*, No. 13–11987, 2014 WL 7139750, *3 (11th Cir. Dec. 16, 2014).

**A. The Communications Decency Act does not protect Google because Google did not act in "good faith" and did not even look at the websites' content, much less make a "good faith" determination that the content was sufficiently objectionable.**

As acknowledged by Google, the Communications Decency Act, 47 U.S.C. 230 ("CDA"), protects internet service providers from liability only where they acted in "good faith."  47 U.S.C. § 230(c)(2). Google further admits that, at this preliminary stage, the issue is whether Plaintiff has pled an absence of good faith. Motion, at 9. *See also Smith v. Trusted Universal Standards,* No. 09cv4567, 2010 WL 1799456, *7 (D.N.J. May 4, 2010) (court could not conclude that internet service providers exercised "good faith" at dismissal stage).

Plaintiff has pled an absence of good faith, alleging that Google's conduct was commercial, punitive, anti-competitive, and went well beyond a "traditional publisher's function."  Specifically, Plaintiff takes issue with that fact that: (1) Google delisted 366 websites without even looking at them, simply because they were apparently affiliated with e-ventures and based on e-ventures' promotion of competitive SEO services through at least one website; (2) Google's published policies  do not reveal this type of conduct to the public; (3) Google's actions were spurred by an anonymous tipster and Google offered e-ventures absolutely no warning or due process before implementing the ban in response to the tip; and (4)  Google did not provide e-ventures with reasonable redress (even after e-ventures contacted Google through counsel and initiated this lawsuit).  None of this speaks of good faith.

Google either ignores Plaintiff's allegations of bad faith or argues that they are not "plausible." Google's Motion, at 13. As the Court is undoubtedly aware, the Court is required to accept Plaintiff's factual allegations and all reasonable inferences from them as true for the purposes of this Motion. Moreover, most of the allegations cited above have either been admitted or ignored by Google. *See Smith,* 2010 WL 1799456, at *7 ("One would expect that if an interactive computer

service had acted in good faith, it could and would have come forward with the legitimate basis for its actions when questioned"). Google's arguments amount to an admission that e-ventures' claims are not ripe for dismissal under the CDA.

In addition, even assuming that Google could meet the "good faith" standard, which it cannot, Google still cannot show it believed the information was "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." *See* §230(c)(2). First, there is no case cited by Google indicating that "search engine manipulation" is "otherwise objectionable" under the statute. <u>The statute was designed to "empower parents to restrict their children's access to objectionable or inappropriate online material."</u> *See Smith,* 2010 WL 179945, at *6. The cases Google cites involving harassing, offensive email spam (which could be sent to email accounts viewed by children or other members of the public) are clearly inapposite. e-ventures' websites were not objectionable and harmed no member of the public. Second, Google did not even review all of e-ventures' websites and ads before summarily removing them, and then relisted some of the same content that had earlier been delisted. Clearly, the content of the websites and ads were not the issue. Google is not entitled to Section 230 immunity for content Google did not even review. Finally, Section 230 immunity does not exist for a FDUTPA claim, given that Section 230 states that "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section." 47 U.S.C. § 230(e)(3).

**B.   The First Amendment Does Not Give Google Unchecked Power.**

In arguing for blanket First Amendment immunity, Google asserts that it was merely acting like a newspaper publisher expressing its opinions about what is most relevant to users.  This does not jibe with Google's other explanation, which was that Google delisted e-ventures' websites' to "deter" e-ventures' perceived "bad behavior."  If *relevance* was truly the concern, then Google

obviously could have merely listed e-ventures' websites on the last pages of its search results (where less relevant results are typically found), but Google decided to preclude e-ventures' websites and ads from being displayed even on pages that most users never reach.  Also, if relevance was the concern, then Google would not be currently accepting funds from e-ventures to display the same sponsored link ad that Google previously banned.

Instead of being analogous to a newspaper that declines to run an article because of that article's content, for its readers' benefit, Google's actions are more analogous to a publisher that summarily decides that one of its longstanding advertisers is engaging in "bad behavior," which has been decreasing the publisher's revenues.  To deter this "bad behavior," the publisher decides that the advertiser and all of its perceived affiliates are being blacklisted from 70-90% of the town's publications for an undetermined amount of time, until the publisher is sufficiently convinced that the advertiser has reformed, at which point, the blacklist will end and the ads will run again. Meanwhile, the publisher's true motivation is anti-competitive.  The publisher only informs the advertiser of the blacklist after the blacklist has already begun, and after the public has already wrongfully concluded that the advertiser was engaged in "bad behavior."  Then the advertiser files suit against the publisher, the blacklist ends, and some of the "blacklisted" content begins running again.

Google's actions were not based on editorial judgments.  First, if Google's removals were based on editorial judgments, then Google would have actually reviewed all of e-ventures' websites before taking action, but Google admitted that it did not even do so.  Second, Google would not have delisted and then relisted some websites without any changes being made to those websites. Third, Google would not have continued to accept payment to display websites that were purportedly being "blocked" as "spam" or violated Google's quality standards.  Fourth, Google would have addressed relevance by ranking e-ventures' websites lower, not blocking them entirely.

10

The content of e-ventures' websites was not the cause of the action taken by Google, and accordingly, Google cannot assert a content-based First Amendment defense.

      1.     <u>Whether Google's "Delisting" of All of a Party's Website Content is Protected By the First Amendment is an Issue of First Impression.</u>

None of the four cases cited by Google involve a party whose websites were precluded from being displayed in a search engine's paid or unpaid search results, regardless of the websites' content. None of these cases involve a Lanham Act false advertising claim, a FDUTPA claim, or an unfair trade practices claim based upon similar facts, or a defamation or tortious interference claim based upon similar facts.  None of the cases involve Google's definition of "spam."  There have been other situations where this has happened to SEO promoters (*see, e.g.*, Ex. A), but this is the first lawsuit.  Each case cited by Google is summarized below:

- ***Zhang v. Baidu.com, Inc.*, 10 F.Supp.3d 433 (S.D.N.Y. 2014).** This anti-censorship lawsuit against a comparatively small, Chinese search engine involved the search engine's filtering out of certain political information related to the pro-democracy movement in China. Similar to how employers or parents may filter out certain material that is obscene, or related to topics like gambling or weapons, Baidu.com adopted algorithms that filtered out certain political information, regardless of the website on which it was displayed. The Court held that this conduct was protected by the First Amendment, considering that it was: (1) politically-motivated; (2) content-based; (3) accomplished through search engine algorithms (not manual action); (4) not accomplished by a search engine with a monopoly (the Court specifically noted that Baidu.com was a relatively small search engine that blocked results which were still "widely available" through search engines such as Google, *id*. at *7); and (5) the speech was not commercial. *Id*. at *8. The Court in dicta stated that sponsored links would be treated differently and as commercial speech.

- ***Langdon v. Google*, No. 06cv319, 2007 WL 530156 (D.Del. Feb. 20, 2007).** Langdon's *pro se* complaint was convoluted, but appeared to assert that "Google disproved his ads on the basis of unacceptable content." *Id.* at *2. Google rejected the ads because they contained attacks against an individual or protected group, including attacks against named individuals. *Id*. Langdon's websites were not delisted. Langdon did not submit any written defense to Google's motion to dismiss on First Amendment grounds. *Id*. at *5. The court summarily concluded that Google was able to decline to run Plaintiff's advertisements based upon the ads' objectionable content under the First Amendment.

- ***Kinderstart v. Google*, No. 06cv2057, 2007 WL 831806 (N.D. Cal. Mar. 16, 2007)**. Kinderstart alleged that Google gave its websites an unfairly-low ranking or "PageRank." Kinderstart was not banned by Google.  Kinderstart's defamation claim against Google was

dismissed due to California's common interest privilege. *Id.* at \*20. However, in its final opinion, the Court noted that, if the defamation claim had not been barred by the common interest privilege, the defect in the defamation claim "conceivably could be cured by amendment." *Id.* at \*19.

- ***Search King v. Google*, No. 02cv1457, 2003 WL 21464568 (W.D. Okla. May 27, 2003)**. Search King also contended that Google was liable for assigning its websites an unfairly low PageRank in Google's <u>unpaid</u> search listings. The case did not involve paid ads or a discussion of commercial speech, and Search King only asserted one claim - intentional interference with contractual relations. The Court concluded that "there is no conceivable way to prove that the relative significance assigned to a given web site [or its PageRank] is false" (*id.* at \*4), and dismissed the claim on that basis.

In sum, there is no case where a court has examined similar conduct by Google and concluded that it was speech protected by the First Amendment. Even if we interpret *Search King*, *Baidu*, and *Langdon* to hold that the PageRank Google assigns to its unpaid search listings is "speech," that does not mean that Google's actions in blocking a certain company from being displayed on any Internet property that Google controls (both paid and unpaid) is "speech."

      2.    <u>Google's Conduct Was Not Speech Because It Was Not Content-Based – It Was Company-Based, Punitive, and Anti-Competitive.</u>

To further its arguments in cases like these, Google previously commissioned a White Paper, which concludes that search engines' immunity is virtually limitless – *see* Eugene Volokh & Donald M. Falk, *Google First Amendment Protection for Search Engine Search Results*, 24 Geo. Mason U. C.R.L.J. 89 (2013). Interestingly, *even in the White Paper Google commissioned*, the authors note that the First Amendment only protects Google to the extent its decisions are motivated by *content*:

> To be sure, it is constitutionally permissible to stop a newspaper from 'forcing advertisers to boycott a competing' media outlet, when the newspaper refuses advertisements from advertisers who deal with the competitor. *Lorain Journal Co. v. United States,* 342 U.S. 143, 152, 155 (1951). But the newspaper in Lorain Journal Co. was not excluding advertisements because of their content, in the exercise of some editorial judgment that its own editorial content was better than the proposed advertisements. Rather, it was excluding advertisements solely because the advertisers—whatever the content of their ads—were also advertising on a competing radio station.

*Volokh & Falk, supra,* at 22. *See also Lorain Journal,* 342 U.S. at 155:

> The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisement from whomever it pleases. We do not dispute that general right. But the word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified.

As in *Lorain Journal Co.*, Google did not block e-ventures' websites and advertisements because of their content.  In fact, Google assures the public that it never removes websites for political, religious, or similar content-based reasons.  Google blacklisted e-ventures for punitive, anti-competitive reasons, and removed e-ventures' websites and ads as part of that effort.  Google did not even review all of the websites before removing them, Google continued to run paid ads for some of the same (allegedly harmful) content, and some content remained the same before and after the websites and ads were delisted.  In defining "pure spam" as - whatever Google wants to define it as, Google is attempting to write itself a blank check that allows Google to punitively damage *any* party it chooses, for whatever reason.  But having taken action against the company, not the content, Google cannot credibly argue that it was just looking out for "relevance" for the benefit of its users.  *See also Hotjobs.com Ltd. v. Digital City, Inc.*, No. 164237, 2000 WL 33333529 (Va.Cir. Mar. 8, 2000) (distinguishing the *Assoc.& Aldrich Co.* case cited by Google "because the newspapers were objecting to specific content of the advertisements, which [claimant] is not."); *Incredible Investments, LLC v. Fernandez-Rundle*, 28 F.Supp.3d 1272, 1283 (S.D.Fla. 2014) (No First Amendment violation or content-based restriction where statute targeted <u>conduct</u>, not content, because "a content-based restriction is one that regulates speech on the basis of its subject matter, messages, ideas and content."); *Foley v. Orange County*, No. 6:12cv269, 2013 WL 4110414, at *13 (M.D.Fla. Aug. 13, 2013) (No First Amendment violation where "activity" was regulated, not content).

13

3.      If Google's Conduct Was Speech, Then It Was Misleading Commercial Speech That Is Not Entitled to Protection.

Google's search results are commercial speech, meant to advance its commercial interests, and its primary source of revenue.  Because Google's speech is commercial, the First Amendment does not provide a complete defense and Plaintiff's claims should not be dismissed.  *Snyder v. Phelps,* --U.S. --, 131 S.Ct. 1207 (2001)*; Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 515 (7th Cir. 2014) (analyzing First Amendment defense to unfair trade practices claim in dispute between private parties); *Baidu*, 2014 WL 1283730, at *8 (Concluding that commercial speech definition "would presumably apply to advertisements displayed by a search engine, and might even apply to 'search results shown to purposefully advance an internal commercial interest of the search provider.'"  e-ventures specifically alleges that Google's decision to ban e-ventures from all of its search results was a commercial decision.

Google's paid ads consist of sponsored links that invite the consumer to click on them, and with each click, Google receives compensation.  Strangely, Google tries to portray the ads as *e-ventures'* ads, not *Google's* ads, but Google sells them, profits from them, and calls them Google's ads.  Accordingly, if the ads were to constitute "speech," that speech would unquestionably be "commercial" and dismissal would not be justified.

The First Amendment also does not extend to protect speech that is misleading to consumers, and Plaintiff claims that Google's conduct and search results were misleading.  *Gerondidakis v. BL Restaurant Operations, LLC,* No. 8:12cv96, 2012 WL 2872849, at *3-4 (M.D.Fla. July 12, 2012) (citations omitted).  This claim rests on factual issues related to what was misleading to e-ventures and the public, which cannot be resolved at this stage.  *See also Bilotta v. Citizens Information Assoc., LLC,* No. 8:13cv2811, 2014 WL 105177 (M.D.Fla. Jan. 19, 2014) (Denying motion to

dismiss on First Amendment grounds because it involved fact issues inappropriate for consideration at this stage).

### C.  Plaintiff states a FDUTPA claim.

Google confuses the standards between a FDUTPA claim surviving a motion to dismiss and succeeding at trial in arguing that the "plaintiff must make 'a showing of probable, not possible, deception.'"  Motion, at 18.  At this stage, Plaintiff is not required to make an evidentiary showing; Plaintiff's factual allegations are accepted as true and are more than sufficient to state a FDUTPA claim.  Moreover, the Court cannot at this stage determine whether Google's statements to the public actually deceived the end consumer, or whether the deception in Google's Removal Policies was cured by Google's Webmaster Guidelines.  *See Brueggemann v. NCOA Select, Inc.*, No. 08cv80606, 2009 WL 5218024, at *3 (S.D.Fla. Dec. 31, 2009) ("The problem with Defendant's argument…is that it requires the Court to make the determination at the pleading stage of the ultimate issue in this case; namely, whether Defendant's advertising actually deceives the consumer…At this stage in the proceeding, it is simply premature to determine whether the placement of the contractual exclusions at issue are misleading or deceptive based on their location on the website.")

Additionally, Google errs in arguing that e-ventures cannot bring a FDUTPA claim because it is not a consumer, at least not as to the unpaid search listings, simultaneously asking that the entire case be transferred to California and that e-ventures be barred from bringing a FDUTPA claim in any forum because of the forum selection clause.  Courts have since held that the 2001 statutory amendment served to broaden the reach of FDUTPA, allowing more than just consumers to seek relief under the statute.  *See, e.g., Kelly v. Palmer, Reifler, and Associates, P.A.,* 681 F.Supp.2d 1356, 1372–74 (S.D.Fla.2010); *Furmanite America, Inc. v. T.D. Williamson, Inc.,* 506 F.Supp.2d

1134, 1145–47 (M.D.Fla.2007); *Niles Audio Corp. v. OEM Systems Co., Inc.*, 174 F. Supp.2d 1315, 1319–20 (S.D.Fla. 2001).  There is no authority cited by Google (and none exists) supporting the conclusion that because this case involves the removal of 366 websites and 1 sponsored link, Plaintiff is precluded from bringing a FDUTPA claim in any jurisdiction.

Google's actions were "unfair" within the meaning of the statute because they were anti-competitive.  Google's criticism of e-ventures was that e-ventures tried to be ranked higher in Google's search results.  Hypocritically, Google accepts monthly payments from e-ventures to achieve the same result.  e-ventures' pays Google significant sums each month to be listed first in Google's paid link advertisements.  Google's true criticism of e-ventures was that e-ventures was decreasing Google's revenues from the paid links. Google states that even if it had an anti-competitive motivation, "Plaintiff does not explain why simply having such a motivation would transform an otherwise legitimate removal into unethical or immoral behavior."  Motion, at 21. Plaintiff alleges that the removals were <u>not</u> legitimate, but that e-ventures (and other companies promoting SEO) were singled out for disparate treatment so that Google could profit at their expense, a fact which was hidden from consumers.

Google's actions were "deceptive" within the meaning of the statute because they contradicted its statements to the public.  As described above, Google makes much of the "Webmaster Guidelines" found somewhere on its website, but those Guidelines never inform the public that Google bans or boycotts website owners for punitive reasons.  Like the Removal Policies, the Guidelines portray Google's removals as entirely content-based.  Google attempts to explain why each of the statements identified in Paragraph 47 is <u>*not*</u> misleading, but these explanations do not appear to be persuasive.  The average consumer would be confused by Google's statements, a fact that is not properly resolved at the pleadings stage.  *See Brueggemann, supra*, at \*3.

16

Google also cannot succeed in arguing that its actions were aimed at preventing injury to the consuming public, while also arguing that Google's goal was "deterring" "bad behavior." The public was not Google's concern, because: (a) Google continued to profit from e-ventures' websites (which Google alleged were engaging in "bad behavior") during the Google ban (*id*. at ¶ 18); (b) Google delisted websites that were not engaged in "deceptive manipulations" (*id*. at ¶ 14, 16); (c) Google eventually restored Plaintiff's websites and ads, sometimes with no changes having been made (*id*. at ¶ 39); and (d) Google delisted the websites instead of just impacting their "relevancy."

### D.   Plaintiff states a defamation claim.

Google's arguments are contradictory. On the one hand, Google argues that it cannot be liable under FDUTPA or in tort because its search results (or lack thereof) are published "speech" protected by the First Amendment, and websites are manually removed by Google only if they meet Google's narrow criteria for removal. On the other hand, Google argues that in manually removing e-ventures' websites, because they *did* meet Google's narrow criteria for removal, Google did not make any false statements about the websites. Google cannot have it both ways.

To understand the false message Google gave to the public about e-ventures, the Court need only look to commentators' statements about Google's action, such as "[e]ventures…was de-indexed by Google…for using black hat tactics."  Doc. 11, Arena Decl., Ex. D. Google's conduct informed the public, falsely, that the delisted websites engaged in "black hat tactics."  Whether or not e-ventures' websites *did* employ certain tactics or contain certain content, in violation of Google's published policies, is a question of fact. Contrary to Google's suggestion, no court has held that Google's delisting of a company's websites is an expression of an "opinion."  In *Search King*, 2003 WL 21464568, at *10-12, the court said that Google's "PageRank," or the relevance assigned to a particular search result, was "opinion-like."  That comment has no bearing on the

17

question whether indicating to the public that e-ventures' websites were removed for "black hat tactics" is a false statement. *See also Jews for Jesus v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008) ("Defamation by implication arises, not from what is stated, but from what is implied when a defendant 'juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication…'") (*quoting Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (2007)). The public could only interpret the disappearance of e-ventures from Google one way, and that implication was defamatory. Moreover, Google's actions were at least negligent, as it acted without even reviewing all of the websites in question, for reasons of "efficiency."

### E.  Plaintiff states a tortious interference claim.

Google argues that the tortious interference claim should be dismissed under Florida's "single publication/single action rule."  This theory would require the Court to disregard that there are multiple publications at issue in this case – Google acted to delist e-ventures' websites not just on September 18, but also later when e-ventures' created new websites. Google's actions were varied and continuing between September 18 and December 11 (when e-ventures' websites were relisted and its preliminary injunction motion withdrawn) (FAC, ¶ 100-101).  Google's theory would also require the Court to conclude that all of e-ventures' damages arose out of a single publication instead of multiple acts of delisting. The single-action rule cannot bar e-ventures' claim.

Finally, Google's argument that it acted with no knowledge of e-ventures' contractual relationships and did not cause them to be breached disregards Paragraphs 97-102 of the FAC, which allege otherwise.  Multiple third parties breached contracts with e-ventures directly as a result of the Google ban.  Obviously, advertisers do not want to pay for advertisements in an online publication that 70-90% of the public cannot locate or view online.  e-ventures revenues

plummeted during the Google ban, as it prevented e-ventures' business partners, customers and prospective customers from locating the website (FAC, ¶ 28-30).

**F.   Plaintiff states a Lanham Act claim.**

Google is correct Plaintiff does not assert a claim based upon false association under §1125(a)(1)(A) and Plaintiff did not attempt to assert such a claim.  Plaintiff's claim under the Lanham Act is for unfair competition under § 1125(a)(1)(B), as set forth in ¶ 65-71 of the FAC.

Google argues that there is no allegation that Google's statements were made "in commercial advertising or promotion," but that is not the case.  As set forth in the FAC and above, Google's search results themselves made a commercial statement to the public in excluding e-ventures' websites from being displayed.  "Google's description of its search engine services in the Removal Policies, and other statements identified in Paragraph 47, in light of Google's actual conduct towards e-ventures" (FAC, ¶ 66) stated to the public that e-ventures had violated Google's policies, when it had not (FAC, ¶ 67).  This statement was false, misleading, and made "in commercial advertising or promotion."   Third parties looked for a paid or unpaid link to e-ventures' websites in Google's search results, but none could be found.  If Google's conduct *had* comported with its statements to the public, Policies, and Guidelines, then e-ventures' websites and ads would not have been entirely delisted from Google's search results (FAC, ¶ 47, 57).  To evaluate whether Google's message to the public was a false or misleading statement in commercial advertising or promotion, the Court should consider the statement in the overall context of Google's conduct.  *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.,* 299 F.3d 1242, 1248 (11th Cir. 2002) ("If the ad campaign as a whole would be misleading to the reasonable consumer, then the defendant should be enjoined from using that ad campaign. It is true that a court must analyze the message conveyed in full context, and that the court must view the face of the statement in its

entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other.") (citations and quotations omitted).  Google's search results, in the context of Google's statements to the public about when its search results are and are not removed, communicated a false and misleading message to consumers about e-ventures.  This message directly resulted in harm to e-ventures.  Accordingly, e-ventures has stated a claim for unfair competition under Section 1125(a)(1)(B) of the Lanham Act.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Google's motion to dismiss the First Amended Complaint. If the Court identifies any deficiency in the FAC that may be cured by amendment, then Plaintiff respectfully requests leave to amend.

Respectfully submitted,

By:   */s/Alexis Arena*
Alexis Arena, Esq.
*Admitted pro hac vice*
**FLASTER/GREENBERG P.C.**
1600 John F. Kennedy Blvd., 2nd Floor
Philadelphia, PA  19103
Dated:  July 6, 2015                          *Attorneys for Plaintiff e-ventures Worldwide, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2015, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system.

By: *  /s/Alexis Arena*

Alexis Arena, Esq.
*Admitted pro hac vice*
**FLASTER/GREENBERG P.C.**
1600 John F. Kennedy Blvd., 2nd Floor
Philadelphia, PA  19103
Dated:  July 6, 2015          *Attorneys for Plaintiff e-ventures Worldwide, LLC*