# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

|  |  |
|---|---|
| e-ventures Worldwide, LLC, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 2:14-cv-00646-JES-CM |
| Google Inc., | ) |
| Defendants. | ) |

**GOOGLE'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW**

BRIAN M. WILLEN (admitted *pro hac vice*)
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
(212) 497-7700

NATHAN BERMAN, Fla. Bar No. 0329230
Zuckerman Spaeder LLP
101 East Kennedy Blvd.
Suite 1200
Tampa, FL 33602
(813) 221-1010

*Counsel for Google Inc.*

5097413.1

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Google Inc. ("Google") moves to dismiss the Second Amended Complaint ("SAC") filed by Plaintiff e-ventures Worldwide LLC ("e-ventures"). Google submits the following memorandum of law in support of its motion.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This is Plaintiff's third attempt to hold Google liable for removing material from its search results that Google determined violated its guidelines aimed at preventing the manipulation of search rankings. The Court dismissed Plaintiff's original complaint for containing impermissible "shotgun" pleading allegations and rejected the second version of the complaint for trying to broaden the scope of the case to encompass advertisements. Plaintiff's latest complaint is limited to claims based on the removal of its websites from Google's ordinary ("natural") search results, but those claims fail as a matter of law and should be dismissed with prejudice.

As an initial matter, Plaintiff's claims are barred by the Communications Decency Act ("CDA"), which protects Google from liability on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be … objectionable." 47 U.S.C. § 230(c)(2). In removing links related to e-ventures from its search results, Google acted to restrict access to material on its service that it deemed objectionable. As courts in similar cases have held, that is exactly what the CDA protects.

The First Amendment separately bars Plaintiff's effort to hold Google liable for its editorial judgments about what information to present to users in response to search queries. In choosing what material to display (and not display) in its search results, Google is engaging in speech protected by the First Amendment and cannot be held liable for that expression of opinion.

Even if they could get past these problems, Plaintiff's claims fail on their own merits. e-ventures invokes Section 43(a) of the Lanham Act, but that statute does not apply here. The SAC fails to identify any statement (much less a false one) that Google made "in commercial

advertisement or promotion." *Id.* § 1125(a)(1)(B). Nor does Plaintiff make a plausible allegation that Google's allegedly misleading statements caused e-ventures any harm.

Plaintiff's state law claims fare no better. The claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") must be dismissed because e-ventures fails to plausibly allege that Google engaged in deceptive or unfair conduct. The SAC presents various innocuous and non-deceptive statements from Google's website that do not relate to the conduct at issue here. Even considered on their own, those statements are not misleading, but Plaintiff cannot hide a host of other public statements from the same Google website that clearly describe Google's readiness to take action—including removal—against website operators that it determines are trying to manipulate search results. Nor does the SAC offer any credible allegation that Plaintiff's purported harm was caused by Google's *statements or omissions*, rather than by Google's removal of e-ventures' webpages from search results. As for unfairness, e-ventures remains unable to plead that Google's conduct violated public policy or that any alleged injury to e-ventures was not outweighed by the benefits to consumers from Google acting against websites that, in its judgment, are undermining the integrity of its search results.

Plaintiff's defamation claim fails because the SAC fails to identify any "statement of fact" that Google "published" about the quality of e-ventures' websites. Indeed, the SAC makes clear that Google communicated an *opinion*—and only to e-ventures, not to the public. There can be no defamation liability in that circumstance. Beyond all that, any statement Google may have made would be protected by the First Amendment unless there were credible allegations of actual malice, which are totally missing from the SAC.

Finally, Plaintiff's effort to repackage its defamation claim as one for tortious interference runs afoul of Florida's "single action" rule. Plaintiff also offers no allegations that Google knew about and acted with the specific intent of harming any of e-ventures' (unidentified) contractual relationships or that any of those relationships were breached as a result of Google's conduct.

5097413.1

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Google and Its Search Engine

While Google offers many different products in service of its mission "to organize the world's information and make it universally accessible and useful" (https://www.google.com/ about/company), this case arises out of its search engine. SAC ¶ 11-12, 24. "Search engines are indexing tools used to locate web sites that correspond to a user's search query." *Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457-M, 2003 U.S. Dist. LEXIS 27193, at *2 n.1 (W.D. Okla. May 27, 2003).

> When a keyword is entered, the search engine processes it through a self-created index of web sites to generate a (sometimes long) list relating to the entered keyword. Each search engine uses its own algorithm to arrange indexed materials in sequence, so the list of web sites that any particular set of keywords will bring up may differ depending on the search engine used.

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999).

Google's search results are selected and ordered primarily by a combination of proprietary algorithms. SAC ¶ 36. Google's algorithms select among billions of webpages to determine which should be displayed in response to a given search. *Search King*, 2003 U.S. Dist. LEXIS 27193, at *3-4. "[E]very algorithm employed by every search engine is different, and will produce a different representation of the relative significance of a particular web site depending on the various factors, and the weight of the factors, used to determine whether a web site corresponds to a search query." *Id.* at *10. Google's search results thus reflect its "fundamentally subjective" opinion about what information is most relevant to each user's search queries. *Id.*

While Google's algorithms are designed to return the best results to users, manual action is sometimes needed to protect the integrity of Google's search engine from content that is unlawful or offensive, as well as from efforts by website operators to manipulate the order of search results. SAC ¶¶ 21, 43. If a website does not conform to Google's quality standards, or if an operator is engaged in tactics to distort Google's results, Google may take action against the

objectionable sites, including removing them from its search index. *Id.* ¶ 21; *see, e.g.*, *Search King*, 2003 U.S. Dist. LEXIS 27193, at *3. Google's guidelines regarding search engine manipulation (also called "webspam") are explained in detail on the support pages of its website. *See* http://support.google.com ("Webmaster Guidelines" and "Removal Policies") (attached hereto as Exhibit A).[1] These policy guidelines are necessary because third parties often try to trick Google's algorithms into ranking certain webpages higher in search results than they would be ranked based on their content and popularity. Ex. A at 12.

Through these statements, Google makes clear that it will not hesitate to remove or demote websites it finds to be engaged in such schemes. *Id.* at 1-14. Google "strongly encourage[s] [website operators] to pay very close attention to the 'Quality Guidelines,' which *outline some of the illicit practices that may lead to a site being removed entirely* from the Google index or otherwise impacted by an algorithmic or manual spam action." *Id.* at 1. (emphasis added). These guidelines provide specific examples of the kinds of manipulations that may lead Google to take manual action against particular websites. *Id.* at 2-14. But Google cautions that the specific violations described in the guidelines are not exhaustive: "These quality guidelines cover the most common forms of deceptive or manipulative behavior, but Google may respond negatively to other misleading practices not listed here." *Id.* at 3. Plaintiff's claims in this case arise out of Google's application of these policies and terms. SAC ¶ 21.

### B.     Plaintiff and Its Claims

e-ventures specializes in publications about "search engine optimization" ("SEO")—strategies aimed at "affecting the visibility" of websites in search engine results. SAC ¶¶ 13-15. Plaintiff operates a network of websites in connection with its business. *Id.* ¶¶ 17, 21. This case

---

[1] As discussed below, these statements are appropriate for consideration with this motion because they are incorporated by reference in Plaintiff's SAC, and because they are subject to judicial notice.

5097413.1

arises from Plaintiff's efforts to artificially boost the appearance of those websites in Google's search results. On September 18, Google applied the policies described on its website to remove e-ventures' websites from search results. *Id.* ¶¶ 21-22. Google notified e-ventures about the removals that same day. *Id.* Google explained that e-ventures' sites had run afoul of Google's quality standards and had been determined to be "pure spam." *Id.* That term is clearly explained in the "Webmaster Guidelines" section of Google's website (Ex. A at 14):

> If you see this message ["pure spam"] on the Manual Actions page, it means that Google has detected that some of your pages may be using techniques that are outside our Webmaster Guidelines. The site appears to use aggressive spam techniques such as automatically generated gibberish, cloaking, scraping content from other websites, and/or other repeated or egregious violations of Google's quality guidelines.

Plaintiff filed suit against Google on November 4, 2014 (Dkt. 1). In the original incarnation of its complaint, Plaintiff asserted various claims under Florida law based on Google's removal of e-ventures' websites from natural search listings. Google filed a motion to dismiss. Dkt. 36. Without reaching any of Google's arguments, the Court dismissed the complaint for employing improper "shotgun" pleadings tactics. Dkt. 52. On May 1, 2015, Plaintiff filed a First Amended Complaint ("FAC") (Dkt. 53). While largely repeating the allegations of the original complaint, the FAC also made allegations about the removal of e-ventures' paid advertisements. Because claims involving advertisements on Google are subject to a forum selection agreement, Google moved to transfer the FAC (Dkt. 57) and, in the alternative, to dismiss the FAC (Dkt. 58). In an effort to avoid the forum selection agreement, e-ventures asked for permission to amend the FAC to remove its allegations about the removal of its paid advertisements. The Court granted leave to amend and on that basis denied Google's motions as moot. Dkt. 73. Plaintiff has now filed its SAC. The SAC is nearly identical to the FAC, but it drops all claims and allegations relating to the removal of e-ventures' advertisements, in keeping with the Court's directive. The SAC asserts a cause of action under federal law for violation of the Lanham Act (SAC ¶¶ 63-71),

5097413.1

as well as claims under Florida law for deceptive and unfair trade practices, violation of the FDUTPA (*id.* ¶¶ 72-85), defamation (*id.* ¶¶ 86-93), and tortious interference (*id.* ¶¶ 94-103).

## ARGUMENT

Only "a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also ADA v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) ("[W]hen plaintiffs have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

## I.     PLAINTIFF'S CLAIMS ARE BARRED BY THE CDA

Section 230(c)(2) of the CDA provides as follows:

> No provider or user of an interactive computer service shall be held liable on account of … any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable.

47 U.S.C. § 230(c)(2). "Congress clearly enacted § 230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions." *Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000). This provision offers a "'robust' immunity." *Holomaxx Techs. Corp. v. Microsoft Corp.*, No. 10-cv-04924 JF (HRL), 2011 U.S. Dist. LEXIS 94316, at *6 (N.D. Cal. Aug. 23, 2011). It gives "fairly absolute protection to those who choose to block [materials they find objectionable]." *e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 607-08 (N.D. Ill. 2008). The "language of section 230(c)(2) is

clearly inconsistent with state law that makes interactive service providers liable based on their efforts to screen content." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1322 n.3 (11th Cir. 2006).[2]

Section 230(c)(2) bars Plaintiff's efforts to hold Google liable for removing e-ventures' websites from search results. As the operator of an Internet search engine (SAC ¶ 10), Google is the provider of an "interactive computer service." *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 630 (D. Del. 2007); *Murawski v. Pataki*, 514 F. Supp. 2d 577, 591 (S.D.N.Y. 2007). And Plaintiff seeks to hold Google liable for "voluntary" action taken "to restrict access to" material that it "considers" "objectionable." 47 U.S.C. § 230(c)(2). The language of the statute "imposes a subjective element into the determination of whether a provider or user is immune from liability." *e360Insight*, 546 F. Supp. 2d at 608. What matters is not whether the material associated with e-ventures was actually objectionable (*cf.* SAC ¶ 23), but whether Google "considers" it to be so. *See Zango, Inc. v. Kaspersky Lab, Inc.*, No. C07-0807-JCC, 2007 U.S. Dist. LEXIS 97332, at *11 (W.D. Wash. Aug. 28, 2007), *aff'd* 568 F.3d 1169 (9th Cir. 2009).

The SAC shows that Google did just that. Plaintiff acknowledges that Google removed e-ventures' material from search results because it considered its websites to be "pure spam." SAC ¶¶ 21-22; *cf.* Ex. A at 14 (explaining what Google means by "pure spam"). Such removals are clear instances of the self-regulation that the CDA protects. Just as email spam—"unsolicited and bulk e-mails"—"are the sort of communications an entity like Comcast could deem to be objectionable" (*e360Insight*, 546 F. Supp. 2d at 607-08), websites that seek to game search results are material that Google can consider sufficiently objectionable to remove from its service. While Plaintiff contends that its websites were not in fact objectionable (SAC ¶ 23), its

---

[2] Courts strive "to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254-55 (4th Cir. 2009) (quoting *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc)). Application of the CDA thus often occurs based on

(continued...)

assessment is beside the point. Under § 230(c)(2), a "mistaken choice to block, if made in good faith, cannot be the basis for liability under federal or state law." *e360Insight,* 546 F. Supp. 2d at 609. Indeed, forcing Google "to litigate the question of whether what it blocked was or was not spam would render § 230(c)(2) nearly meaningless." *Id.*

Finally, there is nothing to suggest that Google did not act "in good faith." The CDA's good faith requirement "is focused upon the provider's subjective intent." *Holomaxx*, 2011 U.S. Dist. LEXIS 94316, at *6-7. The "issue is whether [plaintiff] has pled an absence of good faith." *e360Insight*, 546 F. Supp. 2d at 609. "To raise an issue of an absence of good faith, an allegation of conduct outside the scope of the traditional publisher's function would be required." *Donato v. Moldow*, 865 A.2d 711, 727 (N.J. Super. Ct. 2005) (conclusory allegation of bad faith "is not sufficient to withstand a motion to dismiss on the pleadings"). There is nothing like that here.

The SAC offers no plausible allegations to suggest that Google did not believe that e-ventures' websites were "pure spam." SAC ¶¶ 21-23. Plaintiff says, without any supporting allegations—and ignoring Google's published statements (Ex. A at 14)—that Google applies the "pure spam" label to websites engaged in search-engine optimization because it is threatened by such services. SAC ¶¶ 60-62. But "bald allegations" like this are "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. In any event, the allegation has no bearing on whether Google's actions are outside the traditional publisher functions of a search engine. *Donato*, 865 A.2d at 727 ("[w]hether [defendant] knew and disliked appellants is not relevant to the immunity terms of § 230."). The SAC also refers cryptically to a "third party with a personal vendetta against e-ventures" who may have provided "false information" to Google. SAC ¶ 20. But this in no way suggests bad faith on *Google's* part; Plaintiff certainly does not allege that Google knew that the

---

(...continued from previous page)

the pleadings. *E.g.*, *Langdon*, 474 F. Supp. 2d at 630-31; *e360Insight*, 546 F. Supp. 2d at 609-10.

information provided was false. As in Plaintiff's previous complaints, therefore, the "absence of good faith is not adequately pled." *e360Insight*, 546 F. Supp. 2d at 609.[3]

In short, it is evident "from the allegations in the [] Complaint that Plaintiff attempts to hold [Google] liable for decisions relating to the monitoring, screening, and deletion of content from [its] network.… [T]hese actions are quintessentially related to a publisher's role, and § 230 specifically proscribes liability in such circumstances." *Langdon*, 474 F. Supp. at 630-631.

## II.     PLAINTIFF'S CLAIMS ARE BARRED BY THE FIRST AMENDMENT

e-ventures' claims are also barred by the First Amendment. Google's search results are constitutionally protected opinions, and Plaintiff's effort to impose liability on Google for the content of those results runs headlong into the "basic First Amendment principle" that "freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l. Dev. v. Alliance for Open Soc'y Int'l., Inc.*, 133 S. Ct. 2321, 2327 (2013).

### A.     Google's Search Results Are Opinions Protected By The First Amendment

Every court that has considered the issue has held that Internet search results are speech protected by the First Amendment. *See Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 439 (S.D.N.Y. 2014); *Langdon*, 474 F. Supp. 2d at 629-30; *Search King*, 2003 U.S. Dist. LEXIS 27193, at *11-12. That is not surprising. The "dissemination of information [is] speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011). Search results involve exactly that. In presenting results, a search engine is disseminating information about the contents of various websites and other material across the Internet:

---

[3] In support of an allegation that Google acted in bad faith because it did not review e-ventures' websites individually (SAC ¶ 58), Plaintiff quotes from the declaration Google submitted in response to e-ventures' preliminary injunction motion. Dkt. 31. This declaration describes Google's extensive investigation and review of e-ventures' sites (*id.* ¶¶ 29-33), which belies Plaintiff's assertion that "websites were banned regardless of their contents." SAC ¶ 58. If Plaintiff wants Google's declaration to be considered here, *all* the facts from that declaration must be incorporated, which would further undermine Plaintiff's claims.

> The central purpose of a search engine is to retrieve relevant information
> from the vast universe of data on the Internet and to organize it in a way that
> would be most helpful to the searcher. In doing so, search engines inevitably
> make editorial judgments about what information (or kinds of information)
> to include in the results and how and where to display that information (for
> example, on the first page of the search results or later).

*Zhang*, 10 F. Supp. 3d at 438. With each set of results, moreover, search engines are offering

their opinions—"opinions of the significance of particular web sites as they correspond to a

search query. Other search engines express different opinions, as each search engine's method of

determining relative significance is unique." *Search King*, 2003 U.S. Dist. LEXIS 27193, at *10-12

(observing that search results are "fundamentally subjective in nature").

These opinions are "fully protected First Amendment expression." *Zhang*, 10 F. Supp. 3d at

439; *see also Search King, Inc.*, 2003 U.S. Dist. LEXIS 27193, at *11-12 (same). They deserve no

less protection than "the newspaper editor's judgment of which wire-service stories to run and

where to place them in the newspaper, the guidebook writer's judgments about which attractions

to mention and how to display them, and Matt Drudge's judgments about which stories to link

and how prominently to feature them." *Zhang*, 10 F. Supp. 3d at 438. And because the First

Amendment extends to "the decision of both what to say and what not to say" (*Riley v. Nat'l

Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988)), search engines have a right to decide not

only what to include in their results but also what should be excluded. This protection is robust.

*See Zhang*, 10 F. Supp. 3d at 438 ("there is a strong argument to be made that the First

Amendment fully immunizes search-engine results from most, if not all, kinds of civil liability

and government regulation").

**B.**     **The First Amendment Protects Google From Liability Based On Its
Removal of Plaintiff's Websites From Search Results**

Applying these principles, courts have uniformly rejected—and dismissed at the pleading

stage—claims like those Plaintiff makes here, which seek to impose liability on search engines

for excluding particular websites or material from their search results.

First, in *Search King*, the court rejected claims that Google "maliciously" diminished the position of, and ultimately removed, the plaintiff's website in Google's search results. 2003 U.S. Dist. LEXIS 27193, at *3-4. Presaging e-ventures' strategy in this case, the plaintiff in *Search King* sued for tortious interference, alleging that Google's actions were motivated by concerns about competition and "adversely impacted the business opportunities available" to the plaintiff. *Id.* at *4. The court dismissed the claim, holding that Google was "immune from tort liability arising out of the devaluation because PageRanks constitute protected speech." *Id.* at *4, 12. The court explained that, as expressions of opinion, Google's search results "do not contain provably false connotations." *Id.* at *11. As such, the plaintiff's claim was barred by the rule that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* at *7 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).

The court in *Langdon v. Google, Inc.* similarly held that the First Amendment protected Google against claims (including for deceptive business practices and fraud) arising out of its decisions both to remove the plaintiff's websites from search results and not to display plaintiff's advertisements. 474 F. Supp. 2d at 626-27, 629-30. The court held that these claims impermissibly sought to "compel [Google] to speak in a manner deemed appropriate by Plaintiff and would prevent Google from speaking in ways that Plaintiff dislikes." *Id.* at 629-30. The court granted the motion to dismiss "on the basis that Plaintiff seeks relief precluded by [Google's] First Amendment rights." *Id.* at 630.

Most recently, the court in *Zhang v. Baidu.com, Inc.* built upon these rulings to hold that the First Amendment shielded Baidu (a search engine specializing in Chinese-language material) from claims seeking to hold it liable for refusing to include information in its search results about democracy in China. 10 F. Supp. 3d at 434. As the court explained:

> Plaintiffs call upon the Court to impose a penalty on Baidu precisely because of what it does and does not choose to say. . . . As the *Turner* Court made clear,

> however, "the First Amendment, subject only to narrow and well-understood exceptions"—inapplicable here—"does not countenance governmental control over the content of messages expressed by private individuals."

*Id.* at 441 (internal citations omitted) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). Because Baidu's search results reflected "editorial judgments" protected by the First Amendment, the court rejected the plaintiff's complaint and denied leave to amend. *Id.* at 443.

e-ventures' claims here fail for the same reasons. Just as the First Amendment protects newspaper publishers from interference with their "exercise of editorial control and judgment" (*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)), it protects Google from claims seeking to hold it liable for editorial decisions regarding the information presented through its search results. *Zhang*, 10 F. Supp. 3d at 437 ("the Government may not interfere with the editorial judgments of private speakers on issues of public concern"). In returning results that excluded e-ventures' websites, Google was expressing its constitutionally protected opinion about what information would be most relevant to its users' queries. Plaintiff's effort "to impose 'a penalty on the basis of the content'" of Google's speech is impermissible. *Id.* at 442 (quoting *Tornillo*, 418 U.S. at 256); *Search King*, 2003 U.S. Dist. LEXIS 27193, at *12-13. To allow these claims to proceed would violate "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 573 (1995).

## III.    THE SAC FAILS TO STATE A CLAIM UNDER FEDERAL OR STATE LAW

Plaintiff's claims fail independently of these overarching federal protections. The SAC's effort to invoke the Lanham Act is completely misguided, and its claims under Florida law continue to fall short for the reasons set out in Google's original motion to dismiss (Dkt. 36).

### A.    Plaintiff Cannot State a Claim Under the Lanham Act

Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a), creates "two distinct bases of liability: false association, §1125(a)(1)(A), and false advertising, §1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static*

*Control Components, Inc.*, 134 S. Ct. 1377, 1384 (2014). Plaintiff apparently seeks to advance a claim for false advertising, but such a claim fails as a matter of law on the facts alleged in the SAC.

A false advertising claim under the Lanham Act requires that the defendant "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods." 15 U.S.C. § 1125(a)(1)(B). The SAC does not quote or reference this provision (¶ 64), so it does not seem that Plaintiff is even trying to advance a false advertising claim. But any such claim would fail because there is no allegation, and could not be an allegation, that Google's statements were made "in commercial advertising or promotion."

To fall within §1125(a)(1)(B), the statement must be "for the purpose of influencing consumers to buy defendant's goods or services … [that are] disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012) (citation omitted). Plaintiff does not allege that the statements it relies on meet this criterion (SAC ¶ 65), and for good reason. Google's statements simply provide general information about its policies for operating its search engine and removing certain kinds of objectionable material from search results. *Id.* ¶ 46. Beyond having nothing to do with the search-manipulation guidelines that are actually pertinent to understanding what Google did here, Google's general policy statements are not advertisements or commercial speech, and they cannot give rise to a claim under § 1125(a)(1)(B). *E.g.*, *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 802 F. Supp. 2d 1273, 1287 (M.D. Fla. 2011) (defendant's brochure was not an "advertisement or promotion" in part because it was intended to provide training to those who had already purchased the product).

Nor would Plaintiff have a viable claim even if it could somehow overcome these deficiencies. The Lanham Act requires a showing that the alleged misrepresentation was material to consumers' purchasing decisions (*Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010)) and that the plaintiff suffered "economic or reputational injury flowing directly from the

5097413.1

deception wrought by the defendant's advertising" (*Lexmark*, 134 S. Ct. at 1391). The SAC does not make any plausible factual allegation that Google's statements regarding its removal policies caused consumers to stop using e-ventures' services or injured Plaintiff's business. SAC ¶¶ 66-67. That is not surprising, as any purported harm in this case results from the removal of e-ventures' websites from Google's search results, not from the general statements Google makes about the operation of its search engine. *Id.* ¶ 67 (alleging that e-ventures' revenues plummeted "during and following the Google ban"). It simply is not plausible to conclude that the supposed deception wrought by Google's statements caused e-venture's purported injuries.

**B.**     **Plaintiff Fails To State A FDUTPA Claim**

Plaintiff's FDUTPA claim fails because Plaintiff lacks standing to sue under FDUTPA because it is not a "consumer" of Google's services. Nor has it plausibly alleged that Google's actions were "deceptive" or "unfair."

**Standing.** In enacting FDUTPA, the "Florida legislature intended to create a statutory cause of action to allow citizens to recover damages related solely to a product or service purchased in a consumer transaction infected with unfair or deceptive trade practices or acts." *Dobbins v. Scriptfleet, Inc.*, No. 8:11-cv-1923-T-24-AEP, 2012 U.S. Dist. LEXIS 23131, at *10 (M.D. Fla. Feb. 23, 2012). Prior to 2001, the statute expressly restricted actions for damages to "consumers" of a product or service. *Carroll v. Lowes Home Ctrs., Inc.*, No. 12-23996, 2014 U.S. Dist. LEXIS 68525 at *9 (S.D. Fla. May 5, 2014). "[I]n 2001, the Legislature amended § 501.211(2) by replacing the word 'consumer' with the word 'person.'" *Id.* Since then, while there is some division of authority (*see Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1349-50 (S.D. Fla. 2009)), most courts have held that the amendment did not expand the statute to reach non-consumers.[4] Under these decisions, a FDUTPA claim can be brought only by someone who

---

[4] *See, e.g., Leon v. Tapas & Tintos, Inc.*, No. 14-21133-CIV MORENO, 2014 U.S. Dist. LEXIS 143270, at *12-13 (S.D. Fla. Oct. 7, 2014) ("The Court looks to the legislative history and recent
(continued...)

5097413.1

was acting as a consumer—"one who has engaged in the purchase of goods or services"— in connection with the relevant transaction. *Leon v. Tapas & Tintas, Inc., No. 14-21133-CIV MORENO*, 2014 U.S. Dist. LEXIS 143270, at \*14 (S.D. Fla. Oct. 7, 2014).

That is the correct result. "The legislative history of the 2001 amendment indicates the Florida Legislature did not intend to expand the FDUTPA to non-consumers. Rather, the purpose of the amendment was to clarify that remedies available to individuals under the FDUTPA are also available to businesses." *Carroll*, 2014 U.S. Dist. LEXIS 68525, at \*10; *see also Leon*, 2014 U.S. Dist. LEXIS 143270, at \*13. The amendment was not meant to allow claims with no connection to actual consumer transactions. *Dobbins*, 2012 U.S. Dist. LEXIS 23131, at \*11. This reflects FDUTPA's purpose: protecting the consuming public. "Providing actual damages to non-consumers does not further this purpose." *Carroll*, 2014 U.S. Dist. LEXIS 68525, at \*11.

Here, Plaintiff offers nothing more than a conclusory allegation that the parties have an ongoing commercial relationship. SAC ¶ 73. That allegation is contradicted by the facts Plaintiff actually alleges and is entitled to no weight. *Iqbal*, 556 U.S. at 663. Plaintiff purports to be an "online publishing and research firm . . . that reviews products and services in specific industries." SAC ¶ 9. Plaintiff does not assert that it has any relevant connection to Google (commercial or otherwise) beyond the simple fact that, like millions of other website operators, its sites at various times have appeared in Google's search results. Indeed, as required by the Court's order, Plaintiff amended the SAC to remove its only allegation that could plausibly make

---

(...continued from previous page)

district court decisions to find that the term 'person,' while broadening the scope of FDUTPA, still applies only to consumers."); *Carroll*, 2014 U.S. Dist. LEXIS 68525, at \*11-12 ("I conclude 'person' in § 501.211(2) applies only to 'consumers,' including businesses who are consumers."); *Pinecrest Consortium, Inc. v. Mercedes-Benz USA, LLC*, No. 13-20803-CIV, 2013 U.S. Dist. LEXIS 59558, at \*1-2 (S.D. Fla. April 25, 2013) (FDUTPA "has no application to entities complaining of tortious conduct which is not the result of a consumer transaction.").

it a consumer—claims that Google removed an advertisement e-ventures had paid to put in Google's search results as part of Google's AdWords program. SAC; Dkt. 73 ¶ 1. Without such an allegation, there is no consumer relationship between the parties, and Plaintiff's claim cannot proceed. *See Leon*, 2014 U.S. Dist. LEXIS 143270, at *14 (dismissing FDUTPA claim where Plaintiff failed to alleged that it was a "consumer" who "engaged in any consumer transaction").

**Deception**. A deceptive practice involves "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). The plaintiff must make "a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007). The SAC fails to make such allegations.

As an initial matter, e-ventures' claim is still built around the same sleight-of-hand described in Google's original and second motions to dismiss. Dkt. 36 at 16-17; Dkt. 58 at 18-20. Plaintiff relies on various irrelevant statements about Google's removal policies, but it ignores a host of other statements on the same Google website that clearly explain the policies that actually apply to this case—those that explain Google's willingness to take action against websites that it believes are trying to artificially inflate their position in Google's search engine. Indeed, as explained above (*supra* pp. 3-4), an entire section of Google's website (the "Webmaster Guidelines") is devoted to explaining these policies. For example:

- The Guidelines expressly state that Google is "willing to take manual action on sites that use spammy techniques" and that violations of Google's spam policies "may lead to a site being removed entirely from the Google index" (Ex. A at 1, 12);

- Google's statements "strongly encourage [website operators] to pay very close attention to the 'Quality Guidelines,' which *outline some of the illicit practices that may lead to a site being removed entirely* from the Google index or otherwise impacted by an algorithmic or manual spam action" (Ex. A at 1) (emphasis added);

- Google makes clear that its "quality guidelines cover the most common forms of deceptive or manipulative behavior, but Google may respond negatively to other

5097413.1

misleading practices not listed here. *It's not safe to assume that just because a specific deceptive technique isn't included on this page, Google approves of it.*" (Ex. A at 3) (emphasis added).

These statements give lie to Plaintiff's suggestion (SAC ¶¶ 36-39, 46) that Google only removes content from its search results in the circumstances outlined in the Removal Policies. They likewise undermine any claim that Google tells the public that it "only removes very specific categories of content, which do not include any of the content published by e-ventures." *Id.* ¶ 39. The guidelines put website operators on notice that Google will take action against those who use deceptive techniques, whether or not those techniques are expressly listed. All of this shows that it is Plaintiff (not Google) that is omitting material information. What Google has said publicly about its anti-manipulation guidelines rules out any deception claim. *See, e.g.*, *Zlotnick*, 480 F.3d at 1287 (dismissing FDUTPA claim where defendant's statements "eliminated any possibility that a reasonable [consumer] would be misled").[5]

Even putting aside Plaintiff's lack of candor, its deception allegations simply are not supported by the statements it cherry-picked from Google's website (¶¶ 40-46):

---

[5] The full text of Google's Removal Policies and Webmaster Guidelines can and should be considered in connection with this motion. By selectively pointing to various public statements on Google's website about its removal policies, Plaintiff has incorporated those policies (which include the Webmaster Guidelines) into the SAC. *See, e.g.*, *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) (applying the incorporation-by-reference rule); *Horsley v. Feldt*, 304 F.3d 1125, 1135-37 (11th Cir. 2002); *Smith v. Cox*, No. 13-cv-347-OC-10PAR, 2014 U.S. Dist. LEXIS 126490, at *2-3, n. 3 (M.D. Fla. Sept. 10, 2014). The Court can also take judicial notice of these materials, which are publicly available and whose authenticity is undisputed. *See, e.g.*, *Regions Bank v. Kaplan*, No. 12-cv-1837-T-17MAP, 2013 U.S. Dist. LEXIS 40805, at *49 (M.D. Fla. Mar. 22, 2013) (taking judicial notice of material on defendant's website). Doing so serves the public interest. Plaintiff has cited isolated excerpts from Google's website, falsely implying that they comprise the full universe of Google's statements about the material it will remove from search results. Having done so, e-ventures should not be permitted to keep the Court in the dark about other statements on that same website that contradict its allegations. *See Simpson v. Kay Jewelers*, 142 F.3d 639, 646-47 (3d Cir. 1998) (plaintiffs cannot "pick and choose" favorable outliers among similar evidence).

- *"Google's index merely reflects that the page exists on the wider web, and not that Google endorses it."* SAC ¶ 46(a). This true statement does not suggest that all websites will appear in search results, only that the inclusion of a given site is not an endorsement by Google.

- *"Google search results are a reflection of the content publicly available on the web."* Id. ¶ 46(b). This similarly conveys that Google does not control the content of the websites that appear in its search results. It does not suggest that every public website will be included.

- Google's *"Removals Polices"* page *"explains our policies for different types of content that Google will remove from web, image or video results."* Id. ¶ 46(c),(d). This page accurately explains Google's policies for removing content from search results that is "sensitive or not appropriate for everyone to see." Ex. A at 15. It does not purport to exhaustively describe the circumstances where Google will remove material from search results.

- Google's *"mission is 'to organize the world's information.'"* Id. ¶ 46(e). Google's mission statement is irrelevant. It certainly does not support a deception claim, as organizing information necessarily includes decisions as to what information to exclude.

- *"Google is committed to leading the industry in transparency"* and publishes data that *"sheds light on how laws and policies affect Internet users and the flow of information online."* Id. ¶ 46(f). These true statements are similarly irrelevant. Google's Transparency Report simply lists particular kinds of removals—those done in response to certain kinds of third-party requests. Nowhere does it suggest that Google will not remove material that violates its spam guidelines or promise that Google will publicize removals made for that reason.

- *"Chilling Effects posts and analyses copyright removal requests (among other types of content removal requests) from a number of participating companies on its website. We link in our search results to the requests published by Chilling Effects in place of removed content when we are able to do so legally."* Id. ¶ 46(g). Again, this statement is both true and irrelevant. It discusses Google's policy of sending information to Chilling Effects about removals based on claims of copyright infringement. It does not say that Google will similarly publicize other kinds of removals or that it has any obligation to do so.

- *"It is Google's policy not to censor search results. However, in response to local laws, regulations, or policies, we may do so. When we remove search results for these reasons, we display a notice on our search results pages."* Id. ¶ 46(h). This true statement refers to Google's response to government and other legal censorship, and it explains that when Google is forced to remove search results due to legal pressure, it will put a notice on the results page. It does not say that Google will place a similar notice for all removals or that it is obliged to do so.

In short, none of the statements that Plaintiff puts at issue is inconsistent with Google's decision to remove e-ventures' websites from search results. No reasonable person could conclude from these statements that Google promised not to take action against websites that it

determines are engaged in search manipulation—and, of course, Google tells the public in detail that it will do exactly that. There can be no deception claim based on these statements.[6]

**Unfairness.** Plaintiff's unfairness claim is similarly deficient. The court in *Kinderstart.com, LLC v. Google, Inc.*, No. C 06-2057 JF (RS), 2007 U.S. Dist. LEXIS 22637 (N.D. Cal. Mar. 16, 2007), dismissed a virtually identical claim that Google's decision to remove certain websites from search results was "unfair" competition. *Id.* at *53-55. The outcome should be the same here.

Under FDUTPA, an unfair practice is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR*, 842 So. 2d at 777 (citation omitted). Plaintiff makes no such allegations here. The SAC says merely that "Google committed unfair methods of competition." SAC ¶ 82. But this "'naked assertion[]' devoid of 'further factual enhancement'" cannot support a legally viable claim. *Iqbal,* 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Beyond that, Plaintiff offers no facts whatsoever suggesting that Google's removal of websites that it deems to violate its spam and search rank manipulation guidelines violates any public policy or ethical norm. While e-ventures suggests (implausibly) that Google had an "anti-competitive, economic motivation" for its actions (SAC ¶ 18), Plaintiff does not explain why simply having such a motivation would transform an otherwise legitimate removal into unethical or immoral behavior.

---

[6] Moreover, Plaintiff fails to establish any causal link between Google's alleged deception and e-ventures' purported harm. Dkt. 36, at 19. The SAC's threadbare recital of this causation element (¶¶ 76, 78) is supported by no factual allegations and is entirely implausible. Plaintiff does not explain what harm e-ventures suffered because of Google's alleged misrepresentations regarding its removal policies. *See, e.g.*, *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1317, 1321 (M.D. Fla. 2000) (dismissing FDUTPA claim where plaintiff failed to "allege sufficient facts to show that the consumer has been actually aggrieved by the unfair or deceptive act").

In addition to showing a public policy or ethical violation, a plaintiff pursuing an unfairness claim under FDUTPA must show that it suffered a "substantial" injury that is "not []outweighed by any countervailing benefits to consumers or competition that the practice produces" and is one "that consumers themselves could not reasonably have avoided." *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. 3d DCA 2014). e-ventures makes only bare assertions of "significant damage" to its business. SAC ¶ 29. The SAC does not identify any actual injuries that would qualify as "substantial," much less any that are not outweighed by countervailing public benefits. That is not surprising. It is clear that Google's removal actions were aimed at preventing injury to the consuming public. As Plaintiff admits, websites attempting to manipulate search engines may trick Google's algorithms into placing their sites higher in search results than would be warranted by their actual content and popularity. *Id.* ¶ 13. Google's anti-spam policies are designed to combat this problem for the benefit of the public. By removing or demoting websites it believes are engaged in manipulation, Google allows its users to search more effectively and helps ensure that its results feature higher-value websites that provide quality content for users. Ex. A at 11-12. Plaintiff does not plausibly allege facts to support its unadorned allegation of significant injury, let alone that such injury outranks the benefits resulting from protecting search engine users against potentially deceptive manipulations. For this reason as well, Plaintiff's FDUTPA claim should be dismissed.

### C.    Plaintiff Fails To State A Defamation Claim

To state a claim for defamation under Florida law, a plaintiff must plead: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). e-ventures falls well short of these requirements.

First, the SAC does not identify any published statement by Google about e-ventures. "Publication of defamatory matter is its communication intentionally or by a negligent act to one *other than the person defamed.*" Restatement (Second) of Torts § 577, cited in *Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1016 (Fla. 2001) (emphasis in original). The statements Plaintiff puts at issue (SAC ¶¶ 36-48) say nothing about e-ventures or the removal of its material from search results. Plaintiff asserts, without elaboration, that Google's "search results are publications" (*id.* ¶ 87), but it does not, and cannot, explain how the *exclusion* of links to e-ventures' sites from these results was a publication about e-ventures. Without that, there can be no defamation claim.

Second, any statement that Google made was not defamatory as a matter of law. Defamation requires a showing that "the statement was a false statement of fact as distinguished from opinion, which is protected by the first amendment." *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 715 (11th Cir. 1985) (citation omitted). "Whether a statement is one of fact or one of opinion is a question of law." *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1247 (M.D. Fla. 2007), *aff'd* 294 Fed. Appx. 502 (11th Cir. 2008) (citation omitted). Here, even assuming that Google somehow published a statement by removing e-ventures' material from Google's search results, that would not be a statement of fact. As discussed above, a search engine's decisions about what to include in its results constitute its "opinions of the significance of particular web sites as they correspond to a search query." *Search King*, 2003 U.S. Dist. LEXIS 27193, at *11. Search results thus are "fundamentally subjective in nature" (*id.* at *10), and "there is no conceivable way to prove that the relative significance assigned to a given web site is false" (*id.* at *11-12). Whether something is "worthy of being included" in Google's search results (SAC ¶ 88) is clearly an expression of opinion. And "[o]pinions are protected from defamation actions by the first amendment." *Keller*, 778 F.2d at 717; *accord Gertz v. Robert Welch, Inc.*, 418 US 323, 339-40 (1974) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.").

Third, Plaintiff does not even try to plead fault, *i.e.,* that Google acted with knowledge (as at least negligence) of the falsity of its statements. *See Carroll v. TheStreet.com, Inc.*, No. 11-cv-81123-RYSKAMP/HOPKINS, 2014 U.S. Dist. LEXIS 156499, at *32 (S.D. Fla. July 10, 2014) ("Florida defamation law requires a plaintiff to prove fault."). While a heightened showing of fault is likely required here (*cf. Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1493-98 (11th Cir. 1988)), the Court need not address that issue, as the SAC does not even allege that Google was negligent about the truth of its supposed statements. Without that, there can be no viable defamation claim. *See, e.g., Log Creek, LLC v. Kessler*, 717 F. Supp. 2d 1239, 1251 (N.D. Fla. 2010) (dismissing claim for failure to allege fault).

### D.        Plaintiff Fails to State a Tortious Interference Claim

Plaintiff cannot evade those problems with its defamation claim by asserting a claim for tortious interference. Florida's "single publication/single action rule does *not* permit multiple actions to be maintained when they arise from the same publication upon which a failed defamation claim is based." *Ovadia v. Bloom*, 756 So. 2d 137, 141 (Fla. 3d DCA 2000) (emphasis in original). The rule is "designed to discourage the erosion of free speech safeguards by the simple expedient of looking to a substitute cause of action." *Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1340 (S.D. Fla. 1998), *aff'd* 48 Fed. App'x 739 (11th Cir. 2002) (quoting *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607, 609 (Fla. 4th DCA 1975)).

The rule applies here. Plaintiff's tortious interference claim is based on the same conduct as its defamation claim. SAC ¶ 94. Plaintiff cannot evade Google's First Amendment and other defenses by restating that claim in a different guise. *See Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992) (successful invocation of a defamation privilege precludes a separate claim based on same publication); *see, e.g., Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla.4th DCA 2002) (dismissing tortious interference claim); *Kamau v. Slate*, No. 11-cv-522-RH/CAS, 2012 U.S. Dist. LEXIS 158213, at *24 (N.D. Fla. Oct. 1, 2012) (same).

Even apart from the single action rule, e-ventures cannot state a claim against Google. A tortious interference claim requires a showing of the following:

> (1) the existence of a business relationship[;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (citation omitted). The SAC here falls well short of this standard. Plaintiff's conclusory allegation that the removal of e-ventures' sites was not "privileged, justified, or excusable" (SAC ¶ 102) ignores that Google's decisions regarding what material appears in its search results are constitutionally protected opinions that "cannot constitute improper interference in the context of a claim for tortious interference with contractual relations." *Search King*, 2003 U.S. Dist. LEXIS 27193, at *12-13 (search results "cannot give rise to a claim for tortious interference with contractual relations because it cannot be considered wrongful, even if the speech is motivated by hatred or ill will").

Likewise, Plaintiff's bald assertion that Google "wrongfully and intentionally harmed e-ventures' actual and prospective business relationships" (SAC ¶ 98), is unsupported by any factual allegations and entitled to no weight. Plaintiff still has not identified any of e-ventures' business relationships (SAC ¶ 96), much less offered any facts to suggest that Google knew about, much less "manifested a specific intent to interfere with," any of those relationships. *Hodge v. Orlando Utils. Comm'n*, No 09-cv-1059-irk-19DAB , 2011 U.S. Dist. LEXIS 7621, at *57 (M.D. Fla. Jan. 26, 2011). The same problem dooms Plaintiff's effort to plead damage resulting from a breach. Indeed, the SAC does not allege that any of e-ventures' business and contractual relationships were actually breached, only that they were "damaged" in some unspecified way. SAC ¶¶ 29, 96, 98. Plaintiff conspicuously does not allege that any third parties have cancelled contracts, terminated relationships, or otherwise refused to do business with it since its websites were removed from Google's search results. *Id.* ¶¶ 27, 98. That is not enough. As the Supreme Court has explained, "Rule 8 does not empower respondent to plead the bare elements of his

-23-

cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687.

## CONCLUSION

For these reasons, Plaintiff's SAC should be dismissed, and because any further amendment would be futile, the dismissal this time should be with prejudice.

Dated:  November 16, 2015

Respectfully submitted,

s/ *Nathan M. Berman*
NATHAN M. BERMAN
Fla. Bar No. 0329230
Zuckerman Spaeder LLP
101 East Kennedy Blvd.
Suite 1200
Tampa, FL 33602
Tel: (813) 221-1010
Fax: (813) 223-7961
nberman@zuckerman.com

BRIAN M. WILLEN (ADMITTED *PRO HAC VICE*)
WILSON SONSINI GOODRICH & ROSATI
1301 AVENUE OF THE AMERICAS, 40TH FLOOR
NEW YORK, NY  10019
BWILLEN@WSGR.COM

COUNSEL FOR GOOGLE INC.

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2015, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system.

/s/ Nathan M. Berman
Nathan M. Berman

5097413.1