UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

E-VENTURES WORLDWIDE, LLC,
9045 Strada Stell Court,
Suite 103, Naples, Fl
34109,

      Plaintiff,

v.                                    Case No: 2:14-cv-646-FtM-29CM

GOOGLE, INC., 1600
Amphitheatre Parkway,
Mountain View, CA 94043,

      Defendant.

---

## OPINION AND ORDER

This matter comes before the Court on review of defendant Google's Motion to Dismiss Plaintiff's Second Amended Complaint and Supporting Memorandum of Law (Doc. #78) filed on November 16, 2015. Plaintiff filed an Opposition to Google's Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. #79) on November 30, 2015, to which Google filed a Reply Memorandum in Support of its Motion to Dismiss (Doc. #82) on December 14, 2015.

### I.

Plaintiff's Second Amended Complaint alleges the following facts: Plaintiff e-ventures Worldwide, LLC is an online publishing and research firm that reviews products and services in specific industries. (Doc. #75, ¶ 9.) The majority of plaintiff's revenues

are derived from the "search engine optimization" or "SEO" industry. (<u>Id.</u> ¶ 13.) Search engine optimization is the process of causing websites to be ranked and displayed more prominently in search results, without payment being made to the search engine. (<u>Id.</u>)

Defendant Google operates an Internet search engine and has been called "the world's largest media company" with approximately 70% of the United States' online search market and 90% of Europe's online search market. (<u>Id.</u> ¶ 10.) The majority of Google's revenues are derived from its "AdWords" advertising program, through which consumers pay to have their websites ranked and prominently displayed in Google's search results. (<u>Id.</u> ¶ 11.) Links to the advertisers' websites are displayed at the top of Google's search results and each time a consumer clicks on one of the advertisements, Google charges the advertiser and makes a profit. (<u>Id.</u> ¶ 12.) Due to Google's large market share, SEO companies tend to focus on how their clients' websites can obtain a higher ranking on Google's unpaid search results. (<u>Id.</u> ¶ 14.)

Plaintiff alleges that the SEO services it provides and advertises on its website reduce Google's revenues because if companies are successful in achieving website prominence on Google's unpaid search listing, then there is less of a desire for them to purchase Google's AdWords advertising services. (<u>Id.</u> ¶ 15.) Accordingly, marketing dollars that may otherwise have been

spent on Google advertising are spent by companies on SEO providers to increase their prominence on Google's search results. (Id. ¶ 16.)   Both Google and e-ventures publish information online to assist third parties in achieving increased website visibility on Google. (Id. ¶ 17.) Google hopes that third parties pay Google to be ranked higher in Google's search results, and e-ventures hopes that third parties pay an SEO provider, instead of Google, to achieve the same result. (Id.) Plaintiff alleges that as a result, Google has an anti-competitive, economic motivation to eliminate the visibility of e-ventures' websites on its search engine results. (Id. ¶ 18.)

Plaintiff further alleges that prior to September 2014, e-ventures had not made any significant or sudden changes to its website content that would have prompted Google to treat e-ventures' websites differently than they had been treated in the past. (Id. ¶ 19.) E-ventures obtained information indicating that on or about September 15, 2014, a third party with a personal vendetta against e-ventures caused Google to receive false information regarding e-ventures' websites. (Id. ¶ 20.)   On September 19, 2014, e-ventures was notified by Google that 231 websites owned by e-ventures were being manually removed by Google from all of Google's search results because they had been identified as "pure spam." (Id. ¶ 21.)   "Pure spam" is a term

coined and defined by Google.[1]  "Pure Spam" is defined by Google as indicating that "Google has detected that some of your pages may be using techniques that are outside [Google's] Webmaster Guidelines.  The site appears to use aggressive spam techniques such as automatically generated gibberish, cloaking, scraping content from other websites, and/or other repeated or egregious violations of Google's quality guidelines." (Doc. #78-1, p. 14.) When Google detects pages that it deems as "Pure Spam," it "applie[s] a manual spam action to the affected portion of [the] site." (Id.)  The 231 websites that were manually removed by Google included almost every website owned by e-ventures, including "corporate" websites, brand new websites, and websites that could not have engaged in any activities which could possibly be classified as spam. (Doc. #75, ¶ 23.)  Over time, 365 websites

---

[1] When ruling on a 12(b)(6) motion, "a judge generally may not consider materials outside of the four corners of a complaint without first converting the motion to dismiss into a motion for summary judgment." Pouyeh v. Bascom Palmer Eye Inst., 613 F. App'x 802, 808 (11th Cir. 2015) (citing Day v. Taylor, 400 F.3d 1272, 1275-76 (11th Cir. 2005)). "However, a document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity." Maxcess, Inc. v. Lucent Techs., Inc., 433 F.3d 1337, 1340 n.3 (11th Cir. 2005) (citing Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002)).  Here, the provisions referenced from Google's Webmaster Guidelines were attached to defendant's motion to dismiss, are central to plaintiff's claims, and their authenticity has not been disputed.  Accordingly, the Court may properly consider them in ruling on defendant's Motion to Dismiss.

of e-ventures' websites were removed from Google's search results. (Id. ¶ 57.)

   As a result of Google's removal of e-ventures' websites, e-ventures' websites could not be located on Google.com, the world's most widely used search engine. (Id. ¶ 24.)  Therefore, when an individual would search for e-ventures on Google, a display of third party websites for companies using the trademark 'eventures' would appear, but not e-ventures' actual corporate website.  (Id. ¶ 25.)  As a result, e-ventures' business partners and current and prospective business customers were prevented from locating e-ventures' websites through Google.  (Id. ¶ 26.)  During the ban, e-ventures attempted to have new websites listed in Google's search results, and those websites were rejected based upon their affiliation with e-ventures.  (Id. ¶ 27.)  E-ventures' websites were not only removed from Google.com's search results, but were also removed from all google-affiliated websites and from third party websites participating in Google's advertising program. (Id. ¶ 28.)  Plaintiff alleges that Google's ban of its websites caused it irreparable harm and significant damage to its business. (Id. ¶ 29.)

   Following Google's notification to e-ventures that its websites had been de-listed, e-ventures began researching possible bases for Google's removal of its websites, without success.  (Id. ¶ 30.)  E-ventures alleges that it made every possible change to

its websites in order to get the websites re-listed, but they remained banned. (Id.) Google's removal of its websites appeared to be because Google determined each website was affiliated with e-ventures. (Id. ¶ 31.) Many of the websites had nothing in common with each other, other than their relation to e-ventures. (Id.) E-ventures did not have knowledge of any specific problems that would cause Google to remove its websites. (Id. ¶ 32.)

Prior to filing suit, e-ventures attempted to address with Google the reasons for Google's designation of its websites as "pure spam," made significant changes to its websites, filed multiple resubmission requests, created new websites, and sent letters to Google from counsel, all to no avail. (Id. ¶ 33.) It was not until after plaintiff filed the underlying lawsuit that its websites were relisted on Google's search results. (Id. ¶ 35.)

Google's search results are largely the result of algorithms and Google alleges that it only removes content from its search results in very limited circumstances. (Id. ¶ 36.) These limited circumstances are identified in Google's published "Removal Policies." (Id.) Plaintiff alleges that nowhere in the Removal Policies does Google indicate that it will ban a website owner or take punitive action against a website owner by removing from its paid and unpaid search results every website affiliated or associated with the website owner. (Id. ¶ 37.) The Removal

Policies likewise do not indicate that Google will remove content for anti-competitive reasons. (Id. ¶ 38.) Plaintiff alleges that Google's Removal Policies do inform the public that Google takes a neutral approach and only removes very specific categories of content. (Id. ¶ 39.)

Plaintiff alleges that the following statements made by Google on its website are false, deceptive, and misleading:

- "Google's index merely reflects that the page exists on the wider web."
- "Google search results are a reflection of the content publicly available on the web."
- "See our Removal Policies to learn more about what information Google will remove."
- "This page explains our policies for different types of content that Google will remove from web, image or video results."
- Google's "mission is to 'organize the world's information.'"
- "Google is committed to leading the industry in transparency" and publishes data that "sheds light on how laws and policies affect Internet users and flow of information online."
- "Chilling Effects posts and analyzes copyright removal requests (among other types of content removal requests) from a number of participating companies on its website. We link in our search results to the requests published by Chilling Effects in place of removed content when we are able to do so legally."
- "It is Google's policy not to censor search results. However, in response to local laws, regulations, or policies, we may do so. When we remove search results for these reasons, we display a notice on our search results page. Please note: For some older removals (before March 2005), we may not show a notice at this time."

(See id. ¶ 46.)   E-ventures alleges that Google delisted the websites solely based upon the websites' affiliation with e-ventures, which did not fall within any of Google's listed reasons that it would remove a website from its search results. (Id. ¶ 48.)

E-ventures alleges that Google never accused it of publishing content in violation of Google's Removal Policies nor of "spam." (Id. ¶¶ 51-52.)   Google accused e-ventures of improperly having its website ranked higher in Google's search results, characterizing the conduct as egregious "pure spam." (Id. ¶ 53.) The Federal Trade Commission officials concluded in a 2012 investigation that Google used anti-competitive tactics in connection with its Internet search results and abused its monopoly power in ways that harmed Internet users and rivals. (Id. ¶ 54.) Google has a history of targeting website owners who advertise or promote SEO services by characterizing their websites as "pure spam" and removing them from Google's search results (id. ¶ 60), which it does for anti-competitive reasons, (id. ¶ 62).

Plaintiff's Second Amended Complaint[2] alleges the following claims against Google:   (1) Unfair Competition Under the Lanham

---

[2] Plaintiff filed its initial Complaint (Doc. #1) on November 4, 2014, which was subsequently amended twice, resulting in the Second Amended Complaint (Doc. #75) being the operative pleading before the Court.

Act; (2) violation of the Florida Deceptive and Unfair Trade Practices Act; (3) Defamation; and (4) Tortious Interference with Business Relationships.  (Doc. #75.)  The individual counts will be discussed in greater detail below.

## II.

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(citation omitted).  To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level." Id. at 555.  See also Edwards v. Prime Inc., 602 F.3d 1276, 1291 (11th Cir. 2010).  This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citations omitted).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, Erickson v. Pardus, 551 U.S. 89 (2007), but "[l]egal conclusions without adequate factual support are entitled to no assumption of truth," Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011)(citations

omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.  "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible."  Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012)(citations omitted).  Thus, the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Iqbal, 556 U.S. at 679.

"Generally, the existence of an affirmative defense will not support a motion to dismiss," Quiller v. Barclays Am./Credit, Inc., 727 F.2d 1067, 1069 (11th Cir. 1984), aff'd on reh'g, 764 F.2d 1400 (11th Cir. 1985) (en banc) (per curiam) (reinstating panel opinion), because plaintiffs are not required to negate an affirmative defense in their complaint.  La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).  A complaint may be dismissed, however, when the existence of an affirmative defense "clearly appears on the face of the complaint."  Quiller, 727 F.2d at 1069.  "A complaint may be dismissed if an affirmative defense, such as failure to exhaust, appears on the face of the complaint. Otherwise, exhaustion and other affirmative defenses must be raised in a responsive pleading."  Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (citations omitted).  See also La

<u>Grasta</u>, 358 F.3d at 845 ("[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred") (quoting <u>Omar ex rel. Cannon v. Lindsey</u>, 334 F.3d 1246, 1251 (11th Cir. 2003)); <u>Douglas v. Yates</u>, 535 F.3d 1316, 1321 (11th Cir. 2008)(same).

### III.

All four counts of the Second Amended Complaint are based upon the same facts.  In short, plaintiff alleges that on September 19, 2014, Google removed 231 of its websites from being displayed on Google or Google-affiliated websites because they had been identified as "pure spam."  Over time, 365 such websites were removed.  As a result of these removals, plaintiff's websites could not be located by anyone using the Google.com search engine. Plaintiff attempted to cause new websites to be listed in Google's search results, but these new websites were rejected by Google because of their affiliation with plaintiff.  Plaintiff alleges that the removal of its websites was inconsistent with statements published by Google in its "Removal Policies," both in terms of what the Policy says and what it fails to say.  Plaintiff alleges that Google's public statements about its removal policy were false, deceptive, and misleading because they are inconsistent with what Google did to plaintiff, and identifies eight specific false statements.  Plaintiff alleges that Google's conduct towards

it was motivated by anti-competitive reasons and to punish plaintiff for engaging in "pure spam" and not on the content of the websites.

## A. Communications Decency Act Defense

Defendant first asserts that all of plaintiff's claims are barred by the Communications Decency Act (the "CDA"). (Doc. #78, pp. 7-10.) Pursuant to the CDA, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The purpose of the CDA is to establish "federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1321 (11th Cir. 2006) (citations omitted). Accordingly, the CDA provides immunity for "any action[s] *voluntarily taken in good faith* to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable . . . ." 47 U.S.C. § 230(c)(2) (emphasis added). While the majority of federal circuits have held that such immunity is "broad," the statutory immunity provided for under the CDA "does not apply without limitation." Almeida, 456 F.3d at 1321-22 (citing 47 U.S.C. § 230(e)(1)).

It is not disputed that Google is, as courts across the country have agreed, a provider of an interactive computer service. Dowbenko v. Google Inc., 582 F. App'x 801, 805 (11th Cir. 2014); Langdon v. Google, Inc., 474 F. Supp. 2d 622, 630 (D. Del. 2007); Parker v. Google, Inc., 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006); Novak v. Overture Servs., 309 F. Supp. 2d 446, 452 (E.D.N.Y. 2004). As such, plaintiff's claims against Google are subject to the CDA.

The CDA statutory immunity is an affirmative defense which plaintiff is not required to negate in its Complaint. The plain language of the CDA only provides immunity for actions "voluntarily taken in good faith." 47 U.S.C. § 230(c)(2)(A). While the CDA defense may properly be considered if it is apparent from the face of the complaint, that is not the situation in this case. Here, plaintiff has included allegations within its Second Amended Complaint that Google failed to act in good faith when removing its websites from Google's search results. (Doc. #75, ¶¶ 18, 54, 57-62, 68; Doc. #79, pp. 9-10.) Compare Smith v. Trusted Universal Standards in Elec. Transactions, Inc., No. 09-4567(RBK/KMW), 2010 WL 1799456, at *7 (D.N.J. May 4, 2010) (declining to dismiss due to allegation of lack of good faith in complaint), with E360insight, LLC v. Comcast Corp., 546 F. Supp. 2d 605, 609-10 (N.D. Ill. 2008) (dismissing claims based on CDA where "the absence of good faith is not adequately plead"). Viewing the Second Amended Complaint's allegations in the light most favorable to the

plaintiff, the Court denies Google's Motion to Dismiss on the basis of the CDA.[3]

## B. First Amendment Defense

Defendant next asserts that plaintiff's claims are barred by the First Amendment because Google's search results are constitutionally protected opinions, and the First Amendment protects Google from liability based on its removal of plaintiff's websites from its search results.   (Doc. #78, pp. 10-13.) Plaintiff responds that Google's actions are not entitled to protection by the First Amendment because they did not involve content-based speech and, if speech was involved, it was unprotected misleading commercial speech.  (Doc. #79, pp. 10-15.)

"[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say."  Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 796-97 (1988).   It is well established that First Amendment protection applies not only to individuals, but also to corporations and other associations.  Pac. Gas and Elec. Co. v. Pub. Utils. Comm'n of Cal., 475 U.S. 1, 8 (1986).   The First

---

[3] Google cites to Donato v. Moldow, 865 A.2d 711, 727-28 (N.J. Super. Ct. 2005) to support its argument that plaintiff has not adequately alleged lack of good faith on behalf of Google.   The Court has reviewed the case and finds that plaintiff has more plausibly alleged lack of good faith than that alleged in Donato. Id.  The Court believes the allegations within plaintiff's Second Amended Complaint are sufficient at this stage of the proceedings.

Amendment "can serve as a defense in state tort suits," Snyder v. Phelps, 562 U.S. 443, 451 (2011) (citing Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50-51 (1988)), and limits "the type of speech that may be the subject of state defamation actions." Milkovich v. Lorain Journal Co., 497 U.S. 1, 16 (1990) (emphasis omitted). See also Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv'r's Servs., Inc., 175 F.3d 848, 857-58 (10th Cir. 1999) (finding protected speech cannot serve as the basis for a claim of tortious interference with contractual relationships because the protected speech is *per se* lawful).

The Court has little quarrel with the cases cited by Google for the proposition that search engine output results are protected by the First Amendment. Zhang v. Baidu.com Inc., 10 F. Supp. 3d 433 (S.D.N.Y. 2014); Langdon, 474 F. Supp. 2d 622; Kinderstart v. Google, Inc., No. C06-2057JF(RS), 2007 WL 831806, at *1 (N.D. Cal. Mar. 16, 2007); Search King, Inc. v. Google Tech., Inc., No. CIV-02-1457-M, 2003 WL 21464568, at *1 (W.D. Okla. May 27, 2003). The Court finds these cases persuasive that Google's PageRanks are pure opinions of the website's relevancy to a user's search query, incapable of being proven true or false. While a claim based upon Google's PageRanks or order of websites on Google's search results may be barred by the First Amendment, plaintiff has not based its claims on the PageRanks or order assigned to its websites. Rather, plaintiff is alleging that as a result of its pages being removed

from Google's search results, Google falsely stated that e-ventures' websites failed to comply with Google's policies. (Doc. #75, ¶¶ 66, 88-89, 92.)  Google is in fact defending on the basis that e-ventures' websites were removed due to e-ventures' failure to comply with Google's policies.  (Doc. #78.)  The Court finds that this speech is capable of being proven true or false since one can determine whether e-ventures did in fact violate Google's policies.  This makes this case distinguishable from the PageRanks situation.  Therefore, this case does not involve protected pure opinion speech, and the First Amendment does not bar the claims as pled in the Second Amended Complaint.

Google also argues that its search results are editorial judgments protected by the First Amendment.  (Id. at 13.)  While publishers are entitled to discretion for editorial judgment decisions, plaintiff has alleged that Google's reason for banning its websites was not based upon "editorial judgments," but instead based upon anti-competitive motives.  (Doc. #75, ¶ 18; Doc. #79, p. 11); Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 386 (1973); Ragin v. New York Times Co., 923 F.2d 995, 1003 (2d Cir. 1991); Levitch v. Columbia Broad. Sys., Inc., 495 F. Supp. 649, 662 (S.D.N.Y. 1980) ("[A]bsent such purely editorial conduct, plaintiffs' claims must be tested against the normal pleading requirements applicable in federal court.").  Further, a fact published maliciously with knowledge of its falsity

or serious doubts as to its truth is sufficient to overcome the editorial judgment protection afforded by the Constitution. Pittsburgh Press Co., 413 U.S. at 386.

Plaintiff has adequately alleged that it did not violate any of Google's policies and that the representations made by Google that e-ventures' pages violate Google's policies are false. Whether or not plaintiff can support these assertions and carry its burden at a later stage of the proceedings is for a different day. The Court finds that at this stage of the proceedings, the Second Amended Complaint is sufficient to withstand Google's First Amendment arguments.[4]

**C. Pleading Sufficiency of Count I: Unfair Competition Under the Lanham Act**

In Count I, plaintiff alleges that Google violated a portion of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The Lanham Act provides in pertinent part that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or

---

[4] Because Google is only arguing that its search results are protected pure opinions and it is entitled to protection for editorial judgments, the Court need not address plaintiff's arguments that Google's speech is content-based and unprotected commercial speech.

association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

Count I alleges that Google violated the following portion of the statute:  "Any person who, on or in connection with any goods or services . . . uses in commerce any  . . . false or misleading description of fact, or false or misleading representation of fact which . . . is likely to deceive as to . . . commercial activities by another person . . . shall be liable . . . ."  (Doc. #75, ¶ 64.)  Specifically, plaintiff alleges that:

Google's description of its search engine services in the Removal Policies, and other statements identified in Paragraph 47 . . . were false or misleading to consumers and likely to deceive consumers . . . into believing that [plaintiff's] websites had violated Google's Removal Policies (or other published policies) and that is why the websites were banned from Google's search results, when this was not the case.

(Id. ¶¶ 65-66.)  Plaintiff alleges that this was unfair treatment which resulted in damages.  (Id. ¶¶ 67-71.)

Google moves to dismiss Count I of plaintiff's Second Amended Complaint because plaintiff failed to (1) identify any statement made "in commercial advertisement or production," (2) allege that

the statements were material to consumers' purchasing decisions, and (3) allege that plaintiff suffered injury directly from defendant's advertising.  (Doc. #78, pp. 13-15.)

"The Lanham Act, 15 U.S.C. § 1125(a), sets forth two distinct claims of unfair trade practices: unfair competition under subsection 1125(a)(1)(A) and false advertising under subsection 1125(a)(1)(B)." Synergy Real Estate of SW Fla., Inc. v. Premier Prop. Mgmt. of SW Fla., LLC, 578 F. App'x 959, 961 (11th Cir. 2014).  Count I does not allege a cause of action for false advertising; rather, the Count only quotes from § 1125(a)(1)(A), which provides a cause of action for unfair competition, which in this case is based on allegedly false representations.  Therefore, while Google is correct that Count I fails to identify any statement made "in commercial advertisement or production" and fails to allege that plaintiff suffered injury directly from defendant's advertising, such deficiencies are not relevant to the claim asserted.  The other arguments asserted by Google as a basis for dismissing plaintiff's Lanham Act claim are also aimed at a claim for false advertising under § 1125(a)(1)(B).  Because plaintiff has not alleged a claim for false advertising, the Court need not address these arguments.  Accordingly, defendant's Motion to Dismiss Count I is denied.

### D. Sufficiency of Count II:  Florida Deceptive and Unfair Trade Practices Act ("FDUPTA")

Count II alleges a violation of the Florida Deceptive and Unfair Trade Practices Act.  Plaintiff alleges that Google's deceptive and misleading statements caused it harm (Doc. #75, ¶ 76) and have and are likely to deceive consumers, (id. at ¶¶ 77-80).  Google moves to dismiss plaintiff's FDUPTA claim for lack of standing because e-ventures is not a consumer of Google's services and for failure to state a FDUPTA claim.  (Doc. #78, pp. 15-17.)

In 2001, the Florida legislature amended the FDUPTA statute, replacing "consumer" with "person."  Fla. Stat. § 501.211.  Following the amendment, courts have been split as to whether an individual or entity must be a "consumer" in order to bring a FDUPTA claim.  See Caribbean Cruise Line, Inc. v. Better Bureau of Palm Beach Cnty., Inc., 169 So. 3d 164, 168-69 (Fla. 4th DCA 2015) (comparing cases).  The predominant trend is to interpret the amendment as the legislature's intent to broaden the scope of FDUPTA, allowing any person or entity that has suffered a loss as a result of unfair or deceptive acts or practices to sue for damages, whether or not a "consumer."  Id.; N. Am. Clearing, Inc. v. Brokerage Comput. Sys., Inc., 666 F. Supp. 2d 1299, 1310 n.9 (M.D. Fla. 2009);  Furmanite Am., Inc. v. T.D. Williamson, Inc., 506 F. Supp. 2d 1134, 1146 (M.D. Fla. 2007) ("This amendment demonstrates a clear legislative intent to allow a broader base of

complainants who have been injured by violations of FDUTPA to seek damages, not just injunctive relief."); Advanced Prot. Techs., Inc. v. Square D Co., 390 F. Supp. 2d 1155, 1164 (M.D. Fla. 2005); Intercoastal Realty, Inc. v. Tracy, 706 F. Supp. 2d 1325, 1335 (S.D. Fla. 2010) (noting that the amendment "clarifies that remedies available to individuals are also available to businesses."). Additionally, a few courts have found that regardless of whether an individual non-consumer has standing under FDUPTA, a legitimate business enterprise non-consumer does. Akzo Nobel Coatings, Inc. v. Auto Paint & Supply of Lakeland, Inc., No. 8:09-cv-2453-T-30TBM, 2011 WL 5597364, at *3 (M.D. Fla. Nov. 17, 2011); Intercoastal Realty, Inc., 706 F. Supp. 2d at 1335. Accordingly, the Court finds that e-ventures has standing to sue under FDUPTA.

Google next argues that e-ventures has failed to plausibly allege that Google's actions were deceptive or unfair. (Doc. #78, pp. 17-21.) Google asserts that e-ventures cannot plausibly allege deception or unfair practices based upon the statements that it hand-picked from Google's website because there are additional anti-manipulation guidelines on the website that defeat any such deception or unfair practices allegations. (Id.) Specifically, Google points to the fact that it clearly states on its website that it will remove a website if the website attempts to manipulate its listing in Google's search results or PageRank. (Id.)

In order to state a claim under FDUPTA, a plaintiff must allege a deceptive act or unfair practice, causation, and actual damages.  Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla. 2d DCA 2006).  A deceptive act may be found when there is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."  PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So. 2d 773, 777 (Fla. 2003) (citation omitted).  Further, an "unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  Id. (citations omitted).

Here, plaintiff has alleged the Google removed its websites from its search results for anticompetitive and punitive reasons. (Doc. #75, ¶¶ 72, 76, 81-82.)  Google disagrees with these allegations, but at this stage of the proceedings these allegations are sufficient to allege deceptive acts or unfair practices under FDUPTA.

Lastly, Google argues that plaintiff has failed to allege causation.  The Court finds plaintiff's allegations regarding causation sufficient at this stage of the proceedings. (Id. ¶¶ 74, 76, 78, 84.)  Accordingly, defendant's Motion to Dismiss Count II is denied.

## E. Sufficiency of Count III:  Defamation

Google argues that plaintiff fails to state a claim for defamation because plaintiff has not identified a published statement by Google about e-ventures, any statement that Google made was not defamatory as a matter of law, and plaintiff has failed to plead fault. (Doc. #78, pp. 20-22.) Plaintiff responds that Google is focusing on the wrong message, and the proper focus is the message that Google gave when it delisted e-ventures' websites, which is not an opinion. (Doc. #79, pp. 18-19.)

Under Florida law, to state a claim for defamation, plaintiff must allege: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1106 (Fla. 2008) (citing Restatement (Second) of Torts §§ 558B, 580A–580B (Am. Law Inst. 1977)). "[D]efamation . . . recognizes the concept that literally true statements can be defamatory where they create a false impression." Id. This is commonly referred to as defamation by implication. Id.

Google first alleges that plaintiff has not identified any published statements by Google about e-ventures and has not established how the exclusion of links to e-ventures' sites can be a publication about e-ventures. (Doc. #78, pp. 21-23.) E-ventures

bases its defamation claim upon what is implied from Google's search results.  Plaintiff has alleged that Google's statements regarding its search results and its actual search results are publications made to the public.  (Doc. #75, ¶ 87.)  Plaintiff also alleges that removal of its websites from Google's search results falsely indicated to the public that e-ventures' websites met Google's criteria for removal when that was not true.  (Id. ¶ 88.)  These allegations are sufficient.

Second, Google asserts that any statements made by Google are not defamatory as a matter of law based upon the First Amendment. (Doc. #78, p. 22.)  As addressed supra, the Court finds that the allegations of the Second Amended Complaint are sufficient to preclude dismissal based upon the anticipated First Amendment defense.

Lastly, Google argues that plaintiff "does not even try to plead fault." (Id. at 23.)  E-ventures responds that negligence is implied because Google acted without reviewing all of e-ventures websites prior to removing them.  (Doc. #79, p. 19.)  The Court finds that plaintiff's allegation that Google removed e-ventures' websites without reviewing all of the websites, without more, is insufficient to plead fault for a claim of defamation.

Accordingly, plaintiff's defamation claim is dismissed without prejudice.

24

### F. Sufficiency of Count IV:  Tortious Interference

Google moves to dismiss plaintiff's claim for tortious interference with business relationships because (1) it is prohibited by the "single publication/single action rule" and (2) Google's search results are constitutionally protected opinions that cannot form the basis of a claim of tortious interference with business relationships.  (Doc. #78, pp. 23-26.)

Under Florida law, to state a claim for tortious interference with business relationships, a plaintiff must allege:  "(1) the existence of a business relationship . . . (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship."  Gossard v. Adia Servs. Inc., 723 So. 2d 182, 184 (Fla. 1998) (omission in original) (quoting Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985)).

First Google argues that the single publication/single action rule prevents e-ventures from circumventing "Google's First Amendment and other defenses by stating [a defamation claim] in a different guise."  (Doc. #78, p. 23.)  The single publication/single action rule precludes "multiple actions to be maintained when they arise from the same publication upon which a failed defamation claim is based."  Ovadia v. Bloom, 756 So. 2d 137, 141 (Fla. 3d DCA 2000); Callaway Land & Cattle Co. v. Banyon

Lakes C. Corp., 831 So. 2d 204, 208 (Fla. 4th DCA 2002) ("In Florida, a single publication gives rise to a single cause of action.  The various injuries resulting from it are merely items of damage arising from the same wrong." (citation omitted)). Accordingly, a single publication can only give rise to a single cause of action.  Id.  "The rule is designed to prevent plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm."  Gannett Co. v. Anderson, 947 So. 2d 1, 13 (Fla. 1st DCA 2006).

While the Court agrees with defendant that plaintiff may not maintain multiple causes of action premised upon a single publication, the Court finds it premature to dismiss plaintiff's claim for tortious interference with business relations based upon Florida's single publication/single action rule.  The Court has dismissed plaintiff's defamation claim without prejudice.  As such, plaintiff may or may not choose to seek to amend and re-assert its defamation cause of action.

Google also argues that plaintiff has failed to plead the elements of a claim for tortious interference with contractual business relationships because Google's search results are constitutionally protected opinions, therefore they cannot be considered wrongful, and because plaintiff has failed to

adequately allege that Google wrongfully or intentionally harmed e-ventures' business relationships.  (Doc. #78, pp. 24-25.)

As discussed previously, while the Court does agree that Google's search results can constitute speech and opinions as to the relevance of the search results to a search query, that is not what plaintiff's tortious interference claim is premised upon. Plaintiff's tortious interference claim alleges interference due to Google's removal of the websites, not necessarily what was communicated by its search results.  (Doc. #75, ¶¶ 97-100.) Accordingly, the Court holds that plaintiff's tortious interference claim is based upon Google's action of banning e-ventures' websites, and not on what was communicated by the ban, therefore the claim does not fail on the basis that it is based upon protected pure opinions.  As discussed supra, the Court finds that plaintiff's Second Amended Complaint contains allegations sufficient to overcome Google's defense that its actions were protected editorial decisions—namely that Google's actions were based upon anti-competitive, punitive reasons.  Lastly, plaintiff has alleged that "Google's conduct was not privileged, justified or excusable."  (Id. ¶ 102.)

Google next argues that plaintiff has failed to allege that Google wrongfully and intentionally harmed its business relationships.  (Doc. #78, pp. 24-25.)  The Court disagrees.  (See Doc. #75, ¶ 98.)  Contrary to Google's assertion that plaintiff

has failed to allege facts that Google knew about e-ventures'
business relationships, plaintiff has alleged that "Google was .
. . aware of e-ventures' contractual relationships with third
parties during the ban, because e-ventures and its counsel sent
Google letters detailing the damage prior to filing suit." (Id.
¶ 101.)

Accordingly, the Court denies Google's Motion to Dismiss
Count IV of plaintiff's Second Amended Complaint.

Accordingly, it is now

**ORDERED:**

1.  Defendant Google's Motion to Dismiss Plaintiff's Second
Amended Complaint and Supporting Memorandum of Law (Doc. #78) is
**GRANTED in part and DENIED in part.** Google's Motion to Dismiss
Count III is granted without prejudice; the Motion to Dismiss is
otherwise denied.

2.  Defendant shall file a responsive pleading to
plaintiff's Second Amended Complaint within **FOURTEEN (14) DAYS** of
this Opinion and Order.

**DONE AND ORDERED** at Fort Myers, Florida, this __12th__ day of
May, 2016.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:  Counsel of record