# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| e-ventures Worldwide, LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    Civil Action No. 2:14-cv-646-FtM-PAM-CM |
| | : |
| GOOGLE, INC., | : |
| | : |
| Defendant. | : |
| | : |

## E-VENTURES' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

RICHARD S. GORA (admitted *pro hac vice*)
SINEAD A. RAFFERTY (admitted *pro hac vice*)
Gora LLC
9 W. Broad Street, Suite 550
Stamford, CT 06902
Tel.: 203-424-8021
rich@goralaw.com
sinead@goralaw.com

MATHEW WAGONER (admitted *pro hac vice*)
The Wagoner Firm, PLLC
8 Thurlow Terrace
Albany, NY 12203
matt@thewagonerfirm.com

IAN THOMAS HOLMES (Fla. Bar No. 44193)
DAVID FRASER (Fla. Bar No. 91085)
Holmes Kurnik, P.A.
711 5th Ave S., Suite 200
Naples, FL 34102-6628
iholmes@holmeskurnik.com

*Counsel for Plaintiff*
*e-ventures Worldwide, LLC*

**PUBLIC VERSION**

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ...................................................................................................................... I

**TABLE OF AUTHORITIES** ............................................................................................................. II

**TABLE OF ABBREVIATIONS** ....................................................................................................... IV

**PRELIMINARY STATEMENT** ......................................................................................................... 1

**STATEMENT OF UNDISPUTED MATERIAL FACTS** .................................................................. 5

    A.   GOOGLE'S GUIDELINES ................................................................................................. 5

    B.   GOOGLE'S SPAM TEAM TARGETS E-VENTURES BECAUSE ⬛REDACTED⬛ ⬛ ⬛ ⬛ .................................................................................................................. 6

    C.   GOOGLE SPENDS ⬛REDACTED⬛ ⬛ ⬛ ................. 6

    D.   GOOGLE FAILS TO ⬛REDACTED⬛ .......................................... 9

    E.   E-VENTURES DOES WHATEVER GOOGLE TOLD IT TO REVOKE PURE SPAM .......................... 12

    F.   CAUSATION AND DAMAGES ....................................................................................... 13

**STANDARD OF REVIEW** .............................................................................................................. 14

**I.  GOOGLE IS NOT ENTITLED TO IMMUNITY UNDER THE CDA** ............................... 14

    A.   CDA DOES NOT APPLY TO LANHAM ACT OR FDUPTA CLAIMS ........................... 14

    B.   SECTION 230(C)(1) OF THE CDA DOES NOT APPLY ................................................ 15

    C.   SECTION 230(C)(2) OF THE CDA DOES NOT APPLY BECAUSE QUESTIONS OF FACT EXISTS AS TO GOOGLE'S GOOD FAITH ........................................................................ 17

**II.  GOOGLE IS NOT ENTITLED TO FIRST AMENDMENT PROTECTION** ................... 23

**III.  GOOGLE VIOLATED THE LANHAM ACT AND FDUPTA** ........................................... 24

**IV.  GOOGLE TORTIOUSLY INTERFERED WITH E-VENTURES' BUSINESS RELATIONSHIPS** ...................................................................................................................... 25

**CONCLUSION** ................................................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Advanced Protection Tech., Inc., v. Square D. Co.*,
   390 F.Supp.2d 1155, 1165 (M.D.Fla. 2005) .............................................................. 24

*Almedia v. Amazon.com, Inc.*,
   456 F.3d 1316 (11th Cir. 2006) ..................................................................... 15, 18

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................ 14

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ........................................................................... 15

*Bluesky Greenland Envtl. Solutions v. 21st Century Planet Fund*,
   2013 U.S. Dist. LEXIS 170898 (S.D. Fla. Dec. 4, 2013) .......................................... 25

*Circuit City Stores, Inc. v. Adams*,
   532 U.S. 105 (2001) ............................................................................................ 19

*Doe v. GTE Corp.*,
   347 F.3d 655, 659–60 (7th Cir. 2003) ............................................................. 17

*e360Insight, LLC v. Comcast Corp.*,
   546 F.Supp.2d 605 (N.D. Ill 2008) .............................................................. 22, 23

*Enigma Software Group USA, LLC v. Bleeping Computer LLC*,
   2016 WL 3773394 (S.D.N.Y. 2016) ................................................................. 15

*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ...................................................................... 15, 17

*Ford Motor Co. v. GreatDomains.com, Inc.*,
   2001 WL 1176319 (E.D.Mich. Sept. 25, 2001) ............................................. 15

*Goddard v. Google, Inc.*,
   2008 WL 5245490 (N.D.Cal. Dec. 17, 2008) ................................................ 20

*Hughes v. Stryker Corp.*,
   423 Fed.Appx. 878 (11th Cir. 2011) ............................................................. 22

*Jenkins v. Anton*,
   2016 WL 7180248 (M.D. Fla. Dec. 9, 2016) ................................................. 22

*Jones v. UPS Ground Freight*,
   683 F.3d 1283 (11th Cir. 2012) .................................................................... 22

*Langdon v. Google*,
   2007 WL 530156 (D.Del. Feb. 20, 2007) ..................................................... 24

*Lorain Journal Co. v. United States*,
   342 U.S. 143 (1951) ........................................................................................... 23

*Mario Valente Collezioni Ltd v. AAK Limited*,
   280 F.Supp.2d 244 (S.D.N.Y. 2003) ............................................................. 25

*Nat'l Numismatic Cert., LLC v. eBay, Inc.*,
    2008 WL 2704404 (M.D. Fla. July 8, 2008) ........................................................ 18, 20

*Nationwide Life Ins. v. Bankers Leasing Ass'n*,
    182 F.3d 157 (2nd Cir. 1999) ..................................................................................... 14

*Nunes v. Twitter, Inc.*,
    2016 WL 3660526 (N.D. Cal. 2016) ....................................................................... 15, 16

*Search King v. Google*,
    2003 WL 21464568 (W.D. Okla. May 27, 2003) ......................................................... 24

*Sherman v. Yahoo! Inc.*,
    997 F.Supp.2d 1129 (S.D. Cal. 2014) ............................................................. 17, 18, 19

*Smith v. Trusted Universal Standards*,
    2011 WL 900096 (D.N.J. Mar. 15, 2011) .................................................................... 20

*Song fi, Inc. v. Google, Inc.*,
    108 F.Supp.3d 876 (9th Cir. 2015) ....................................................................... 17, 19

*Suris v. Gilmore Liquidating, Inc.*,
    651 So.2d 1282 (Fla. 3d DCA 1995) ........................................................................... 24

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    568 F.3d 1169 (9th Cir. 2009) .................................................................................... 18

*Zhang v. Baidu.com, Inc.*,
    10 F.Supp.3d 433 (S.D.N.Y. 2014) ............................................................................. 24

**STATUTES**

15 U.S.C. § 1125 ................................................................................................................. 24

47 U.S.C. § 230(c)(1) .................................................................................................. passim

**RULES**

Federal Rule of Evidence 407 ........................................................................................... 22

**LEGISLATIVE HISTORY**

141 Cong. Rec. S1953 (daily ed. Feb. 1, 1995) ............................................................... 14

**WHITE PAPER**

Eugene Volokh & Donald M. Falk, GOOGLE FIRST AMENDMENT PROTECTION FOR SEARCH ENGINE
    SEARCH RESULTS, 24 Geo. Mason U. C.R.L.J. 89 (2013) ........................................ 23

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| **CDA** | Communications Decency Act (47 U.S.C. §230) |
| **e-ventures** | Plaintiff e-ventures Worldwide, LLC |
| **e-ventures Tr.** | 30(b)(6) Deposition of Jeev Trika (November 9, 2016), attached as Exhibit 6 to the Rafferty Decl. |
| **Falls Decl.** | Declaration of Brandon Falls in support of Defendant Google Inc.'s Opposition to Plaintiffs' Motion for Preliminary Injunction, dated November 25, 2014, attached as Exhibit 21. |
| **Falls Tr.** | Deposition of Brandon Falls (October 28, 2016), attached as Exhibit 2 to the Rafferty Decl. |
| **FDUPTA** | Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. Ann. §501.201-213) |
| **Google** | Defendant Google Inc. |
| **Google Tr.** | 30(b)(6) Deposition of Brandon Falls (October 27, 2016), attached as Exhibit 1 to the Rafferty Decl. |
| **Google RFA** | Google's Responses to e-ventures' First Set of Requests for Admissions, attached as Exhibit 22 to the Rafferty Decl. |
| **Google ROG** | Google's Amended Responses to e-ventures' Interrogatories, attached as Exhibit 23 to the Rafferty Decl. |
| **Kwok Tr.** | Deposition of Cody Kwok (November 3, 2016), attached as Exhibit 4 to the Rafferty Decl. |
| **Paton Rpt.** | Report of Jeremy Paton dated October 11, 2016, attached as Exhibit 8 to the Rafferty Decl. |
| **Paton Tr.** | Deposition of Jeremy Paton (November 10, 2016), attached as Exhibit 7 to the Rafferty Decl. |
| **Plaintiff** | Plaintiff e-ventures Worldwide, LLC |
| **Rafferty Decl.** | Declaration of Sinead Rafferty in support of Plaintiff e-ventures' Worldwide, LLC's Memorandum of Law in Opposition to Google Inc.'s Motion for Summary Judgment |
| **Trika Decl.** | Verification of Jeev Trika in support of Plaintiffs' Motion for Preliminary Injunction, attached as Exhibit 20. |

**Trika Tr.**        Deposition of Jeev Trika (November 8, 2016), attached as Exhibit 5 to the Rafferty Decl.

**White Tr.**        Deposition of Brian White (November 2, 2016), attached as Exhibit 3 to the Rafferty Decl.

# PRELIMINARY STATEMENT

This case of first impression seeks to remedy Google's unfair and deceptive policies and practices in targeting e-ventures instead of the content on the 366 e-ventures websites removed from Google's search results. According to Google, its 740+ page public-facing webmaster guidelines (the "Guidelines") nebulously suggest to webmasters (*i.e.*, owners of websites) on how to get websites on Google's search results – and stay there.

The Guidelines provide even more obscure suggestions on how Google can designate a website as "pure spam." That designation effectively deletes the website from Google's search index (i.e., the Internet). If a Google user searches for the removed website on google.com, that website will never again show up on Google (unless Google changes its mind – which Google publicly acknowledges is "rare"). Rafferty Decl., Ex. 24 at 2. The "pure spam" designation is a death sentence. That is what Google did to e-ventures. Google relies on hindsight to shift focus from what it actually did (target e-ventures) to what it should have done (review content).

e-ventures is not a REDACTED n of websites. It was a very real business. It made millions of dollars. And it employed numerous Florida residents. In and prior to 2014, e-ventures maintained independent websites providing online publishing and advertising services. In its simplistic form, e-ventures provides rankings of companies in certain verticals similar to how Consumer Reports® provides product ratings and reviews. e-ventures' clients pay e-ventures to be reviewed and ranked on e-ventures' rating lists for certain verticals. That's the same thing Google does to make money: provide advertising space. Rafferty Decl., Ex. 22, RFA 1-2, 38. e-ventures' clients paid a premium to be ranked by e-ventures because e-ventures' websites were highly ranked on Google's organic search results (*i.e.*, a virtual billboard) – typically among the most valuable results (if not, the first result). In short, e-ventures' websites were found immediately beneath Google's AdWords advertisements – the precious listings by which Google generated nearly $60 billion in revenue in

2014. Rafferty Decl., Ex. 22, RFA 41; Ex. 26 at #6.

To be clear, however, e-ventures was a real threat to Google. Because each dollar earned by e-ventures was a dollar not earned by Google. This is because e-ventures specialized in ranking companies in the search engine optimization ("SEO") vertical. The companies in the SEO vertical drive revenue away from Google because they facilitate a website's higher placement on Google's organic search results. That results in more money driven away from Google's bread and butter AdWords program. For that reason, e-ventures competes with Google, which targets SEOs because they threaten Google's $60 billion money train. That is why Google fought so hard against producing its secret "hit list" of SEO companies to e-ventures.

Google's arguments fall flat. The First Amendment and the CDA do not apply to these facts. Google engaged in anti-competitive behavior by maliciously targeting e-ventures (not content) based on Google's malicious belief e-ventures was an SEO. First, contrary to Google's overtures, Google did not remove e-ventures' websites for content reasons or based on editorial judgments. Put simply, to be an editor, you have to review content. And Google could not exercise "editorial judgment" on content it did not read. Beyond that, the record establishes factual issues of whether Google did, in fact, review the content on each of the 366 websites containing REDACTED during its less than REDACTED. Second, this Court already recognized that anti-competitive motives are not protected by the First Amendment in its ruling denying Google's motion to dismiss. Likewise, bad faith is not protected by the CDA. Being prototypical questions of fact, at a minimum, bad faith and motive must be decided by the jury. The undisputed facts establish that Google (i) did not review the content on each of the REDACTED of e-ventures' websites prior to removal, (ii) REDACTED and (ii) removed the websites, after

**REDACTED**

**REDACTED**.

Google's anti-competitive motives are further evident from Google's secret "investigatory" documents. Notably, the **REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**. Falls Tr. 113:21-24; 114:4-7; Rafferty Decl., Ex. 9 (2042.R). **REDACTED**

**REDACTED**

**REDACTED** Falls Tr. 82:2-12; 115:5-8. **REDACTED**

**REDACTED**. Falls Tr. 120:11-19.

Returning to that external anonymous e-mail "tip," Mr. Falls received that "tip" on September 15, 2014, 09:48 [PST]. Rafferty Decl., Ex. 10; Google Tr. 79:13-17 (**REDACTED**

**REDACTED**). **REDACTED**

**REDACTED**. That tip contained a copy of e-ventures' customer list. Rafferty Decl., Ex 22., RFA 19, 50; *see also* Falls Declaration, 12/1/16, Ex. 15 (ECF 138-16). Yet, Mr. Falls never **REDACTED**

**REDACTED**

**REDACTED** *Compare* Rafferty Decl., Ex. 9 (GOOG_EVTS_00002013-2026) *with* Ex. 10.

To mask its anti-competitive motive and bad faith, Google relies on *post-hoc* justifications. Not surprisingly, Google's reconsideration request process (the process to get websites back on the Internet after Google removes them) did not particularize the clear reasons for removal. e-ventures Tr. 163:15; 164:18-20. That is because Google itself had no idea which of the **REDACTED** of e-

ventures' websites violated which guideline. As a result, e-ventures was forced to take remedial measures in a desperate and scrambled effort to be re-indexed, so it could salvage what remained of its business. e-ventures Tr. 164:23-25; 165:4-12; 169:4-6. The subsequent changes e-ventures made to its websites were prompted by Google's so-called suggestions, and are equivalent to coerced-compliant false confessions. Moreover, these so-called "admissions" are not admissible, let alone negate that factual issues of Google's targeting e-ventures and not content.[1]

Google intended to interfere with e-ventures' business relationships.



Rafferty Decl., Ex. 11. If

Rafferty Decl., Ex. 12.

To add insult to injury, in conjunction with filing reconsideration requests, e-ventures **paid Google** to advertise its banned websites through its AdWords Program in order to mitigate the damage done to its customer base. e-ventures Tr. 156:14-18; Trika Decl. ¶8; Rafferty Decl., Ex 22.,

---

[1] Furthermore, e-ventures' filing reconsideration requests demonstrates the absence of "pure spam," not guilt as Google would have the Court believe. According to Matt Cutts, Google's former head of webspam, "it's *rare* for people to actually file reconsideration requests for sites that are classified as pure spam, because many webmasters approach them as churn and burn." Rafferty Decl., Ex. 24 at 2 (emphasis added). Google admittedly restored several of e-venture's websites despite Mr. Cutts' caution that "pure spam is probably one of the more difficult spam flags to overcome." *Id.* at 3. That Google revoked its "pure spam" penalties, so quickly after being removal, is evidence of anti-competitive motive and bad faith conduct, namely that the removal was company-based and not content-based. That is because, as Mr. Cutts says, usually pure spam websites are "churn and burn," so Google became concerned about liability when e-ventures sought reconsideration. According to a Mr. Cutts declaration in another case, spam "refers to *pages* from the World Wide Web." Rafferty, Decl., Ex. 18, ¶ 2. He also provides a useful example: "a page containing pornographic material that attempted to show up as a result to a search for 'Disney Cartoons' would be considered webspam." *Id.* There is no evidence that each page of e-ventures' 366 websites contained pure spam, or that Google reviewed each website page. Thus, it is reasonable to infer that Google removed those websites because of e-ventures, and not because of any content on e-ventures' websites.

4

RFA 4-5. Curiously, e-ventures' websites were not good enough for Google's free search results, but ███████████████████ REDACTED ███████████████████.

In addition to the factual issues for the jury, Google is not entitled to summary judgment as a matter of law for four reasons. <u>First</u>, the CDA does not apply to Lanham Act or FDUPTA claims, and its plain language provides immunity only for actions, not present here, "voluntarily taken in good faith" for objectionable content. 47 U.S.C. § 230(c)(1) and (c)(2)(A). <u>Second</u>, Google's conduct is not entitled to First Amendment protection because Google was motivated by anti-competitive reasons: targeting e-ventures, not content on its websites, particularly after receiving e-ventures' customer list. By removing e-ventures' websites from its search results, Google falsely represented to the world that e-ventures' websites are pure spam. <u>Third</u>, Google's deceptive and misleading statements caused e-ventures substantial harm, and deceived e-ventures' own consumers into believing e-ventures went out of business, under FDUTPA. <u>Fourth</u>, Google tortiously interfered e-ventures' relationships by intentionally damaging them after getting e-ventures' customer list.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. GOOGLE'S GUIDELINES

████████████████ REDACTED ████████████████. e-ventures Tr. 132:10-11; 133:1-6, 16-22; 146; 22-25; Rafferty Decl., Ex 22., RFA 13. ███████ REDACTED ███████ ██████. Falls Tr. 29:13-14, 16-24; Rafferty Decl., Ex 22., RFA 20. ████ REDACTED ████ ██████████████████. e-ventures Tr. 133:4-6. And, the Guidelines are not exhaustive. Rafferty Decl., Ex. 22 at RFA 15. While Google has ██████ REDACTED ██████ *see* Google Tr. 94:23-24, the Guidelines state that websites (not "networks") are only removed if they contain "pure spam." Rafferty Dec., Ex. 24. Google publicly advises website owners that "pure spam is reserved for the spammiest of websites." *Id*. Duplicate content on your site does **not** mean penalization. Rafferty Decl., Ex. 25 at 2-3 (#duplicate-content).

**B.** **GOOGLE'S SPAM TEAM TARGETS E-VENTURES BECAUSE** **[REDACTED]**
████████ ███ ██ ████

Google targets SEOs. ████████[REDACTED]████████ Google

Tr. 70:8; 153:4-6. ████████[REDACTED]████████

Google Tr. 65:12-15; White Tr. 81:12-13. ████████[REDACTED]████████

████████████████████████████████████████████████

████████████████████████ Google Tr. 66:20-67:7. ████[REDACTED]████

████████████████████████████████████ Google

Tr. 68:3-6. ████████[REDACTED]████████████

████████████████████████████████████████

████████████████████████████████ Falls Tr. 111:22-24; 113:14-

15; Rafferty Decl. 9 at 2042R-2054R (████[REDACTED]████).

The Guidelines suggest only that "sites" may be removed; nowhere do the Guidelines

disclose that a "network" could be removed for guilt-by-association reasons. Rafferty Decl., Ex. 22

at Ex. A. Yet, that is exactly what Mr. Falls did. Rafferty Decl., Ex. 22 at ¶9 ("we acted upon the

entire network of websites to efficiently use Google's resources"). And, because e-ventures'

"network" of websites were removed without prior disclosure in the Guidelines, that leads more

credence to the fact that e-ventures was targeted – not the content on its websites.

**C.** **GOOGLE SPENDS** ████████[REDACTED]████████ ██ ████████

Google cannot get its story straight. On the one hand, in its moving papers, Google says

each website was reviewed. But, just six months ago, Google admitted to reviewing only "numerous

individual websites." Rafferty Dec., Ex. 23 at 17. Following that up, "Google intended its removal

actions not just to focus on particular sites but on e-ventures' entire network [and] Google took

action against the ***network*** as a whole for several reasons" because Google wanted "to prevent e-

ventures from migrating problematic content from removed to unremoved websites." *Id.* (emphasis

added). Rafferty Decl., Ex 22., RFA 27. That rationale strains credulity: if each website violated the Guidelines, then Google should not have had to justify removing e-ventures' network. Yet, in another flip flop, two years before that, Mr. Falls declared under penalty of perjury that Google acted upon e-ventures' entire network of websites to "*efficiently* use Google's resources." Falls Decl. ¶ 39 (emphasis added); Rafferty Dec., Ex. 22, RFA 25.

Further indicia of targeting e-ventures (instead of concentrating on content), Mr. Falls



Falls Tr. 63:9-12. REDACTED

Google Tr. 70:8; 153:4-6. REDACTED

Falls Tr. 24:11-12. REDACTED Google

Tr. 45:8-16.

REDACTED

Falls Tr. 51:25. REDACTED

Falls Tr. 40:3-4.

REDACTED [2] Falls Tr.

39:19; 72:25. REDACTED . Falls Tr. 47:8-23;

48:1-8. With good reason, he was caught. e-ventures' 366 websites contain REDACTED

). Rafferty Decl., Ex. 9 (1997.R – 2009.R). To review that number of websites

and pages in REDACTED , Mr. Falls would have had to REDACTED

---

[2] REDACTED

.

[REDACTED]. What makes that even more unbelievable is that Google claims e-ventures' [REDACTED]

[REDACTED] Falls Tr. 31:2-12; 95:17-23; 101:2-10; 105:3-5; 131:5-16; 144:18-24; 146:18-23; 199:22-200:24; 217:20-24; 218:4-9. To confirm that, Mr. Falls would have had to **compare** the content on one site with that of another, thereby doubling the amount of work needed in that limited window of time – [REDACTED]

[REDACTED] *See supra* at 7, n.1; *infra* at 10-11 Mr. Falls testified that [REDACTED]

[REDACTED] Falls Tr. 105:3-5. That does not leave much time for Mr. Falls to confirm [REDACTED]

[REDACTED] There are 600 minutes in 10 hours.

[REDACTED]

[REDACTED] Google Tr. 55:2-4. [REDACTED] Falls Tr. 95:19-21. [REDACTED]

[REDACTED] Rafferty Decl., Ex. 9. Mr. Falls was on vacation September 1 through September 5, 2014. Rafferty Decl., Ex. 15. [REDACTED]

[REDACTED]

[REDACTED] Falls. Tr. 89:7; 83:11; 56:4 (emphasis added). [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Google Tr. 88:6-22.

The date of the external e-mail "tip" was September 15, 2014. Rafferty Decl., Ex. 10. On September 15, 2014, in direct response to the "tip", Mr. Falls e-mailed [REDACTED]

[REDACTED] Rafferty Decl., Ex. 11. On September 17, 2014, Mr. Falls subsequently [REDACTED]

[REDACTED] Rafferty Decl., Ex. 10. [REDACTED]

[REDACTED]

[REDACTED]. Falls Tr. 105:25; 106:1; 108:23-25; 109:1-4; Rafferty Decl., Ex. 9.

[REDACTED]

[REDACTED]

[REDACTED]. Google Tr. 140:14-21; 142:20-25; 143:3-6. [REDACTED]

[REDACTED] Google Tr. 141:6-13. [REDACTED]

[REDACTED] Falls Tr. 91:2-7. [REDACTED]

[REDACTED] Google Tr. 141:14-16, 22; Falls Tr. 91:15-17; White Tr. 61:24-25; 62:1-2. [REDACTED]

[REDACTED]

[REDACTED]. Falls Decl. ¶39.

**D.      GOOGLE FAILS TO** [REDACTED]

Google admitted that [REDACTED]

[REDACTED] Google Tr. 110:18-21. Without question, Mr. Falls never [REDACTED]

[REDACTED] Falls Tr. 93:18-20; 94:1-4,10-11. Had he done so, he would know about Google's [REDACTED]

[REDACTED]



Rafferty Decl., Ex. 19 (GOOG_EVTS00000977)

[REDACTED].

White Tr. 112:5-11. [REDACTED]

[REDACTED] Google Tr. 38:13, 22; 42:13, 10-12, 19; 43:3. "[REDACTED]

[REDACTED] Google Tr. 31:6-8. [REDACTED]

[REDACTED].

Google Tr. 200:3-4; 201:7-12. [REDACTED]

[REDACTED] Google Tr. 217:8-12.

[REDACTED]

[REDACTED] Google Tr. 40:25;

41:1-2; 42:11-12. [REDACTED]

[REDACTED] White Tr. 90:1-4. [REDACTED]

[REDACTED]

[REDACTED] Google Tr. 95:10-19. [REDACTED]

[REDACTED] White Tr. 117:25;

118:1-3; Kwok Tr. 38:23-25; 39:1. [REDACTED]

[REDACTED] Google Tr. 95:5-7. [REDACTED]

[REDACTED] Google Tr. 93:25; 94:1-6.

[REDACTED]

[REDACTED]. Google Tr. 101:2-4; White Tr. 90:1-4. [REDACTED]

[REDACTED] Trika Tr. 152:2-17. [REDACTED]

[REDACTED]

[REDACTED] Google Tr. 145:24-25; 146:2-5;

Falls Tr. 86:2-3; White Tr. 87:22-23, 88:14-15,23; Rafferty Decl., Ex. 11. [REDACTED]

[REDACTED]

[REDACTED]



[REDACTED]. Falls Tr. 63:18-23; 64:17-22; 65:3-4.

[REDACTED]

[REDACTED]

[REDACTED]. Falls Tr. 65:20-21; 73:12-20. [REDACTED]

[REDACTED]. Falls Tr. 73:12-16.

[REDACTED]

[REDACTED]. White Tr. 48:7-8, 18-20. [REDACTED]

[REDACTED]

[REDACTED] Falls Tr. 33:14-21.

[REDACTED]. Google Tr. 102:19-21. [REDACTED]

[REDACTED], *see* Google Tr. 52:14-25, [REDACTED]

[REDACTED] *see* Google Tr. 55:5-15, [REDACTED]

[REDACTED]:

[REDACTED]

Google Tr. 101:17-21.

[REDACTED]

Google Tr. 134:22-135:1.

Instead of testifying as to facts supporting the removal, Google copped out: [REDACTED]

[REDACTED] Google Tr. 134:22-135:1. [REDACTED]

[REDACTED],

REDACTED[3] White Tr. 95:4-7, 15; 117:11-24; Kwok 34:17-21. That is because Mr. Falls did not

follow the ██████ REDACTED ██████. Rafferty Decl., Ex. 19, GOOG_EVTS00000977.[4]

### E. e-Ventures Does Whatever Google Told It To Revoke Pure Spam

██████ REDACTED ██████. White Tr.

98:14-17. ██████ REDACTED ██████

██████

██████. White Tr. 101:4-7. ██████ REDACTED ██████

██████

██████. White Tr.101:15-19, 20-23; Rafferty Decl., Ex. 9 (2042.R). ██████ REDACTED ██████

██████.

Rafferty Decl., Ex. 19. ██████ REDACTED ██████

██████. White Tr. 102:10-13.

Google did not provide any explanation as to why e-ventures' websites were delisted. Trika

Decl. ¶¶16,18; Rafferty Decl., Ex 22., RFA 32. ██████ REDACTED ██████

██████

██████ Tr. 163:15; 164:18-20. ██████ REDACTED ██████

██████

██████ 178:8-13. ██████ REDACTED ██████

---

[3] ██████ REDACTED ██████
██████ oogle Tr. 209:7-11; 210:7-15; 212:20-23. ██████ REDACTED ██████
██████ Google Tr. 206:22-24; 207:1; 212:3-7. ██████ REDACTED ██████
██████ oogle Tr. 206:22-24; 207:1.

[4] ██████ REDACTED ██████
██████
██████ -ventures Tr. 151:17-25; 152:1-2, 14-16.



[REDACTED]

Tr. 164:23-25; 165:4-12; 169:4-6.

[REDACTED]

. Trika Tr. 163:3-7,12-14. [REDACTED]

.” Trika Tr. 146:8-10; 147:12-14. [REDACTED]

*Id.;* e-ventures Tr. 169:14-15; Trika Decl. ¶5.

e-ventures’ disclosed expert in this case, Jeremey Paton, testified that [REDACTED] Rafferty Dec., Ex. 7 at 7 § 4; Paton Tr. 260:5-6. Google missed the deadline to disclose an expert to discredit Mr. Paton’s opinion. Rafferty Decl. ¶28.

**F.    CAUSATION AND DAMAGES**

Prior to removal, Mr. Falls was keenly aware of e-ventures’ contractual relationships that depended on the websites’ positions on Google’s search engine: [REDACTED]

Rafferty Decl., Ex. 11. [REDACTED]

. Google Tr. 144:18-19, 25; Rafferty Decl., Ex. 11. [REDACTED] . Rafferty Decl., Ex. 11.

---

[5] Moreover, during the ban, e-ventures launched a “test website,” (www.bwdanews.com), which simply included the text: “ByeBye World.” Trika Decl. ¶9. Incredibly, according to Google, those two words constitute “pure spam”; so it removed that site within *hours*. Trika Decl. ¶9.

████████████ REDACTED ████████████

████████████. Rafferty Decl., Ex. 17. Revenue plummeted and visitor traffic significantly

dropped. Trika Decl. ¶¶16, 25. ██████ REDACTED ████████ e-ventures Tr. 24:17-21.

## STANDARD OF REVIEW

Courts should act with caution in granting summary judgments. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Because summary judgment is a "drastic device," cutting off a party's right to present its case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. *See Nationwide Life Ins. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2nd Cir. 1999).

## I. GOOGLE IS NOT ENTITLED TO IMMUNITY UNDER THE CDA

The legislative history confirms that the CDA was to protect children from sexually explicit content. In his statement introducing the proposed legislation, Senator Exon proclaimed, "[T]he information superhighway should not become a red light district. This legislation will keep that from happening and extent the standards of decency which have protected telephone users to new telecommunications devices." 141 Cong. Rec. S1953 (daily ed. Feb. 1, 1995) (statement of Sen. Exon). The statute also explains that its passage was prompted by a desire to encourage the development of "filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. §230(b)(4).

### A. CDA DOES NOT APPLY TO LANHAM ACT OR FDUPTA CLAIMS

The CDA does not apply to claims brought under the Lanham Act or FDUPTA. Section 230(e)(2) states that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property." 47 U.S.C. §230(e)(2). Section §230(e)(3) of the CDA does not bar e-ventures' FDUPTA claim: "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section." 47 U.S.C. §230(e)(2). Federal

courts routinely enforce those provisions. *Enigma Software Group USA, LLC v. Bleeping Computer LLC,* 2016 WL 3773394 at *4 (S.D.N.Y. 2016); *see also Ford Motor Co. v. GreatDomains.com, Inc.*, No. 00 Civ 71544, 2001 WL 1176319, at *1 (E.D.Mich. Sept. 25, 2001); *Almedia v. Amazon.com, Inc.,* 456 F.3d 1316 (11th Cir. 2006).

## B.  SECTION 230(C)(1) OF THE CDA DOES NOT APPLY

Section 230(c)(1) does not "create a lawless no-man's-land on the internet. *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC,* 521 F.3d 1157, 1162, 1164 (9th Cir. 2008). Rather, it protects from liability only (a) a provider or user of an interactive computer service (b) that the plaintiff seeks to treat as a publisher or speaker (c) of information provided by another information content provider. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009); Section 230(c)(1) (Stating only that: "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."),

In assessing a Section 230(c)(1) defense, "what matters is…**whether the cause of action inherently requires the court to treat the defendant as the publisher or speaker of content provided by another**." *Barnes*, 570 F.3d at 1101–02 (internal quotation marks omitted) (emphasis added). "[C]ourts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker." *Id.* (internal quotation marks omitted). The Court in *Nunes v. Twitter, Inc.*, 2016 WL 3660526, at *8 (N.D. Cal. 2016) provides an instructive analogy:

> If someone delivers newspapers containing false gossip, and the person who is the subject of the gossip sues the delivery person for defamation, that lawsuit seeks to treat the delivery person as a publisher. But if the delivery person throws an unwanted newspaper noisily at a door early in the morning, and the homeowner sues the delivery person for nuisance, that suit doesn't seek to treat the delivery person as a publisher. The suit doesn't care whether the delivery person is throwing a newspaper or a rock, and the suit certainly doesn't care about the content of the newspaper. It does not involve the delivery person's "reviewing, editing, and deciding whether to publish or to withdraw from publication

third party content." *Barnes*, 570 F.3d at 1102. Nor is the lawsuit asking a court to impose "liability arising from content." *Roommate.com*, 521 F.3d at 1162. It merely seeks to stop the nuisance.

*Id.* Here, e-ventures is not seeking to treat Google as the "publisher or speaker" of information provided by e-ventures (or any third party). There is no third party content at issue in this case and e-ventures is not arguing that Google's liability is based on information provided by e-ventures on e-ventures' websites. Rather, e-ventures claims are based on ***Google's anti-competitive conduct***, which was in contravention of ***Google's own statements*** to the public. Defendants are not permitted to avoid liability for their own deceptive statements or unlawful conduct under Section 230(c)(1), which is what Google seeks to do here.

Thus, the issue is not that an e-ventures' website stated "Bye Bye World," for example, the issue is that Google told the public that it would not remove these types of websites, and then Google did it anyway, for anti-competitive reasons. Google's "investigation" of e-ventures websites started and ended ▮▮REDACTED▮▮. The "tip" email, and Google's receipt of e-ventures' customer list, ▮▮REDACTED▮▮, are compelling facts exposing Google's anti-competitive motive in removing e-ventures' websites just days later without further investigation. *See Nunes*, 2016 WL 3660526 at *1 (denying summary judgment under the CDA).

Wrongfully removing websites for the purpose of decreasing competition and increasing advertising revenues does not fall within the traditional editorial functions of a publisher. This is particularly true because there is no evidence supporting any notion that Google even reviewed the content of every website prior to removal. As competitors, Google and e-ventures seek revenue from the same individuals looking for prime advertising placement on the internet. Yet, the cases to which Google cites merely describe the *exercise* of that function (i.e. the decision whether to publish or remove content) without regard to the *purpose* a given publisher might make for such a decision.

The jury must assess Google's credibility, and scrutinize the anti-competitive motives, behind Google's exercise of "editorial" functions as a façade to decrease competition under Section 230(c)(1) without reviewing content. It must further determine whether removing e-ventures' "network" of sites for efficiency reasons – something not disclosed in the Guidelines – evidences anti-competitive conduct and bad faith. Rafferty Decl., Ex. 21, ¶39 ("we acted upon the entire network of websites to *efficiently* use Google's resources") (emphasis added). On that point, there would be no reason for Mr. Falls to act "efficiently" against the "network" on September 18, 2014, if he already determined that each website page had violated the Guidelines.

### C. SECTION 230(C)(2) OF THE CDA DOES NOT APPLY BECAUSE QUESTIONS OF FACT EXISTS AS TO GOOGLE'S GOOD FAITH

Good faith is a question of fact incapable of resolution on summary judgment. Google lacked good faith under the CDA since it did not review the content on each e-ventures website prior to removal and removed those websites immediately after receiving e-ventures' customer list. More glaring is Mr. Falls' blatant disregard of the REDACTED – which establishes an ulterior, bad faith motive. Rafferty Decl., Ex. 20, GOOG_EVTS00000977.

Section 230(c)(2) provides a shield from liability only for "any action voluntarily taken in *good faith* to restrict access to or availability of material that the provider . . . considers to be obscene . . . or otherwise objectionable." Section 230(c)(2)(A) (emphasis added). Section 230 is captioned "Protection for 'Good Samaritan' blocking and screening of *offensive* material," which indicates that Congress was focused on potentially offensive materials, not simply materials undesirable to a content provider or user. 47 U.S.C. Section 230(c) (emphasis added); *Song fi, Inc. v. Google, Inc.*, 108 F.Supp.3d 876, 880 (9th Cir. 2015); *see Doe v. GTE Corp.,* 347 F.3d 655, 659–60 (7th Cir. 2003) (interpreting Section 230(c) in light of this caption); *see also Fair Housing Council,* 521 F.3d at 116364 (citing *Doe* and a subsequent Seventh Circuit decision with approval); *see also Sherman v. Yahoo! Inc.,* 997 F.Supp.2d 1129, 1138 (S.D. Cal. 2014) (declining "to broadly

interpret 'otherwise objectionable' material to include any or all information or content.").

A question of fact exists as to whether e-ventures' websites contained "objectionable" content. The United States District Court for the Middle District of Florida has held that "objectionable" content **must**, at a minimum, involve or be similar to pornography, graphic violence, obscenity, or harassment. *Nat'l Numismatic Cert., LLC v. eBay, Inc.*, 2008 WL 2704404, at*25 (M.D. Fla. July 8, 2008). Other federal courts have aligned with the *eBay* court. The Ninth Circuit expressed concern that such an "unbounded" reading of "otherwise objectionable" would enable content providers to "**block content for anticompetitive purposes** or merely at its malicious whim, under the cover of considering such material 'otherwise objectionable.'" *See Zango, Inc. v. Kaspersky Lab, Inc.,* 568 F.3d 1169, 1178 (9th Cir. 2009) (Fisher, J., concurring) (emphasis added). The statutory immunity provided for under the CDA "does not apply without limitation." *Almeida,* 456 F.3d at 1321-22 (citing 47 U.S.C. §230(e)(1)). A jury must decide what is already known – e-ventures' websites did not contain any pornography, graphic violence, obscenity or harassment.

This Court should follow the Middle District of Florida's decision in *eBay, Inc.* There, the plaintiffs sued eBay for reputational harm allegedly inflicted when eBay removed their coin auction times for violations of eBay's Counterfeit Currency and Stamp Policy. *Id.*, 2008 WL 2704404, at*6. Like Google does here, eBay argued immunity based on its public-facing policy of removing "objectionable" material under Section 230(c)(2). *Id.* The *eBay* court called, as the Court should here, defendant's immunity argument "unsound," because the content removed by eBay did not "at a minimum involve or be similar to pornography, graphic violence, obscenity, or harassment." *Id.* at *25. There is not even a shred of evidence of objectionable material on any e-ventures' website. Google would not know that, however, because it did not review content prior to removal.

Likewise, content analysis – something Google did not do – is a prerequisite to immunity under the CDA. The Court in *Sherman* concluded, as this Court should here, that Section 230(c)(2),

the "good Samaritan" immunity, is inapplicable where Yahoo! did not engage in any form of *content analysis* of the subject text to identify material that was offensive or harmful prior to the automatic sending of a notification message. *Sherman*, 997 F. Supp. 2d at 1138. Furthermore, just last year, the Ninth Circuit held that traffic to a website is not a valid basis for Google's immunity under the CDA. In *Song fi,* Google removed a music video entitled "Luv ya" due to an inflated view count allegedly violating Google's terms of service. *Song fi,* 108 F.Supp.3d at 880. Google argued there, as it does here, that something other than content – increased traffic – is "otherwise objectionable" within the meaning of Section 230(c)(2) of the CDA. *Id.* at 882. The Court summarily rejected that argument, analyzing that neither the plain meaning of "otherwise objectionable," nor the context, purpose, or history of the CDA, allows Google to stretch the reach of the CDA to bounds not contemplated by Congress. *Id.*

Google's overreaching here is likewise outside the scope of the CDA. Citing to the United States Supreme Court ruling in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001), the *Song fi* court reasoned, as this Court should here, that when a statute provides a list of examples followed by a catchall term (or "residual clause") like "otherwise objectionable," the preceding list provides a clue as to what the intent of the statute. *Song fi*, 108 F.Supp.3d. at 883. The *Song fi* court stated that given the list of terms preceding "otherwise objectionable," – "obscene, lewd, lascivious, filthy, excessively violent, [and] harassing ..." – it is hard to imagine that the phrase includes, as Google urges, the allegedly artificially inflated view count associated with "Luv ya." *Id.* The Court added that even if it can "see why artificially inflated view counts would be a problem for ... YouTube and its users," the terms preceding "otherwise objectionable" suggest Congress did not intend to immunize YouTube from liability for **removing materials from its website simply**

**because those materials pose a "problem" for YouTube**. *Id.* (emphasis added).[6] In short, YouTube's removal and relocation of "Luv ya" was not the kind of self-regulatory editing and screening that Congress intended to immunize under the CDA. *Id.* at 884.

Similarly, Google's after-the-removal conduct disqualifies summary judgment under the CDA. In *Smith v. Trusted Universal Standards,* 2011 WL 900096 at *3, *8-9 (D.N.J. Mar. 15, 2011), the court denied summary judgment under the CDA where competing evidence questioned defendant's good faith in allegedly blocking blocked e-mail for financial motive, namely to encourage the plaintiff to upgrade his service plan. *Id.* There, the court found, as this Court should here, that a reasonable jury could conclude that defendant acted in bad faith and was not entitled to immunity under the CDA when it failed to respond to the plaintiff's repeated requests for an explanation as to defendant's conduct. *Id.,* 2011 WL 900096 at *9. This Court should continue the favorable reliance on *Smith*, *see* Dkt. 86, at 13, by finding Google's inability to provide, despite e-ventures' repeated requests after removal and in this case, the specific reason each website was removed or any evidence that it reviewed each website before removal.

All in all, the CDA does not give Google blanket immunity. First, e-ventures' legitimate business content was not objectionable under the CDA. e-ventures' websites did not contain pornographic or obscene content. Google Tr. 217:8-12. Google accuses e-ventures of "tricking" the search results but the Court has already held that artificially inflating a view count does not constitute objectionable content within the meaning of Section 230(c)(2). *Song fi*, 108 F.Supp.3d at 882. Second, Mr. Fall's evasive testimony, the investigatory gaps in the manual action tool log and the timing of the removal, which coincided with an uncorroborated external "tip" and the receipt of

---

[6] Courts around the country are in accord. *See also Goddard v. Google, Inc.*, 2008 WL 5245490, at *6 (N.D.Cal. Dec. 17, 2008) (the relevant portions of Google's Content Policy "relat[ing] to business norms of fair play and transparency are ... beyond the scope of § 230(c)(2)"); *eBay, Inc.,* 2008 WL 2704404, at *25 (concluding, based in part on *eiusdem generis,* that Congress did not intend "otherwise objectionable" to refer to auction of potentially counterfeited coins).

e-ventures' customer list, unearths Google's bad faith. That is in addition to Mr. Falls' going rogue by failing to ████████████████████████████████████ ████████████████████." Rafferty Decl., Ex. 19, GOOG_EVTS00000977. Lest, he apparently forgot, as the ███████████████ requires, to ████████████" and ██████████." *Id.*

The evidence establishes that (i) e████████████████████ White Tr. 112:5-11; (ii) ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████ Google Tr. 31:6-8; 38:13, 22; 42:10-13; 42:19-43:3; 101:17-21; 134:22-135:1; and (iii) ██████████████ █████████████████████████████████████ Google Tr. 110:18-21.

Google's explanations are not plausible and lack credibility. Mr. Falls testified that e-ventures' alleged conduct ██████████████████████ ████████████████████ Falls. Tr. 89:7; 83:11; *see also* Falls Tr. 56:4 ████ █████████████████████████████████"). ██████████████████████ ████████████████████████████████. White Tr. 61:19-22 (██████████ █████████████████. Or, even better, an internal discussion about e-ventures' ████ ██████████████████████████ Falls. Tr. 17:4-5. Yet, Mr. Falls did not recall ██████████ ███████████████████████████████████. Google Tr. 88:6-22.; Falls Tr. 91:2-7, 15-17; Google Tr. 141:14-16, 22; White Tr. 61:24-25; 62:1-2. The Court cannot

resolve Mr. Falls' serious credibility issues on summary judgment. *See Jenkins v. Anton*, 2016 WL 7180248, at *2 (M.D. Fla. Dec. 9, 2016) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences [] are jury functions, not those of a judge").

In addition to the lack of internal Google communication corroborating Mr. Falls' self-serving testimony to save his job, he testified █████████ REDACTED █████████ ████████████████████████████. Yet, there is no corroborative documentary evidence – ████████ REDACTED ████████. Nor is it credible that he could have compared the content on 366 websites or ████ REDACTED ████ in the unaccounted ███ REDACTED ███ ██████████ or found tens of thousands of scraped articles or hundreds of doorway domains in that period. Even more so, it calls into question whether Google was aware of the content scraping – at all – *prior* to removing e-ventures' websites from Google's search results. Even if Google could rely (which it cannot) on the inadmissible evidence of e-ventures' reconsideration requests[7] to establish alleged tens of thousands of scraped articles (████ REDACTED ████ ██████████████████████████████[8] it does nothing to prove Google's good faith awareness and reliance on that information *before* removal. Thus, just as the court in *Sherman* held the CDA did not apply where Yahoo! did not engage in any form of *content analysis*, so too should this Court find that Google's inability to present any evidence of content review or offensive content prior to removal does not support a CDA defense.[9]

---

[7] The court may properly refuse to consider any arguments or facts arising from e-ventures' reconsideration requests to Google, or any conduct or statement relating to getting e-ventures' websites back on Google, as remedial measures under Federal Rule of Evidence 407. *See Hughes v. Stryker Corp.,* 423 Fed.Appx. 878, 880–81 (11th Cir. 2011) (finding that the district court properly refused to consider a party's arguments related to a recall letter on a motion for summary judgment because it was inadmissible evidence under Rule 407).

[8] The court may not consider inadmissible hearsay on a motion for summary judgment. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012). As a result, Exhibits 4, 5, 6, 7, 8, 9, 10, 11, 12 and 24 to the Falls Declaration (ECF 138-1), and Exhibit 9 to the Willen Declaration (ECF 138-28), and any discussion thereon in Google's brief, should be stricken.

[9] Google clings onto *e360Insight, LLC v. Comcast Corp.*, 546 F.Supp.2d 605 (N.D. Ill 2008) to support its claim for immunity. But that case is distinguishable from the instant set of facts. There, *e360Insight* found that "a *mistaken choice*

## II.     GOOGLE IS NOT ENTITLED TO FIRST AMENDMENT PROTECTION

Google is not entitled to protection under the First Amendment. To further its arguments in cases like these, Google commissioned a White Paper, which concludes that search engines' immunity is virtually limitless – *see* Eugene Volokh & Donald M. Falk, GOOGLE FIRST AMENDMENT PROTECTION FOR SEARCH ENGINE SEARCH RESULTS, 24 Geo. Mason U. C.R.L.J. 89 (2013). Interestingly, even in the White Paper Google commissioned, the authors note that the First Amendment only protects Google to the extent its decisions are motivated by content (absent here):

> To be sure, it is constitutionally permissible to stop a newspaper from 'forcing advertisers to boycott a competing' media outlet, when the newspaper refuses advertisements from advertisers who deal with the competitor. *Lorain Journal Co. v. United States*, 342 U.S. 143, 152, 155 (1951). But the newspaper in *Lorain Journal Co.* was not excluding advertisements because of their content, in the exercise of some editorial judgment that its own editorial content was better than the proposed advertisements. Rather, it was excluding advertisements solely because the advertisers—whatever the content of their ads—were also advertising on a competing radio station.

Volokh & Falk, *id.* at 22.

As in *Lorain Journal Co.*, Google did not block e-ventures' websites and advertisements because of their content. In fact, Google assures the public that it never removes websites for political, religious, or similar content-based reasons. Google blacklisted e-ventures for punitive, anticompetitive reasons, and removed e-ventures' websites and ads as part of that effort. Google did not even review all of the websites before removing them. Google did not document the violations pursuant to the Spam Documentation Policy, Google continued to run paid ads for some of the same (allegedly harmful) content, and some content remained the same before and after the websites and ads were delisted. In defining "pure spam" as – whatever Google wants to define "spam" as – Google is attempting to write itself a blank check allowing Google to punitively damage any party

---

to block [the plaintiff's emails], if made in good faith, cannot be the basis for liability." *Id.* at 609. No mistake was made, here.

for whatever reason with impunity. But having taken action against e-ventures, not content, Google cannot credibly argue that it was just looking out for "relevance" for the benefit of its users.

Google's First Amendment argument is supported by inapposite case law and fails for the same reasons as the CDA. The decision in *Zhang v. Baidu.com, Inc.*, 10 F.Supp.3d 433 (S.D.N.Y. 2014) is inapplicable because it was based on the pleadings and, unlike in *Baidu*, here: (i) Google's removals were not politically-motivated; (ii) Google's removals were not content-based, they were company-based; (iii) Google's removals were not accomplished through algorithms, but rather by Mr. Falls; and (iv) unlike Baidu.com, Google has monopoly power – when you search something on the Internet, you "Google it". *Id.* Similarly, *Search King v. Google*, 2003 WL 21464568 (W.D. Okla. May 27, 2003) is not relevant because it did not involve paid ads or a discussion of commercial speech, and *Search King* only asserted one claim - intentional interference with contractual relations. *Id.* Lastly, the court should not follow *Langdon v. Google*, 2007 WL 530156 (D.Del. Feb. 20, 2007) because that was a decision on a motion to dismiss. *Id.* Unlike *Langdon*, this case does not concern Google's rejection of objectionable ad content. The content of e-ventures' ads remained the same before and after the Google ban. e-ventures Tr. 169:14-15; Trika Decl. ¶5.

## III.    GOOGLE VIOLATED THE LANHAM ACT AND FDUPTA

Google's false representations amount to unfair competition pursuant to The Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and violate FDUPTA. FDUPTA prohibits a deceptive act or unfair practice, which may be found where there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment. *Advanced Protection Tech., Inc., v. Square D. Co.*, 390 F.Supp.2d 1155, 1165 (M.D.Fla. 2005) (Plaintiff's misrepresenting defendant's conduct of cloning and selling plaintiff's product precluded summary judgment); *Suris v. Gilmore Liquidating, Inc.,* 651 So.2d 1282, 1283 (Fla. 3d DCA 1995).

This Court should follow *Mario Valente Collezioni Ltd v. AAK Limited*, 280 F.Supp.2d 244,

256 (S.D.N.Y. 2003). There, the Court found that the defendant violated Section 1125(a)(1)(A) when it (i) attempted to sell the plaintiff's product; (ii) represented that the plaintiff "had gone out of business or lost the label"; and (iii) damaged plaintiff's relationship with buyers. *Id.* at 255-256.

That is what happened here. Google knew e-ventures' business depended on Google's search results. After removal, **REDACTED**. e-ventures Tr. 156:14-18. Further, Google lied to the public, telling them that e-ventures had violated the Guidelines and, effectively, communicated that e-ventures had gone out of business. What shocks the conscience is that e-ventures' allegedly "spammy" websites were not good enough to be on Google's search results, but they good enough for AdWords. e-ventures Tr. 156:14-18; Google Tr. 174:3-5; 178:22-25; 179:1. And e-ventures' customers noticed. One of e-them stated that it "**REDACTED**." Rafferty Decl., Ex. 17 (P000380).

## IV. GOOGLE TORTIOUSLY INTERFERED WITH E-VENTURES' BUSINESS RELATIONSHIPS

"To determine whether interference is justified or privileged requires a commonsense consideration of whether the conduct was 'sanctioned by the rules of the game' and what is "right and just' under the circumstances." *Bluesky Greenland Envtl. Solutions v. 21st Century Planet Fund,* 2013 U.S. Dist. LEXIS 170898, *27 (S.D. Fla. Dec. 4, 2013). **REDACTED**. Google Tr. 144:18-19, 25; Rafferty Decl., Ex. 10; Falls Tr. 111:22-24; 113:14-15. Indeed, e-ventures' continues to be damaged, and its profits and contractual relationships have been affected adversely. Rafferty Decl., Exs. 13, 16-17; e-ventures Tr. 24:17-21; Trika Decl. ¶¶ 9, 25.

## CONCLUSION

The Court should deny Google's Motion for Summary Judgment.

Dated: December 15, 2016

Respectfully submitted,

By: /s/ Sinead Rafferty

RICHARD S. GORA (admitted *pro hac vice*)
SINEAD A. RAFFERTY (admitted *pro hac vice*)
Gora LLC
9 W. Broad Street, Suite 550
Stamford, CT 06902
Tel.: 203-424-8021
rich@goralaw.com
sinead@goralaw.com

MATHEW WAGONER (admitted *pro hac vice*)
The Wagoner Firm, PLLC
8 Thurlow Terrace
Albany, NY 12203
matt@thewagonerfirm.com

IAN THOMAS HOLMES (Fla. Bar No. 44193)
DAVID FRASER (Fla. Bar No. 91085)
Holmes Kurnik, P.A.
711 5th Ave S., Suite 200
Naples, FL 34102-6628
iholmes@holmeskurnik.com

*Counsel for Plaintiff*
*e-ventures Worldwide, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2016, I electronically filed the foregoing with the

Clerk of the Court using the Court's CM/ECF system.

By: _/s/ Sinead Rafferty___
Sinead Rafferty