UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

e-ventures Worldwide, LLC

          Plaintiff,

v.

Google, Inc.,

          Defendant.

Case No. 2:14-cv-646-FtM-PAM-CM

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment. For the following reasons, the Motion is granted.

**BACKGROUND**

Plaintiff e-ventures Worldwide, LLC, is an online publisher that specializes in search engine optimization, or "SEO," for its clients. "Search engine optimization is the process of causing websites to be ranked and displayed more prominently in search results, without payments being made to the search engine." (May 12, 2016, Order (Docket No. 86) at 2.) Defendant Google's search engine is perhaps the largest in the world. Google's income derives in large part from "AdWords," through which companies pay Google to have their websites ranked highly in search results and displayed prominently on the search results page. (Id.)

Google has promulgated Webmaster Guidelines to govern sites to which Google's searches link. As relevant to this case, Google prohibits search engine manipulation, or

"webspam," in the form of link schemes,[1] doorway pages,[2] and scraped content.[3] Google contends that for years it has found various e-ventures' sites to be in violation of its Guidelines. In August 2014, one of its search quality analysts, Brandon Falls, decided to investigate e-ventures further after determining that one of e-ventures' websites was directing people to a malicious spam network. (Falls Dep. (Docket No. 138-30) at 20, 22; Falls Decl. (Docket No. 138-1) ¶ 40.)

Google alleges that Falls looked at more than 350 websites related to e-ventures. Falls documented the violations he found (Falls Decl. Ex. 16) and concluded that e-ventures was violating the Guidelines in an egregious way. Repeated or egregious violations of the Guidelines are known as "pure spam," and as "pure spam" all of e-ventures' sites were subject to removal. (Falls Decl. Ex. 2.) On September 18, 2014, Google removed all of e-ventures' websites from its search results. Google contacted e-ventures privately and explained what had happened and how e-ventures violated the Guidelines. (Falls Decl. ¶¶ 88-89.)

According to e-ventures, Google's investigation and removal of e-ventures' content was motivated not by concern over webspam, but by Google's concern that e-ventures was cutting into Google's revenues. In support of this theory, e-ventures notes that, in August 2014, Google's initial examination of e-ventures' sites led to Google

---

[1] Link schemes are links that are intended to manipulate a site's ranking in Google's search results. (Falls Decl. ¶ 17.) As Google describes it, it is akin to ballot-stuffing in an attempt to artificially inflate a given site's popularity.

[2] Doorway pages are multiple webpages published by the same operator that contain identical content. (Falls Decl. ¶ 24.)

[3] Scraped content is content copied wholesale from other websites. (Falls Decl. ¶ 22.)

merely demoting some of those sites in its search results. (Falls Dep. at 111, 113.) In September 2014, however, Google received an anonymous e-mail tip that contained a copy of e-ventures' customer list. (Falls Decl. Ex. 15 (Docket No. 138-16).) Almost immediately after receiving the anonymous e-mail, Google reopened its investigation of e-ventures and removed all of e-ventures' websites from Google's search engines. Because of this allegedly anti-competitive motivation, e-ventures contends that all of Google's conduct here is suspect.

But e-ventures' own consultant told e-ventures that its websites were spam and "way out of bounds." (Willen Decl. Ex. 9 (Docket No. 138-37).) And in its attempts to secure re-listing of its sites on Google, e-ventures admitted that its sites were littered with doorway domains and scraped content—e-ventures told Google that its single topseos.com site contained 18,000 scraped articles, 46,000 scraped press releases, and more than 28,000 scraped job listings. (Falls. Decl. ¶ 81, Ex. 22 (Docket No. 138-23).) By mid-November, Google restored 50 of e-ventures' websites that had been removed. (Id. ¶ 83.) e-ventures abandoned nearly 100 of its removed websites, consolidating many of them into a single preexisting domain. (Id. ¶ 86.)

e-ventures raises three claims against Google in its Second Amended Complaint (Docket No. 75): unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); violation of Florida's Deceptive and Unfair Trade Practices Act; and tortious interference with contractual relationships. e-ventures also brought a defamation claim against Google, but that claim was dismissed without prejudice (Docket No. 86) and e-ventures did not amend its complaint to re-state the defamation claim.

**DISCUSSION**

Summary judgment is proper only if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). When opposing a motion for summary judgment, the nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

**A.     Communications Decency Act**

Google first argues that it is protected from liability by the Communications Decency Act, 47 U.S.C. § 230. The CDA, enacted in large part in response to the prevalence of obscene and pornographic materials on websites that children might access, provides for immunity to information providers on the internet. Specifically, the CDA grants immunity from liability for "any action taken in good faith to restrict access to or

4

availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A). In ruling on Google's motion to dismiss, Judge John E. Steele found that the CDA applied to e-ventures' claims but that dismissal was not appropriate because e-ventures had sufficiently pled that Google did not have the requisite good faith for CDA immunity. Google now claims that good faith is not required, and even if it is, the record establishes Google's good faith. e-ventures responds that Google must establish its good faith to be entitled to CDA immunity and that good faith is a question of fact that a jury must resolve.

Google's argument regarding the good-faith requirement stems from the interplay between CDA subsections (c)(1) and (e)(3). Subsection (c)(1) states that "no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Id. § 230(c)(1). Subsection (e)(3), in turn, states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." Id. § 230(e)(3). Thus, according to Google, it is immune from liability under the CDA for any actions it took as a publisher, and deciding what content to block or remove from Google's search engines is a quintessentially a publisher action.

In Barnes v. Yahoo!, Inc., 570 F.3d 1096 (9th Cir. 2009), the Ninth Circuit Court of Appeals explained that "subsection (c)(1) only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another

5

information content provider." Id. at 1100-1101. But this definition of CDA immunity seems to indicate that the "information content provider" in the third element is a different entity or person from either the plaintiff or the "provider" in the first element. As the court stated in Barnes, "what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." Id. at 1102 (emphasis added). The facts in Barnes fit easily into these elements: a woman sought to hold Yahoo liable for its failure to remove offensive content her ex-boyfriend posted. Here, e-ventures seeks to hold Google liable for removing e-ventures' own content, which does not fit within the Barnes court's explanation of (c)(1) immunity. See also Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157, 1170-71 (9th Cir. 2008) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.").

Other courts have found that CDA immunity attaches when the content involved was created by the plaintiff. Thus, Facebook was immunized from liability for its decision to remove content of a group dedicated to religious minorities in India, who claimed discrimination under Title II after Facebook's removal of their content. Sikhs for Justice "SFJ", Inc. v. Facebook, Inc., 144 F. Supp. 2d 1088 (N.D. Cal. 2015). The SFJ court noted that "the reference to 'another information content provider'. . . distinguishes the circumstances in which the interactive computer service itself meets the definition of 'information content provider' with respect to the information in question." Id. at 1093 (quotations omitted).

> In other words, the CDA immunizes an interactive computer service provider that "passively displays content that is created entirely by third parties," but not an interactive computer service provider that acts as an information content provider by creating or developing the content at issue. Roommates.com, 521 F.3d at 1162. Put another way, "third-party content" is used to refer to content created entirely by individuals or entities other than the interactive computer service provider. See id. By contrast, the number of parties in a given litigation is irrelevant to CDA immunity.

Id. at 1094; see also Darnaa, LLC v. Google, Inc., 2016 WL 6540452 (N.D. Cal. Nov. 2, 2016) (plaintiff's tort claim was barred by CDA because it sought "to hold defendants liable for 'an action that is quintessentially that of a publisher,' regardless of defendants' alleged motive.") (quoting Barnes, 570 F.3d at 1003).

But interpreting the CDA this way results in the general immunity in (c)(1) swallowing the more specific immunity in (c)(2). Subsection (c)(2) immunizes only an interactive computer service's "actions taken in good faith." If the publisher's motives are irrelevant and always immunized by (c)(1), then (c)(2) is unnecessary. The Court is unwilling to read the statute in a way that renders the good-faith requirement superfluous.

e-ventures also argues that CDA immunity does not apply in the first instance because the content here is not obscene, lewd, or lascivious. But spam is undoubtedly "harassing" or "objectionable" content for purposes of the CDA. See, e..g., e360Insight, LLC v. Comcast Corp., 546 F. Supp. 2d 605, 607-08 (N.D. Ill. 2008) (finding that CDA imposes subjective requirement as to whether the content is objectionable and noting cases finding spam objectionable under CDA); but see Song fi Inc. v. Google, Inc., 108 F. Supp. 3d 876, 883 (N.D. Cal. 2015) (finding "otherwise objectionable" under CDA

does not extend to content that merely poses a problem for interactive computer service providers).

Under the facts of this case, CDA subsection (c)(1) does not immunize Google's actions here. Subsection (c)(2) may provide that immunity, but that section only immunizes actions taken in good faith, and e-ventures has brought forward enough circumstantial evidence—including the fact that Google's decision to remove all of e-ventures' websites was made the day Google received a list of e-ventures' customers from a "tipster"—to raise a genuine issue of fact as to Google's good faith. Google's Motion on this point is denied.

**B.     First Amendment**

"[T]he First Amendment protects as speech the results produced by an Internet search engine." Zhang v. Baidu.com, Inc., 10 F. Supp. 3d 433, 435 (S.D.N.Y. 2014). A search engine is akin to a publisher, whose judgments about what to publish and what not to publish are absolutely protected by the First Amendment. See Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper . . .—whether fair or unfair—constitute[s] the exercise of editorial control and judgment" that the First Amendment protects.) The presumption that editorial judgments, no matter the motive, are protected expression is too high a bar for e-ventures to overcome.

First, as Google argues, the removal of e-ventures' websites from Google's search engines is not a false statement and is thus protected First Amendment speech. There is no dispute that Google made no public announcement regarding the removal of e-

ventures' websites or the reasons behind the removal.  But even if Google had published a press release that e-venutures' websites were violating Google's guidelines, that publication would be protected because the statement is true.  e-ventures' websites were in violation of Google's Guidelines, and thus the removal of those websites was true speech, if it was speech at all.

But there is a more fundamental reason why the First Amendment bars e-ventures' claims.  Google's actions in formulating rankings for its search engine and in determining whether certain websites are contrary to Google's guidelines and thereby subject to removal are the same as decisions by a newspaper editor regarding which content to publish, which article belongs on the front page, and which article is unworthy of publication.  The First Amendment protects these decisions, whether they are fair or unfair, or motivated by profit or altruism.

**CONCLUSION**

The First Amendment protects Google's actions and precludes all of e-ventures' claims.  Accordingly, **IT IS HEREBY ORDERED that** Defendant's Motion for Summary Judgment (Docket No. 138) is **GRANTED** and this matter is **DISMISSED with prejudice**.

**The Clerk shall enter judgment accordingly, terminate all remaining deadlines as moot, and close the file.**

Dated: *February 8, 2017*                                        *s/ Paul A. Magnuson*
                                                                           Paul A. Magnuson
                                                                          United States District Court Judge